No. 26-4100

IN THE

# United States Court of Appeals for the Tenth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

SPENCER J. COX, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Utah
No. 2:26-cv-151 (Shelby, J.)

## KALSHIEX LLC'S EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

MATTHEW L. LALLI
ANNIKA L. JONES
BRANDON S. FULLER
SNELL & WILMER LLP
15 W. South Temple, Ste. 1200
Salt Lake City, UT 84101

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN ROH SINZDAK
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

August 11, 2026

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 4

I. LEGAL BACKGROUND .......... 4

II. FACTUAL AND PROCEDURAL BACKGROUND .......... 6

LEGAL STANDARD .......... 9

ARGUMENT .......... 10

I. KALSHI IS LIKELY TO PREVAIL ON APPEAL. .......... 10

A. The CFTC's Exclusive Jurisdiction Over Kalshi's Contracts Preempts State Law. .......... 10

B. The District Court Erred In Rejecting Preemption. .......... 15

II. KALSHI WILL SUFFER IRREPARABLE HARM ABSENT RELIEF. .......... 22

III. THE EQUITIES STRONGLY FAVOR AN INJUNCTION. .......... 24

CONCLUSION .......... 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES:** Page(s)

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ........................................2, 14

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................15

*Bishop v. Commodity Exch., Inc.*,
564 F. Supp. 1557 (S.D.N.Y. 1983)........................................17

*BNSF Ry. Co. v. Hiett*,
22 F.4th 1190 (10th Cir. 2022) ........................................1, 11

*Chamber of Com. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010)........................................24

*Chi. Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989)........................................12

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) ........................................4

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)........................................10, 11

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
622 F.2d 216 (6th Cir. 1980) ........................................12

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933)........................................4, 20

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
269 F.3d 1149 (10th Cir. 2001)........................................9

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001)........................................13

*KalshiEX LLC v. CFTC*,
2024 WL 4164694 (D.D.C. Sep. 12, 2024) ........................................6

**TABLE OF AUTHORITIES—Continued**

Page(s)

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 3, 7, 12, 17, 23

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .......... 4, 12

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 6, 13, 17

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) .......... 11

*Monsanto Co. v. Durnell*,
146 S. Ct. 2001 (2026) .......... 11, 14

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 22

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 9

*O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*,
389 F.3d 973 (10th Cir. 2004) .......... 10

*O Centro Espirita Beneficiente Uniao De Vegetal v. Ashcroft*,
314 F.3d 463 (10th Cir. 2002) .......... 9

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) .......... 2

*Ortega v. Grisham*,
148 F.4th 1134 (10th Cir. 2025) .......... 24

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) .......... 21

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) .......... 12

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ........ 11

*Thornton v. Tyson Foods, Inc.*,
28 F.4th 1016 (10th Cir. 2022) ........ 21

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
108 F.4th 144 (3d Cir. 2024) ........ 11

*United States v. Texas*,
144 S. Ct. 797 (2024) ........ 3

**STATUTES:**

7 U.S.C. § 1a(19)(iv) ........ 5

7 U.S.C. § 1a(47)(A) ........ 5

7 U.S.C. § 2(a)(1)(A) ........ 1, 4, 5, 11, 15, 16

7 U.S.C. § 2(f)(1) ........ 19

7 U.S.C. § 6c (1936) ........ 11

7 U.S.C. § 7(d) ........ 6

7 U.S.C. § 7a-2(c)(1) ........ 6

7 U.S.C. § 7a-2(c)(5)(C)(i) ........ 5, 15, 17, 20

7 U.S.C. § 16(e)(1) ........ 18

7 U.S.C. § 16(e)(2) ........ 18

29 U.S.C. § 1144(a) ........ 19

29 U.S.C. § 1144(b)(2)(B) ........ 19

31 U.S.C. § 5362(1)(A) ........ 20

31 U.S.C. § 5362 (1)(E)(ii) ........ 20

## TABLE OF AUTHORITIES—Continued

Page(s)

49 U.S.C. § 41713(b)(1) .......... 19

49 U.S.C. § 41713(b)(4) .......... 19

Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, App. E, § 2(e), 114 Stat. 2763A-365, 2763A-378 .......... 18

Utah Code § 76-9-1404(2)-(3) .......... 22

Utah Code § 76-9-1405(2)-(3) .......... 22

**REGULATIONS & RULES:**

17 C.F.R. § 38.4(b) .......... 6

17 C.F.R. § 38.5(b) .......... 6

17 C.F.R. § 38.151(b) .......... 6, 14, 21, 23

17 C.F.R. § 38.251(a) .......... 6

17 C.F.R. § 40.2(a) .......... 6

17 C.F.R. § 40.11(c) .......... 6

17 C.F.R. § 40.11(c)(2) .......... 6

10th Cir. R. 8.1 .......... 9

Christopher J. Kirkpatrick, CFTC, Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents (July 14, 2026), https://perma.cc/82PB-J6QM .......... 23

*Concept Release*, 73 Fed. Reg. 25,669, 25,673 (May 7, 2008) .......... 12

Fed. R. App. P. 8(a) .......... 9

Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) .......... 8, 13, 15

## TABLE OF AUTHORITIES—Continued

Page(s)

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30,464 (1974) ....................................................................12

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.)............................... 1, 4, 13, 16, 17

H.R. Rep. No. 106-711, pt. 2 (2000)..........................................................19

*Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. (1974)......................................................................................................13

**OTHER AUTHORITIES:**

Alixel Cabrera, *Kalshi is Subject to Utah's Anti-Gambling Law, Judge Rules*, Utah News Dispatch (Aug. 4, 2026), https://perma.cc/6FWH-3G7J ................................................................ 9

CFTC Br., *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 .......3, 7, 13, 14, 22, 23

Intervenor Compl., *KalshiEX LLC v. Furcolo*, No. 26-cv-327 (D.R.I. May 28, 2026), Dkt. No. 37.................................. 7

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) .......................................................12

*Mandatory KYC and Surveillance*, Kalshi, https://perma.cc/VL8Y-8GAH (last visited August 11, 2026)............... 25

*Responsible Trading*, Kalshi, https://perma.cc/9ZNA-CGVG (last visited August 11, 2026)............................................................... 25

## INTRODUCTION

Defendants have threatened to prosecute KalshiEX LLC ("Kalshi") under Utah law for offering contracts subject to the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). Although Defendants' efforts are preempted under the plain text of the Commodity Exchange Act ("CEA"), the district court granted summary judgment against Kalshi and denied preliminary relief, splitting from the only court of appeals to resolve the question and from the CFTC's own position. Kalshi thus faces an imminent risk of civil or *even criminal* enforcement under preempted state laws.

Kalshi is a CFTC-licensed and regulated exchange, known as a designated contract market ("DCM"). Federal law accordingly preempts state regulation of trading on Kalshi, as confirmed by every marker of legislative intent. The CEA's text grants the CFTC "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A). Congress deleted the CEA provision that previously preserved concurrent state jurisdiction, noting its intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And this Court has held that a statutory grant of "exclusive jurisdiction" preempts state law "by its plain language." *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1194 (10th Cir. 2022).

Federal law therefore bars states from regulating Kalshi's contracts under straightforward preemption principles. If Utah could enforce its gambling laws against Kalshi, so could 49 other states, subjecting Kalshi to a patchwork of contradictory regulation that would interfere with the CFTC's uniform oversight and undermine Kalshi's federal obligations, resulting in "total chaos." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (citation omitted).

Nonetheless, to avoid what it viewed as undesirable consequences of preemption, the district court allowed Utah to ban Kalshi's contracts. It reached the extraordinary conclusion that the CEA's grant of exclusive jurisdiction to the CFTC does not preempt state law and therefore allows states to criminally prosecute the offering of contracts traded on DCMs. Its decision rests on "purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). And it gets Congress's intent flat wrong. For as long as derivatives trading has existed, states have sought to ban it as a form of gambling. Congress was aware of these efforts and answered them by drawing a clear line: States may regulate off-exchange trading, but the CFTC alone may regulate on-DCM trading.

The decision below breaks from the only merits decision from any court of appeals resolving these issues. *See KalshiEX LLC v. Flaherty*, 172 F.4th 220, 224 (3d Cir. 2026). It is also inconsistent with the CFTC's position that "[s]tates cannot invade the CFTC's exclusive jurisdiction" "by re-characterizing swaps trading on DCMs as illegal gambling," which would present "a fundamental threat to Congress's statutory design." CFTC Br. 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Br."). The CFTC's position, which the district court ignored, itself warrants relief.

Kalshi will face irreparable harm absent relief. If Kalshi declines to comply with Utah's preempted laws, it risks criminal prosecution. If it complies, it will violate its federal obligations and incur substantial financial harms that it could not recoup if it ultimately prevails on appeal. Defendants, by contrast, suffer no harm from complying with the Supremacy Clause.

Kalshi therefore respectfully requests that the Court grant an injunction pending appeal. Defendants have declined to withhold enforcement against Kalshi, and Kalshi therefore seeks emergency relief. If more time is needed to consider this motion, Kalshi respectfully requests administrative relief while this motion is pending. *See United States v. Texas*, 144 S. Ct. 797, 798-99 (2024) (Barrett, J., concurring).

# BACKGROUND

## I. LEGAL BACKGROUND

Before Congress regulated derivatives, many states prohibited futures trading as "gambling." *E.g.*, *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). Congress began regulating derivatives trading with the Grain Futures Act of 1922. In 1936, Congress passed the CEA, extending the regulatory framework for grain futures to other commodities. But these early statutes did not preempt state law. States therefore remained free to regulate derivatives transactions, including by prohibiting "gambling in grain futures." *See Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

That changed in 1974, when Congress passed sweeping amendments to the CEA. Congress created the CFTC and granted it "exclusive jurisdiction" over on-DCM trading, thus "supersed[ing]" state laws. 7 U.S.C. § 2(a)(1)(A). Congress's purpose was to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35. Courts immediately recognized the amendments' preemptive effect. *E.g.*, *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980).

The 1974 amendments did not preempt *all* state derivatives regulation. Section 2(a) made clear that, beyond the CFTC's "exclusive jurisdiction" over

DCMs, the CEA did not "supersede or limit the jurisdiction" of "regulatory authorities under the laws ... of any State." 7 U.S.C. § 2(a)(1)(A).

The CFTC now has exclusive jurisdiction over "accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on" DCMs. 7 U.S.C. § 2(a)(1)(A). The CEA broadly defines "swap" to include a contract tied to "the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," an agreement that "is" or "becomes[ ] commonly known to the trade as a swap," or any combination thereof. *Id.* § 1a(47)(A).

This appeal concerns event contracts, a type of derivative under the CFTC's exclusive jurisdiction. The CEA refers to event contracts as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon [an] occurrence." 7 U.S.C. § 7a-2(c)(5)(C)(i); *see id.* § 1a(19)(iv) (defining "excluded commodity" to include certain "occurrence[s]"). In 2010, Congress enacted a "Special [R]ule" allowing the CFTC to review and prohibit event contracts within six categories—including contracts involving "gaming" or "activity that is unlawful under any Federal or State law"—if the CFTC concludes the contracts are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i). Absent an adverse public-interest determination, however, DCMs may list such contracts for trading.

The CEA sets out a "comprehensive regulatory structure" for entities seeking to offer derivatives. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). Derivatives exchanges must become DCMs and comply with 23 "core principles" identified in the CEA and CFTC regulations. 7 U.S.C. § 7(d); 17 C.F.R. § 38.5(b). Among many requirements, DCMs must offer "impartial access" to their platforms, 17 C.F.R. § 38.151(b), and monitor for "manipulation," *id.* § 38.251(a).

The CEA also prescribes a detailed regulatory system under which DCMs may list new contracts by self-certifying compliance with applicable requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 38.4(b), 40.2(a). If the CFTC concludes an event contract may fall within an enumerated category in the Special Rule, it may subject the contract to a 90-day public-interest review. 17 C.F.R. § 40.11(c). Following review, the CFTC "shall issue an order approving or disapproving" the contract. *Id.* § 40.11(c)(2).

## II. Factual and Procedural Background

In 2020, the CFTC certified Kalshi as a DCM. *See KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Kalshi offers event contracts related to climate, health, popular culture, economics, and more.

In January 2025, Kalshi began offering contracts on sports events. Multiple states responded by threatening to enforce state gambling laws

against Kalshi, prompting litigation across the country regarding whether the CEA preempts these efforts. Federal district courts have split, but the only court of appeals to resolve the question concluded that the CEA's plain text "preempts otherwise applicable state laws that purport to regulate sports-related event contracts on CFTC-licensed DCMs." *Flaherty*, 172 F.4th at 228.

The CFTC agrees. It has explained that "[s]tates cannot invade the CFTC's exclusive jurisdiction … by re-characterizing swaps trading on DCMs as illegal gambling"; that allowing states to regulate event contracts "is inconsistent with the text, structure, and history of the CEA"; and that the states' theory presents "a fundamental threat to Congress's statutory design" that would create "a seismic shift in the longstanding status quo between CFTC and state authority." CFTC Br. 2. The CFTC has since sued numerous states to enjoin unlawful enforcement actions against DCMs like Kalshi.[1]

---

[1] *United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz.); *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn.); *United States v. Illinois*, No. 1:26-cv-3659 (N.D. Ill.); *United States v. Kentucky*, No. 3:26-cv-49 (E.D. Ky.); *United States v. Minnesota*, No. 0:26-cv-2661 (D. Minn.); *United States v. New Mexico*, No. 1:26-cv-1912 (D.N.M.); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y.); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis.); Intervenor Compl., *KalshiEX LLC v. Furcolo*, No. 26-cv-327 (D.R.I. May 28, 2026), Dkt. No. 37.

The CFTC has also published a Notice of Proposed Rulemaking ("NPRM") concerning event contracts. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026). The NPRM recognizes that the CEA "expressly preempts state laws"; confirms that sports-event contracts are derivatives under CFTC jurisdiction; and concludes that many (but not all) sports-event contracts "can be operated consistent with the public interest." *Id.* at 35,808, 35,813-15, 35,836.

In February 2026, more than a year after Kalshi began offering sports-event contracts, Utah Governor Spencer Cox announced that he would use "every resource" available to "beat" Kalshi in court. Mem. Decision & Order at 8, Dkt. No. 65 ("Op."). To protect against imminent enforcement of state gambling laws, Kalshi filed this suit. Op.8.

The district court denied Kalshi a preliminary injunction and granted Defendants summary judgment. Op.24-25. The court concluded that, notwithstanding the CEA's grant of exclusive jurisdiction to the CFTC, the CEA nonetheless permits states to regulate trading on DCMs. Op.13-15, 24.

Kalshi appealed. But nothing prevents Defendants from enforcing Utah's gambling laws against Kalshi pending appeal. The Attorney General

has promised to enforce Utah's gambling laws,[2] and Defendants have refused Kalshi's request to forbear during the appeal. Kalshi moved in the district court for an injunction pending appeal on August 6, 2026, and requested relief by August 10. The district court has not yet ruled on Kalshi's motion. Kalshi thus seeks relief from this Court to prevent imminent civil or criminal enforcement while the appeal proceeds.

## LEGAL STANDARD

The Court may grant an injunction pending appeal to prevent irreparable harm. *See* Fed. R. App. P. 8(a); 10th Cir. R. 8.1. The factors are as follows: likelihood of success on the merits, irreparable harm absent relief, whether the injunction will substantially injure other interested parties, and the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *O Centro Espirita Beneficiente Uniao De Vegetal v. Ashcroft*, 314 F.3d 463, 466 (10th Cir. 2002). The first two factors are "the most critical." *Nken*, 556 U.S. at 434. Kalshi's requested relief is prohibitory because it merely preserves the "last uncontested status between the parties which preceded the controversy," i.e., Kalshi operating its exchange nationwide. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th

[2] *See* Alixel Cabrera, *Kalshi is Subject to Utah's Anti-Gambling Law, Judge Rules*, Utah News Dispatch (Aug. 4, 2026), https://perma.cc/6FWH-3G7J.

Cir. 2001). Accordingly, this Court need not subject this motion to heightened scrutiny. *See O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).

## ARGUMENT

This case cries out for relief pending appeal. The decision below does not merely present a substantial question; it privileges extratextual policy considerations over the statutory text, gets the CEA's preemption structure backwards, breaks from the Third Circuit, and ignores the CFTC's emphatic confirmation of its exclusive jurisdiction. Without relief, Kalshi will suffer irreparable harm from being forced to choose between criminal liability under preempted state law and violation of its federal obligations.

### I. KALSHI IS LIKELY TO PREVAIL ON APPEAL.

#### A. The CFTC's Exclusive Jurisdiction Over Kalshi's Contracts Preempts State Law.

The Supremacy Clause sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Congress can preempt state law expressly in a statute; it can preempt an entire field of regulation; and it can preempt state law where compliance with both federal and state law is "impossible" or where state law stands as an "obstacle" to Congress's objectives. *Id.* at 372-73. These categories are not "rigidly

distinct." *Id.* at 372 n.6 (citation omitted). The CEA preempts state regulation of trading on DCMs in each of these respects.

Express preemption: The CEA's plain text gives the CFTC "exclusive jurisdiction" over transactions on DCMs. 7 U.S.C. § 2(a)(1)(A). The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). For decades, the Supreme Court has held that a statute granting "exclusive" "jurisdiction" to a federal regulator preempts state law. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 233-34 (1947) (citation modified); *accord Monsanto Co. v. Durnell*, 146 S. Ct. 2001, 2008 (2026) (state law preempted where Congress gave agency "comprehensive and exclusive authority"). This Court has also held that a statutory grant of "exclusive jurisdiction" preempts state law "by its plain language." *BNSF*, 22 F.4th at 1194; *accord Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024) ("statutory conferral of exclusive jurisdiction ... is a form of express preemption").

Other features of the CEA's text confirm that the exclusive-jurisdiction provision preempts state laws as to trading on DCMs. For example, when Congress considered the 1974 amendments, a provision of the CEA preserved any State law "applicable to any transaction" regulated by the CEA. 7 U.S.C. § 6c (1936). Senate drafters "deleted" this clause "to assure that

Federal preemption is complete." 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis).

Courts immediately recognized that "the CEA preempts the application of state law." *Leist*, 638 F.2d at 322; *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980) (CFTC's exclusive jurisdiction "ensure[d] that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation"); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (state-law "commercial gambling" claim barred because the CEA "preempts all state laws inconsistent with its provisions"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive"). As the Third Circuit recently held, the CEA's "text … preempts otherwise applicable state laws that purport to regulate sports-related event contracts on CFTC-licensed DCMs." *Flaherty*, 172 F.4th at 228.

The CFTC agrees—and always has. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 694-95 (1982). It explained in 2008 that "the CEA supersedes and preempts" state "gaming" laws "with respect to transactions executed on" DCMs. *Concept Release*, 73 Fed. Reg. 25,669, 25,673 (May 7, 2008). Its recent NPRM confirms that

subjecting event contracts "to a patchwork of 50 state regulations is precisely what Congress sought to avoid with the CEA." 91 Fed. Reg. at 35,808. "States cannot invade the CFTC's exclusive jurisdiction over" DCMs "by re-characterizing swaps trading on DCMs as illegal gambling," and a contrary conclusion would represent "a seismic shift in the longstanding status quo between CFTC and state authority." CFTC Br. 2.

<u>Field preemption</u>: The CEA's express text resolves this case, but every other indicator of congressional intent confirms preemption. The CEA is "a comprehensive regulatory structure" to oversee the "futures trading complex." *Curran*, 456 U.S. at 356 (citation omitted). That scheme leaves no room for parallel state regulation of trading on DCMs. The 1974 CEA amendments sought to "avoid unnecessary, overlapping and duplicative regulation" of DCMs. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001) (citation omitted). Congress sought to bring "the futures markets" "under Federal regulation" because "different State laws would just lead to total chaos." *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 249, 685 (1974) (statements of Sen. Clark) [hereinafter "*Senate Hearings*"]. And the conference report emphasized Congress's intent to "preempt the field." H.R. Rep. No. 93-1383, at 35.

Conflict preemption: Conflict-preemption principles also bar state regulation in at least three respects.

*First*, Utah's threatened enforcement would require Kalshi to block Utah users from trading on a nationwide DCM, unwind open positions, or both. Kalshi cannot run a national exchange while complying with a state-by-state patchwork of local bans. As the CFTC has confirmed, compliance with such restrictions is an "impossibility" for DCMs, which are "required by federal law to provide 'impartial access' to all eligible participants nationwide," and "cannot fulfill [that] federal mandate" if subject to state-by-state regulation. CFTC Br. 26-27 (quoting 17 C.F.R. § 38.151(b)(1)). Utah's contrary view would leave the CFTC's impartial-access rule with a state-law exception nowhere found in the regulation's text.

*Second*, "[a]pplying state-by-state local requirements to national commodity exchanges would" pose an "obstacle" to the CEA by creating "the very 'patchwork' " Congress sought to prevent. CFTC Br. 27; *see Monsanto*, 146 S. Ct. at 2010 (state law preempted where Congress's goal of "[u]niformity" "would otherwise be impossible to achieve" (citation modified)); *Am. Agric.*, 977 F.2d at 1156-57 (state law "is preempted" where it "would directly affect trading on" a DCM).

*Third*, letting Utah ban Kalshi's contracts would conflict with the "method" Congress prescribed to regulate event contracts. *Arizona v. United States*, 567 U.S. 387, 406 (2012). The Special Rule provides that the CFTC *alone* "may" prohibit contracts involving "gaming" if it determines they are contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i). Exercising that authority, the CFTC has made clear that many sports-event contracts "can be operated consistent with the public interest," 91 Fed. Reg. at 35,836, while proposing to prohibit sports-event contracts "present[ing] a particular risk of manipulation or market disruption," *id.* at 35,829. Letting states override the CFTC's determination creates an obvious conflict.

**B. The District Court Erred In Rejecting Preemption.**

Notwithstanding the overwhelming evidence of preemption, the district court concluded that the CEA does not preempt state law as to transactions subject to the CFTC's exclusive jurisdiction. That conclusion is irreconcilable with the statutory text and upsets a half century of precedent confirming that the CEA preempts state law. The district court's contrary ruling rests on multiple clear errors that call for relief pending appeal.

*First*, the district court's express preemption analysis was severely flawed. The court acknowledged that Section 2(a)(1)(A) gives the CFTC "exclusive jurisdiction" over swaps traded on DCMs, Op.13, but held that

Utah could still enforce state laws because other provisions of the CEA leave room for state regulation, Op.13-15. That reasoning ignores the text's plain meaning. If Kalshi's contracts are DCM-traded swaps, and if Congress gave the CFTC "exclusive jurisdiction" over DCM-traded swaps, then states have no jurisdiction to regulate those contracts. None of the provisions the district court cited are to the contrary.

The district court relied on Section 2(a)'s two savings clauses, but both support Kalshi. The first provides that "*[e]xcept as hereinabove provided*" by the grant of "exclusive jurisdiction" to the CFTC, Section 2 does not "supersede" or "limit" the jurisdiction of "other regulatory authorities" under the laws "of any State." 7 U.S.C. § 2(a)(1)(A) (emphasis added). By specifying that Section 2 does not "supersede" state law *except as provided* by the CEA's grant of exclusive jurisdiction, this clause means that the grant *does* "supersede" states from regulating on-DCM transactions. Indeed, Congress added the italicized proviso specifically to "clarify[]" that "where applicable," the CFTC's jurisdiction "supersedes State as well as Federal agencies." H.R. Rep. No. 93-1383, at 35. The district court did not acknowledge the proviso.

The second savings clause provides that the CEA does not "supersede or limit the jurisdiction conferred on courts of the United States or any State." Op.13 (citation omitted). The district court misread that provision to

say that Section 2(a) does not "limit the jurisdiction … [of] any State," as opposed to the *courts* of any State. Op.24 n.152. But that language refers to state *court* jurisdiction to adjudicate disputes, not state *regulatory* jurisdiction, which is addressed by the prior provision that "regulatory authorities" acting under the laws "of any State" *are* superseded by the CFTC's exclusive jurisdiction. *See Flaherty*, 172 F.4th at 237. Precedent confirms that these clauses "deprive state 'regulatory authorities' but not state courts of jurisdiction relating to commodities." *Bishop v. Commodity Exch., Inc.*, 564 F. Supp. 1557, 1563 (S.D.N.Y. 1983); *see Curran*, 456 U.S. at 386-87 (second clause was added because without it the CEA could "prohibit all court actions" including commercial-law claims arising from derivatives). The clause is fully consistent with Congress's intent to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35.

The district court cited the Special Rule for the proposition that the CEA allows state regulation to "operate in tandem with the CEA." Op.13. But this misreads the Special Rule, which grants the *CFTC*—not 50 states—discretion to prohibit event contracts that "involve" "gaming" or "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i).

The district court pointed to the preemption provision in Section 16(e) and maintained "Congress' intended scope of preemption" is limited to that

provision. Op.14. That reading is backwards. Section 16(e)(1) provides that "[n]othing" in the CEA "shall supersede or preempt" state law for transactions that are "not conducted on or subject to the rules of a registered entity" such as a DCM. 7 U.S.C. § 16(e)(1). The only coherent inference of this provision is that the CEA *does* preempt state law for transactions that *are* conducted on DCMs. Section 16(e)(2) then creates targeted exceptions to the general rule that off-DCM transactions are not subject to preemption. 7 U.S.C. § 16(e)(2). But each of these exceptions involves transactions that *do not occur on DCMs*, and therefore are not covered by the CEA's exclusive jurisdiction provision.

One exception—described in Subparagraph (A)—provides that the CEA "shall supersede and preempt" state law for transactions on "an electronic trading facility excluded under section 2(e)." *Id.* § 16(e)(2)(A). "Excluded" swaps did not need to be traded on DCMs. Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, App. E, § 2(e), 114 Stat. 2763A-365, 2763A-378. That is why a separate preemption provision was necessary. And because Congress repealed that version of Section 2(e) in 2010, the current Section 2(e), which the district court cited, Op.14, is not the provision Section 16(e)(2)(A) cross-references. Another exception—described in Subparagraph (B)—provides that the CEA "shall supersede and

preempt" state law for transactions excluded or exempted under Sections 2(c), 2(f), 27 to 27f, or 6(c)—categories such as foreign currency, government securities, mortgages, banking products, hybrid instruments, and public-interest exemptions. Again, these transactions are not traded on DCMs, which is why a separate preemption provision was required. *See, e.g.*, 7 U.S.C. § 2(f)(1) ("Nothing in this chapter (other than section 16(e)(2)(B) of this title) governs or is applicable to a hybrid instrument that is predominantly a security."). Thus, when Congress added Section 16(e)(2) to the CEA in 2000, it recognized that the then-"current" CEA already "supersede[d] and preempt[ed]" state laws "in the case of transactions conducted *on* a registered entity" such as a DCM, and that the new provision further provided that the CEA likewise "supersedes and preempts State gaming and bucket shop laws" as to certain off-DCM transactions. H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (emphasis added).

The CEA's structure is common: Congress often pairs a broad preemption rule with narrower preemption provisions addressing different subjects, and the narrow provisions do not shrink the broad one. ERISA and the Airline Deregulation Act do exactly that. *See* 29 U.S.C. §§ 1144(a), 1144(b)(2)(B); 49 U.S.C. §§ 41713(b)(1), 41713(b)(4). By contrast, treating Section 16(e)(2) as the exclusive source of preemption would mean that

Congress protected peripheral off-exchange products from state gaming laws while leaving the CEA's core focus—trading on CFTC-regulated DCMs—exposed to state regulatory schemes. That is not a plausible interpretation of a statute that gives the CFTC "exclusive jurisdiction" over DCM trading.

*Second*, the district court overlooked overwhelming evidence that Congress intended derivatives to be subject to CFTC regulation rather than state gambling laws. The Special Rule's reference to "[e]vent contracts" involving "gaming" is textual proof Congress understood that sports event contracts would fall under the CFTC's jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). The Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA") underscores the point. UIGEA, an internet gambling statute, acknowledges that a "bet or wager" can pertain to "a sporting event," 31 U.S.C. § 5362(1)(A), but specifically provides that "any transaction conducted on" a DCM is *not* a "bet or wager." *Id.* § 5362(1)(E)(ii).

If the district court were correct, nothing would stop states from prohibiting *all event contracts* or *all futures trading* as gambling—as states did a century ago. *Dickson*, 288 U.S. at 198. That is the theory that Utah unabashedly espoused in the proceedings below—that the system of concurrent federal and state regulation flowing out of the 1936 passage of the CEA was left unchanged by the seminal 1974 amendments. By adopting that

premise, the district court disregarded the plain statutory text, the legislative history leading to its passage, and unanimous court of appeals precedent concluding that Section 2(a)(1)(A) preempted state law as applied to DCMs.

*Third,* the district court erred in applying a presumption against preemption. Op.11-12, 16. As the court acknowledged (Op.16), the presumption does not apply where, as here, a statute "contains an express pre-emption clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified); *see also Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1023-25 (10th Cir. 2022) (same). Nor does Utah's invocation of gambling policy justify diluting Congress's express text. While the district court applied the presumption due to Utah's interest in regulating gambling, the question in this appeal is not whether Utah may regulate gambling generally, but whether Utah may regulate trading on DCMs. The district court's analysis inverted the inquiry by allowing a general presumption to override the CEA's specific textual allocation of authority.

*Finally*, the court erred in rejecting conflict preemption. It maintained that the impartial-access requirement concerns only financial discrimination and does not prevent state-specific geographic exclusions. Op.20-22. But the text of 17 C.F.R. § 38.151(b)(1) is not limited to financial discrimination, and the CFTC has said that compliance with state laws like Utah's is an

"impossibility" because a DCM "cannot fulfill its federal mandate" under state-by-state restrictions. CFTC Br. 26-27. The court's contrary reasoning would mean that DCMs *must offer up to 50 different markets for the same contracts*, a "seismic shift." *Id.* at 2. Recent events confirm the conflict is real: when a state court ordered Kalshi to unwind certain trades in Michigan, the CFTC directed Kalshi not to cancel those trades because cancellation would conflict with the CEA's regulatory scheme.[3]

## II. KALSHI WILL SUFFER IRREPARABLE HARM ABSENT RELIEF.

Kalshi faces irreparable harm along several dimensions.

*First*, absent an injunction pending appeal, Kalshi faces a "Hobson's choice" of "violat[ing]" state law or "suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Utah makes intentionally offering online gambling a third-degree felony, and it subjects entities that aid gambling for economic benefit to a Class A misdemeanor (subject to enhancement). Utah Code §§ 76-9-1404(2)-(3), 76-9-1405(2)-(3). Defendants should not be permitted to inflict such injury on Kalshi

[3] The district court also reasoned that Utah law does not frustrate the CEA because the CEA "explicitly provides for State jurisdiction," citing Section 2(a)(1)(A)'s provision reserving jurisdiction of state *courts*, not *regulators*. Op.24. The court repeated the same error described above. *See supra* at 16-17.

under Utah's laws while this Court considers whether those very same laws are preempted. If Utah were to secure a judgment in state court, that could raise nettlesome jurisdictional complications if Kalshi later prevails before this Court, further underscoring the need to maintain the status quo.

*Second*, shutting down access in Utah and unwinding users' positions would do the same, impairing user access and risking harm to Kalshi's federal license. As the CFTC has emphasized, blocking users from certain states would prevent a DCM from "fulfill[ing] its federal mandate." CFTC Br. 26-27; *see* 17 C.F.R. § 38.151(b) (requiring DCMs to offer "impartial access"). As noted, when Kalshi was ordered by a state court to unwind certain trades in Michigan, the CFTC ordered Kalshi "to fulfill the trades in question in accordance with its normal practices." Christopher J. Kirkpatrick, CFTC, Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents (July 14, 2026), https://perma.cc/82PB-J6QM. Without an injunction, Defendants could put Kalshi in the same untenable position of choosing between compliance with a state court order and a contrary order from Kalshi's federal regulator.

*Third*, compliance with Utah's demands would subject Kalshi to "economic and reputational harm, including loss of business and goodwill," *Flaherty*, 172 F.4th at 231, as well as unrecoverable compliance costs, and

losses from unwinding open positions. Blocking Utah users and unwinding trades would cause an immediate loss of business for Kalshi. And those users may not immediately (or ever) return to Kalshi even if Kalshi prevails on appeal. The Eleventh Amendment precludes monetary recovery from the state, and economic injury is irreparable where the plaintiff cannot recover the losses if it ultimately prevails. *Chamber of Com. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010).

## III. THE EQUITIES STRONGLY FAVOR AN INJUNCTION.

The harms Kalshi will suffer absent relief outweigh any harms Defendants or the public would suffer if relief is granted. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Ortega v. Grisham*, 148 F.4th 1134, 1154 n.13 (10th Cir. 2025) (citation omitted), and Utah has no cognizable interest in enforcing a preempted statute, *Edmondson*, 594 F.3d at 771.

Utah's asserted interest in enforcing its laws cannot outweigh the public interest in preventing enforcement of preempted law while this Court considers Kalshi's appeal. An injunction would preserve the last uncontested status between the parties: Kalshi operating nationwide without state enforcement. Utah waited more than a year after Kalshi began offering sports-event contracts before threatening enforcement, reinforcing the

absence of harm from a short delay pending appeal. And Utah retains undiminished authority to regulate casinos and sportsbooks, just not federally authorized transactions on a DCM.

Kalshi, moreover, is subject to rigorous regulations and oversight by the CFTC. Kalshi also employs Know-Your-Customer procedures and lets users self-exclude from trading, take trading breaks, and set personal funding caps limiting deposits to Kalshi.[4] Defendants have proffered no evidence that Kalshi users in Utah have suffered harm from trading on Kalshi. The question is not whether Kalshi should be regulated, but rather by whom. Congress's clear answer is the CFTC.

## CONCLUSION

The Court should grant an injunction pending appeal and, if necessary, emergency administrative relief to maintain the status quo while this motion is pending.

[4] *Mandatory KYC and Surveillance*, Kalshi, https://perma.cc/VL8Y-8GAH (last visited August 11, 2026); *Responsible Trading*, Kalshi, https://perma.cc/9ZNA-CGVG (last visited August 11, 2026).

Date: August 11, 2026

Respectfully submitted,

/s/ William E. Havemann

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

MATTHEW L. LALLI
ANNIKA L. JONES
BRANDON S. FULLER
SNELL & WILMER LLP
15 W. South Temple, Ste. 1200
Salt Lake City, UT 84101

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN ROH SINZDAK
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com
whavemann@milbank.com

*Counsel for Plaintiff-Appellant KalshiEX LLC*

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,194 words, excluding the parts of the motion exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia font 14-point.

Date: August 11, 2026

*/s/ William E. Havemann*
William E. Havemann

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 11, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system.

Date: August 11, 2026

*/s/ William E. Havemann*
William E. Havemann