**No. 26-4100**

# United States Court of Appeals for the Tenth Circuit

KalshiEX LLC,

*Plaintiff-Appellant*,

v.

Spencer J. Cox, Governor of Utah, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Utah, No. 2:26-cv-00151-RJS-CMR
Honorable Robert J. Shelby

**Defendants-Appellees' Opposition to Plaintiff-Appellant Kalshi's Motion for Injunction Pending Appeal**

Derek Brown
Utah Attorney General
Stanford E. Purser
Utah Solicitor General
Mark C. Gillespie
Utah Assistant Solicitor General

Joshua B. Cutler
Utah Assistant Solicitor General
Utah Attorney General's Office
160 E. 300 S., 5th Floor
P.O. Box 140858
Salt Lake City, UT 84114-0858
(801) 366-0533

*Counsel for Defendants-Appellees*

# Table of Contents


Introduction ........ 1

Background ........ 3

A. Legal Context ........ 3

B. Factual and Procedural Background ........ 5

Legal Standard ........ 6

Argument ........ 7

I. Kalshi's premature motion is procedurally deficient. ........ 7

II. Kalshi is not likely to prevail on the merits of its preemption claim ........ 8

A. Express preemption ........ 8

1. Statutory Text ........ 9

2. Precedent ........ 12

3. Other interpretive tools ........ 15

B. Field preemption ........ 17

C. Conflict preemption ........ 20

III. Kalshi will not suffer irreparable harm in the absence of an injunction ........ 22

IV. The public interest and balance of the equities heavily favor the State. ........ 26

Conclusion ........ 28

## Table of Authorities

### Cases

*Aid for Women v. Foulston*,
441 F.3d 1101 (10th Cir. 2006) .......... 26

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 17

*Baker v. Adams Cnty./Ohio Valley Sch. Bd.*,
310 F.3d 927 (6th Cir. 2002) .......... 7

*BNSF Ry. Co. v. Hiett*,
22 F.4th 1190 (10th Cir. 2022) .......... 13

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) .......... 8

*Chem. Weapons Working Grp. v. Dep't of the Army*,
101 F.3d 1360 (10th Cir. 1996) .......... 7, 23

*Coinbase Fin. Markets, Inc. v. Nessel*,
2026 WL 2295184 (E.D. Mich. Aug. 7, 2026) .......... 14

*Denver Homeless Out Loud v. Denver*,
32 F.4th 1259 (10th Cir. 2022) .......... 7, 26

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) .......... 4, 18

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 24

*First W. Cap. Mgmt. Co. v. Malamed*,
874 F.3d 1136 (10th Cir. 2017) .......... 6, 22

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987) .......... 18

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) .......... 13

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) .......... 19

*Hobby Lobby Stores, Inc. v. Sebelius*,
568 U.S. 1401 (2012) .......... 23

*Ho-Chunk Nation, v. Kalshi Inc.*,
2026 WL 1284077 (W.D. Wis. May 11, 2026) .......... 17

*Holladay v. CME Grp.*,
2012 WL 5845621 (N.D. Ill. Nov. 16, 2012) .......... 13

*Huron Portland Cement Co. v. City of Detroit*,
362 U.S. 440 (1960) .......... 18

*International Trading, Ltd. v. Bell*,
556 S.W.2d 420 (Ark. 1977) .......... 13

*KalshiEX LLC v. Cafferelli*,
2026 WL 2294589 (D. Conn. Aug. 10, 2026) .......... 14

*KalshiEX LLC v. Flaherty*,
2025 WL 1218313 (D.N.J. Apr. 28, 2025) .......... 15

*KalshiEX LLC v. Johnson*,
2026 WL 1223373 (D. Ariz. May 5, 2026) .......... 15

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) .......... 11, 14, 22

*KalshiEX LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) .......... 15

*KalshiEX LLC v. Schuler*,
2026 WL 1295806 (6th Cir. Apr. 24, 2026) .......... 14

*KalshiEX LLC v. Williams*,
2026 WL 1961872 (S.D.N.Y. July 7, 2026) .......... 14

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) .......... 14, 22

*KalshiEX, LLC v. Schuler*,
2026 WL 657004 (S.D. Ohio Mar. 9, 2026) .......... 14, 15

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*,
971 F.3d 1222 (10th Cir. 2020) .......... 16

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......... 17

*May v. Harper*,
306 F. Supp. 1222 (N.D. Fla. 1969) .......... 23

*Meese v. Keene*,
481 U.S. 465 (1987) .......... 24

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 4, 9

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 2, 19

*N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*,
815 F. Supp. 3d 1169 (D. Nev. 2025) .......... 14

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) .......... 8

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) .......... 17, 18

*QCX LLC v. Nessel*,
2026 WL 1166362 (W.D. Mich. Mar. 10, 2026) .......... 14

*Ray v. Atl. Richfield Co.*,
435 U.S. 151 (1978) .......... 18

*Rice v. Bd. of Trade of City of Chicago*,
331 U.S. 247 (1947) .......... 4, 12

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 14, 17

*Schrier v. Univ. of Colo.*,
427 F.3d 1253 (10th Cir. 2005) .................... 22, 23

*Strobl v. N.Y. Mercantile Exch.*,
561 F. Supp. 379 (S.D.N.Y. 1983) .................... 12

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .................... 26

*United States v. Bryan*,
339 U.S. 323 (1950) .................... 15

*United States v. Menasche*,
348 U.S. 528 (1955) .................... 10

*United States v. Minnesota*,
2026 WL 2150211 (D. Minn. July 27, 2026) .................... 15

*Warner v. Gross*,
776 F.3d 721 (10th Cir. 2015) .................... 6, 7

*Witzel v. Chartered Sys. Corp. of New York*,
490 F. Supp. 343 (D. Minn. 1980) .................... 12

**Statutes**

7 U.S.C. §2 .................... 4, 8, 9, 10, 12, 15

7 U.S.C. §5 .................... 21

7 U.S.C. §7 .................... 5

7 U.S.C. §7a-2 .................... 21, 22

7 U.S.C. §12a .................... 11, 12

7 U.S.C. §16 .................... 4, 11

8 U.S.C §1324a(h)(2) .................... 9

15 U.S.C. §3001(a)(1) .................... 2

18 U.S.C. §1955 .................... 3, 21

21 U.S.C. §360k(a) .................... 9

29 U.S.C. §1144 .................... 10

49 U.S.C. §41713 .................... 10

**Rules**

10th Cir. R. 8 .................... 7, 8

Fed. R. App. P. 8 .................... 7

**Regulations**

17 C.F.R. §38.151(b)(1) .................... 20

89 Fed. Reg. 48968 .................... 4, 19

91 Fed. Reg. 5386 .................... 5

## Introduction

Appellant KalshiEx, LLC has widely advertised its app as enabling users to "bet on anything." Although gambling is prohibited by Utah's Constitution and statutes, Kalshi argues that the Commodity Exchange Act (CEA) renders Utah powerless to prevent Kalshi from pushing gambling, and its well-documented social harms, into the State.

The district court disagreed, denying Kalshi's request to preliminarily enjoin all Utah's gambling laws and granting the State summary judgment that the CEA does not preempt those State laws. Kalshi appeals and wants an injunction pending this Court's decision. But Kalshi does not satisfy any of the requirements for such extraordinary relief.

Most importantly, Kalshi cannot show a likelihood of success on the merits. The CEA provision Kalshi relies on—granting "exclusive jurisdiction" over "swaps" to the Commodity Futures Trading Commission (CFTC)—was previously interpreted by the Supreme Court to merely "separate" regulatory functions. For decades, lower courts have interpreted the CEA consistent with the Supreme Court, holding

that the CEA preempts only State laws that intrude upon the CFTC's regulatory role and statutorily assigned functions. And, following the rise of prediction markets as backdoor gambling apps, most courts have similarly concluded that the CEA does not preclude States from enforcing their gambling laws against prediction-market companies.

For good reason. Problematic gambling is a pernicious public-health issue that the CFTC has no authority nor ability to address. "[G]ambling is associated with a wide range of financial, cultural and crime-related harms," and it is "recognized by the [World Health Organization] as a health-harming activity."[1] Self-harm, suicide, domestic abuse, and bankruptcy are just a few of the social harms closely tied to gambling. Both Congress and the Supreme Court have recognized that States are free to confront these harms as the States see fit,[2] and Congress has also made it illegal to operate a business within a State in a manner that violates State gambling laws, as Kalshi

[1] Dist. Ct. Dkt. 71 at 11.

[2] *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 484 (2018); 15 U.S.C. § 3001(a)(1).

is doing here.[3] Like every other State, Utah has adopted regulations to combat gambling's harms.

The CFTC, in contrast, has neither the authority nor the expertise to address gambling or other public-health issues—a fact the CFTC has recognized.[4] Despite this, Kalshi sued Utah, arguing that Utah is powerless to enforce any of its generally applicable laws against Kalshi. Because Kalshi has not identified any State law that would impermissibly intrude on any regulatory function the CEA confers on the CFTC, the district court correctly dismissed Kalshi's complaint on summary judgment.

Kalshi fails to show how the district court erred, much less any likelihood of success on its claims. And with no successful merits argument, Kalshi's assertions about irreparable harm fall apart (and fail for other reasons too). The Court should deny Kalshi's Motion.

## Background

### A. Legal Context

Congress enacted the CEA (originally the 1922 Grain Futures Act) to mitigate the "potential hazards" the futures market presented.

---

[3] 18 U.S.C. § 1955.
[4] Dist. Ct. Dkt. 34 at 6.

*Merrill Lynch*, 456 U.S. at 360. In the century since, the Supreme Court has twice answered the question whether the CEA preempts State law (both times with "no"). In 1933, the Court held that the Act established requirements for the lawful trading of grain futures, but did "not purport to validate any dealings" prohibited by State law. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198-99 (1933). And the Court reached a similar conclusion a decade later, relying on language that remains in the CEA. *See Rice v. Bd. of Trade of City of Chicago*, 331 U.S. 247, 249 (1947); 7 U.S.C. §16(a).

In 1974, Congress gave the CFTC "exclusive jurisdiction" over certain transactions—a list that now includes "swaps." 7 U.S.C. §2(a)(1)(A). Six years after that amendment, the Supreme Court interpreted the exclusive-jurisdiction provision to merely "separate" regulatory functions. *Merrill Lynch*, 456 U.S. at 386. Consistent with that holding, the CFTC recently explained that it had neither "the statutory mandate nor specialized experience appropriate to oversee" gambling, a traditional area of state regulation. Event Contracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024).

Just before Kalshi filed this lawsuit, the CFTC suddenly reversed course, claiming for the first time authority to regulate sports betting under the CEA. *See* 91 Fed. Reg. 5386 (Feb. 6, 2026) (withdrawing June 10, 2024 proposed amendments); Dkt. 1 ¶7.

### B. Factual and Procedural Background

Kalshi is a contract market designated by the CFTC under the CEA. *See* 7 U.S.C. §7. It bills itself as a platform where users can "trade on anything"—sports, politics, elections, culture, entertainment, crypto, weather, and so on—through "event contracts."[5] But the event contracts offered by Kalshi are indistinguishable from what others call "bets." For sporting events alone, Kalshi offers moneyline bets, over-under bets, spread bets, proposition (or "prop") bets, and combo (or "parlay") bets. Dkt. 34 at 8-10. Among countless other things, users may bet on "the 'greatest seeding upset margin' in a sporting competition and whether an announcer would say "tush push" during the 2026 Superbowl broadcast. Dkt. 65 at 7; Dkt. 34 at 43.

In February 2026, Kalshi sued Utah officials, seeking a declaration that Kalshi's "event contracts never violate state law when

[5] https://kalshi.com/.

they are traded on [Kalshi].” Dkt. 1 ¶6, and an injunction barring Utah from enforcing its laws against Kalshi. In short, Kalshi argued the CEA preempted *all* Utah laws that might be used against Kalshi. Utah moved to dismiss or, alternatively, for summary judgment. After a hearing, the district court denied the preliminary injunction and granted summary judgment to the State, concluding that “the CEA does not preempt Utah’s enforcement of its anti-gambling laws against Kalshi.” *Id.* at 24.

Kalshi appealed. On August 6, it filed a motion for an injunction pending appeal in the district court and informed the district court that it had two business days to render its decision before Kalshi would move this Court for relief. Dkt. 70 at 3. Kalshi filed its Tenth Circuit motion on August 11. Kalshi Mot. 26. The district court motion remains pending.

## Legal Standard

A motion for an injunction pending appeal is an “‘extraordinary and drastic remedy,’” *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015) (quotation omitted), and “‘never awarded as of right,’” *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017). To

prevail, a movant "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Warner*, 776 F.3d at 728; *see* 10th Cir. R. 8.1. Failure to establish any of the factors is fatal. *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022).

## Argument

Kalshi's Motion is procedurally deficient, and all four injunctive-relief factors favor the State. The Court should deny the Motion.

### I. Kalshi's premature motion is procedurally deficient.

Kalshi's Motion lacks necessary elements. Kalshi does not "show that moving first in the district court would be impracticable" or "state that, a motion having been made, the district court denied the motion or failed to afford the relief requested and state any reasons given by the district court for its action." Fed. R. App. P. 8(a)(2)(A). That failure warrants dismissal. *Chem. Weapons Working Grp. v. Dep't of the Army*, 101 F.3d 1360, 1361-62 (10th Cir. 1996); *see also, e.g.*, *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930-31 (6th Cir. 2002).

Kalshi's rushed Motion also provides no basis of jurisdiction. *See* 10th Cir. R. 8.1(A). Yet "[n]o motion for a stay or an injunction pending appeal will be considered unless" that requirement is met. CA10 R. 8.1. That alone is reason to deny Kalshi's demand for extraordinary relief.

## II. Kalshi is not likely to prevail on the merits of its preemption claim.

### A. Express preemption

Congress did not expressly preempt States from enforcing generally applicable State gambling laws when it enacted the CEA. Express preemption occurs "through express language in a statute." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). "When a federal law contains an express preemption clause, [courts] 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011).

Kalshi argues that the CEA preempts all Utah's laws through the "exclusive jurisdiction" provision in 7 U.S.C. §2(a)(1)(A). But Section 2(a)(1)(A) does not expressly preempt State law. Instead, as the Supreme Court has explained, it functions only to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory

agencies." *Merrill Lynch*, 456 U.S. at 386. Regulatory separation can *impliedly* preempt State laws when those laws would confer an overlapping regulatory role or function on a State agency. But Section 2(a)(1)(A) does not preempt generally applicable State laws—laws not aimed at regulating swaps *as swaps*. That reading is consistent with the CEA's text, decades of CEA precedent (including recent prediction-market cases), and other tools of statutory interpretation.

**1. Statutory Text**

Section 2(a)(1)(A)'s plain language says nothing about preempting other "laws." Instead, it speaks in terms of "jurisdiction," defining the CFTC's regulatory authority without expressly declaring other laws preempted.

That language materially differs from language Congress typically uses for express preemption. *See*, *e.g.*, 8 U.S.C §1324a(h)(2) ("Preemption[.] The provisions of this section preempt any State or local law imposing civil or criminal sanctions…"); 21 U.S.C. §360k(a) ("[N]o State…may establish…any requirement…which is different from…any requirement applicable under this chapter…"). In those provisions, Congress unambiguously declares that "State laws" shall be preempted,

or that States cannot enact any requirements beyond those of federal law. That's the case with the statutes cited by Kalshi. *See* Kalshi Mot. 19; *cf*. 29 U.S.C. §1144; 49 U.S.C. §41713.

Section 2(a)(1)(A)'s savings clause uses similarly precise language, referencing the "jurisdiction" and "duties and responsibilities" of other agencies, not the underlying *laws* of other jurisdictions. Congress was concerned with avoiding regulatory overlap while preserving the existing "laws of the United States [and] of any State." 7 U.S.C. §2(a)(1)(A).

The CEA's other provisions confirm this reading.

***Sections 16(e)(2) and 16(h)(2).*** These provisions preempt State gambling laws under certain circumstances not applicable here and State insurance laws as to swaps, respectively. Both provisions would be superfluous if the exclusive-jurisdiction provision already preempted all State law, including State gaming and insurance laws—and so that reading is unreasonable. *See United States v. Menasche*, 348 U.S. 528, 538-39 (1955).[6]

[6] Kalshi cites Section 16(e) as evidence that State law is preempted as to on-exchange swaps. Kalshi Mot. 18-19. To the contrary, the statute's

***Section 7a-2.*** This provision authorizes the CFTC to prohibit transactions on any nationwide exchange if the transactions involve certain specified activities, including an "activity that is unlawful under any Federal or State law." It assumes that activity occurring on nationwide exchange can nevertheless be "unlawful" under other federal laws *or the laws of specific States. See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 680 (D. Md. 2025).

***Section 5.*** This provision outlines the CEA's five discrete, codified purposes, aimed at establishing self-regulated markets free of traditional market dangers. The CFTC's authority is limited to making rules "reasonably necessary to effectuate any of the provisions [of the CEA] or to accomplish any of the purposes" in Section 5. 7 U.S.C. §12a(5); Dkt. 34 at 16-18. The CFTC does *not* regulate the legality of the underlying subject matter of the transactions occurring on CFTC-regulated markets.

***Section 16(a).*** The Supreme Court previously held that this provision, which states that the CFTC "may cooperate" with State

---

language makes clear that Congress chose *not* to preempt on-exchange and off-exchange swaps equally. *See* 7 U.S.C. §16(e)(2).

governments, "supports the inference that Congress did not design a regulatory system which excluded state regulation not in conflict with the federal requirements." *Bd. of Trade*, 331 U.S. at 255.

***Section 12a.*** This provision authorizes the CFTC to refuse to register *or to revoke* the registration of market actors where those actors have been convicted of various State crimes—including "*gambling*" crimes. 7 U.S.C. §12a(2). It thus assumes that States enjoy ongoing jurisdiction to prosecute gambling crimes against registered market participants.

The CEA's framework enables self-regulation within a larger body of State law promoting public health, safety, and well-being. Congress knows how to preempt State law; it did not do so in Section 2(a)(1)(A).

**2. Precedent**

Courts nationwide have interpreted the CEA consistent with this reading (and the district court's) for decades. *See, e.g., Strobl v. N.Y. Mercantile Exch.*, 561 F. Supp. 379, 385 (S.D.N.Y. 1983) ("[N]othing in the statutory language, legislative history or purpose of the CFTCA indicating a congressional intent to preempt" state law beyond laws establishing competing "regulatory schemes"); *Witzel v. Chartered Sys.*

*Corp. of New York*, 490 F. Supp. 343, 347–48 (D. Minn. 1980) (preemption occurs only where the state law envisions "administrative agency involvement which might conflict with the CFTC's regulatory role"); *Holladay v. CME Grp.*, 2012 WL 5845621, at *2 (N.D. Ill. Nov. 16, 2012). Kalshi's cited authorities prove the point. In *International Trading, Ltd. v. Bell*, for example, the Arkansas Supreme Court concluded that certain provisions in the Arkansas Securities Act were preempted by the CEA, but held that a generally applicable criminal statute could be used to "prosecute an offender" because such "actions could not constitute any realistic interference with the federal regulatory scheme." 556 S.W.2d 420, 425 (Ark. 1977); *see also, e.g.*, *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001) (rejecting preemption argument as overly broad because "it suggest[ed] that the scope of the CFTC's exclusive jurisdiction is broader than the scope of the agency's authority to regulate under the CEA").

Cases construing other statutory "exclusive jurisdiction" provisions further confirm such clauses separate regulatory functions rather than categorically preempting generally applicable State law. *See, e.g.*, *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1197 (10th Cir. 2022)

(federal statute governing "railroad operations" preempted State "Blocked Crossing Statute" that had as "[i]ts primary directive" the aim to regulate "the movement of trains"); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 237 (1947) (concluding that certain state-law warehouse regulations were preempted by federal warehouse act, but other state-law provisions were not because there was no specific, overlapping provision of federal law).

That is also consistent with how most courts have resolved the preemption issue specifically as applied to prediction markets. Eight federal district courts[7] and four State courts have ruled against prediction markets on the preemption issue. Additionally, the Sixth[8]

---

[7] *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1021 (D. Nev. 2025); *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1175-76 (D. Nev. 2025); *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *7 (S.D. Ohio Mar. 9, 2026); *KalshiEX LLC v. Williams*, 2026 WL 1961872, at *9 (S.D.N.Y. July 7, 2026); *KalshiEX LLC v. Cafferelli*, 2026 WL 2294589, at *11 (D. Conn. Aug. 10, 2026); *Coinbase Fin. Markets, Inc. v. Nessel*, 2026 WL 2295184, at *1 (E.D. Mich. Aug. 7, 2026); *QCX LLC v. Nessel*, 2026 WL 1166362 (W.D. Mich. Mar. 10, 2026); *U.S. v. Wisconsin*, 2:26-civ-749 (E.D. Wisc. July 28, 2026); Dkt. 65.

[8] *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *4-6 (6th Cir. Apr. 24, 2026) (per curiam).

and Ninth[9] Circuits have denied Kalshi's requests for an injunction pending appeal, with both courts concluding that Kalshi is unlikely to succeed on the merits. In contrast, only four district courts and a divided Third Circuit have ruled in Kalshi's favor.[10]

### 3. Other interpretive tools

***Absurdity Canon.*** Kalshi's proposed reading of Section 2(a)(1)(A) should be rejected because it leads to absurd results that Congress could not have intended. *United States v. Bryan*, 339 U.S. 323, 342 (1950). Kalshi's reading, which considers sports bets to be "swaps," would transform the CFTC into the nation's sole gambling regulator, forcing sportsbooks across the country out of business. *KalshiEx, LLC, v. Schuler*, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026); *see* 7 U.S.C. §2(e) (making it "unlawful for any person…to enter into a swap unless the swap is entered into on" a CFTC-recognized exchange). It would also insulate criminal conduct from State law whenever a person conceives

[9] *Nevada v. KalshiEX LLC*, No. 26-1304 (9th Cir. May 21, 2026).

[10] *KalshiEX LLC v. Johnson*, 2026 WL 1223373, at *3 (D. Ariz. May 5, 2026); *United States v. Minnesota*, 2026 WL 2150211, at *9 (D. Minn. July 27, 2026); *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025), *aff'd,* 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *1 (M.D. Tenn. Feb. 19, 2026).

of a way to use a CFTC-recognized (but self-regulated) exchange to commit a crime. Dkt. 1 ¶6 ("Event contracts *never violate state law* when they are traded on a DCM."). Kalshi offers no justification for reading such breathtaking state-law criminal immunity into the CEA. Dkt. 54 at 13-14.

***Presumption against preemption.*** Ignoring the district court's four-page textual analysis of the CEA, Kalshi's Motion argues that the district court improperly applied the presumption against preemption. Kalshi Mot. 21; *cf*. Dkt. 65 at 12-15. But as explained above, the CEA contains no express preemption clause. The court's use of the presumption was thus appropriate. *See* Dkt. 65 at 11-16 & n.68.

***Legislative history.*** While the "traditional tools of statutory interpretation" are enough to resolve this case without recourse to the CEA's legislative history, *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1237 (10th Cir. 2020), that history wholly supports the district court's interpretation: that Congress aimed to preempt State law only in the sense that it wanted to separate the CFTC's regulatory functions from the functions of other agencies. Dkt. 65 at 13-14. Kalshi's appeals to legislative history thus fall short. Kalshi Mot. 11-12, 20-21.

Kalshi also points to a different statute—the UIGEA—as evidence that Congress intended to legalize sports betting. Kalshi Mot. 20. But "just because Kalshi's conduct is not prohibited by the UIGEA, does not make its offering of sports betting contracts legal anywhere." *Ho-Chunk Nation, v. Kalshi Inc.*, 2026 WL 1284077, at *8 (W.D. Wis. May 11, 2026). Legislative history, to the extent it matters, does not support Kalshi.

**B. Field preemption**

Field preemption has only been found in "rare cases." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Historically, those cases involve a challenger asserting that a *specific* provision in federal law preempts a *specific* state law. *See*, *e.g.*, *Santa Fe Elevator*, 331 U.S. at 236-37 (federal *warehouse act* preempted some, but not all, provisions of Illinois Grain *Warehouse Act*). Here, in contrast, Kalshi argues that the CEA preempts *any* State law so that "event contracts *never violate state law* when they are traded on a DCM." Dkt. 1 ¶6. The Court should reject this argument.

Field preemption applies where State and federal laws regulate "on the same subject," *Arizona v. United States*, 567 U.S. 387, 399

(2012), or in the same "specific area," *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983). So, "[w]hen the federal government completely occupies a given field or an identifiable portion of it,…the test of preemption is whether '*the matter on which the state asserts* the right to act is in any way regulated by the federal government.'" *Id.* at 212-13 (emphasis added).

Accordingly, the Supreme Court has consistently rejected field-preemption challenges to generally applicable State laws. *See, e.g.*, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20 (1987) (NLRA did not preempt State employment laws applying to all employees generally); *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440 (1960) (generally applicable pollution laws not preempted by "comprehensive" federal regulations regarding boilers on sea vessels); *Dickson*, 288 U.S. at 198-200 (original version of CEA did not preempt Missouri gambling prohibition).

Significantly, in cases where field preemption did apply, the Court has occasionally clarified that the same preemption would not apply to *generally applicable* laws. *See Ray v. Atl. Richfield Co.*, 435 U.S. 151, 164-65 (1978) (federal law preempted State law "aim[ed] precisely at

the same ends" but not State laws "having other purposes"). For example, in *Gade v. National Solid Wastes Management Association*, the Court concluded that the Occupational Safety and Health Act (OSHA) preempted Illinois worker-licensing laws enacted with the express purpose "to promote job safety." 505 U.S. 88, 100, 108-09 (1992). But the Court clarified that "state laws of *general applicability* (such as laws regarding traffic safety or fire safety that do not conflict with OSHA standards and that regulate the conduct of workers and nonworkers alike) would generally not be preempted." *Id*. at 107 (emphasis added). That is true even where "laws of general applicability may have a 'direct and substantial' effect on worker safety," because "they regulate workers simply as members of the general public." *Id*.

So too here. Kalshi does not allege that Utah is attempting to regulate swaps *as swaps* or otherwise usurp any of the CFTC's statutorily conferred functions. *See generally* Dkt. 1. Nor can it, since Utah has merely indicated that it intends to regulate gambling *as gambling*. The CEA grants no authority to the CFTC to regulate gambling or address the serious public-health concerns gambling raises—a fact the CFTC has recognized. 89 Fed. Reg. at 48976. Instead,

Congress's "federal policy" has been to "respect the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484. The Court should thus reject Kalshi's overbroad field-preemption argument.

### C. Conflict preemption

Kalshi's conflict-preemption arguments are similarly flawed. First, Kalshi argues that the CFTC's impartial-access rule makes compliance with Utah's gambling laws impossible. Kalshi Mot. 14 (citing 17 C.F.R. §38.151(b)(1)). The district court's order provides three pages of thoughtful analysis showing why this argument fails. Dkt. 65 at 19-21. Kalshi fails to rebut that analysis. Kalshi Mot. 21-22. It also fails to explain how State regulation of gambling runs afoul of an "impartial" access rule—that is, a rule requiring access criteria to be "not partial or biased." *Impartial*, Merriam-Webster Dictionary.[11] As the district court explained, Kalshi would not violate the impartial-access rule by requiring users to comply with the laws of their State.

Second, Kalshi argues that the application of State law would frustrate Congress's objective of creating a uniform nationwide market.

---

[11] https://www.merriam-webster.com/dictionary/impartial.

Kalshi Mot. 14. But Congress codified the CEA's purposes—and, unlike in some federal statutes, did not include uniformity as one of those purposes. *See* 7 U.S.C. §5. In fact, the CEA states that the futures "transactions" it governs are part of "interstate and *international* commerce," thereby demonstrating that uniformity was not essential and that futures would be subject to differing rules from jurisdiction to jurisdiction. *Id.* (emphasis added). Kalshi's uniformity argument, particularly in the gambling context, is further undermined by the fact that Congress has also made it illegal under *federal* law to operate a business within a State in a manner that violates State gambling laws. *See* 18 U.S.C. §1955.

Third and finally, Kalshi argues that the application of any State law to swap transactions would impermissibly interfere with the "method" that Congress chose to regulate event contracts when it adopted the special rule in 7 U.S.C. §7a-2(c)(5)(C)(i). Kalshi Mot. 15. But Section 7a-2(c) does not confer any authority on the CFTC to criminalize conduct or enforce any criminal gambling laws. Instead, it only authorizes the CFTC to regulate access to *nationwide* markets if the "event contracts" are unlawful under the laws of one State. In

enacting the special rule, Congress contemplated situations in which States treat the underlying legality of an event contract differently. As one district court found in ruling against Kalshi last year, Section 7a-2 "clearly reflects an affirmative intent to preserve state laws governing whether particular conduct is lawful or unlawful." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 680 (D. Md. 2025).

***

The CEA does not preempt Utah's generally applicable gambling laws; Kalshi will not prevail on the merits. The Court should thus deny Kalshi's Motion.[12]

## III. Kalshi will not suffer irreparable harm in the absence of an injunction.

Kalshi also fails to show that it will suffer irreparable harm without an injunction. That is "not an easy burden to fulfill." *First W. Cap.*, 874 F.3d at 1141 (quotation omitted). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical."

---

[12] Alternatively, the Court should deny the Motion because all or most of Kalshi's bets do not fall within the CEA's definition of the term "swap" and therefore fall outside the CFTC's exclusive jurisdiction. *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1026-32 (D. Nev. 2025).

*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quotation omitted).

Kalshi asserts three potential harms. But none constitutes irreparable harm because, as Kalshi admits, all three are conditioned upon a future decision by Kalshi to violate Utah law. Such "speculative harm does not amount to irreparable injury." *Id.* (quotation omitted).

First, Kalshi argues that it faces a "Hobson's choice": either violate Utah's laws or obey the law during the pendency of appellate review. Kalshi Mot. 22. But "[o]beying the law during the pendency of the proceedings" to challenge the law does not constitute irreparable harm. *See, e.g.*, *Chem. Weapons*, 101 F.3d at 1362. While "[t]he possibility of criminal prosecution for law violation is always present," that possibility, "standing alone…violates no constitutional rights." *May v. Harper*, 306 F. Supp. 1222, 1224 (N.D. Fla. 1969). Indeed, denial of a motion for stay pending appeal is common. *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 568 U.S. 1401, 1403-04 (2012) (Sotomayor, J., in chambers) (denying injunction pending appellate review in case where plaintiffs eventually prevailed on merits). So the only harm that could be suffered by Kalshi is conditional on Kalshi's own decision to violate

duly enacted statutes; there is no need for Kalshi to take "affirmative steps" to "avoid the risk of harm" by the operation of State law. *Meese v. Keene*, 481 U.S. 465, 475 (1987).

Second, Kalshi suggests that the lack of an injunction could "risk[] harm to Kalshi's federal license" as a DCM and "impair[] user access." Kalshi Mot. 23. Again, Kalshi's alleged harms may never emerge, since they depend entirely on Kalshi's own future conduct and the independent decisions of third parties. The "links in the chain of causation" projected by Kalshi here are supported only by conjecture, making them "too speculative" and "too attenuated" to form an actionable injury. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quotation omitted).

Kalshi's concern is also misplaced because the CFTC expressly instructs DCMs to "account[] for" and manage risks arising from "State regulatory actions and pending and potential litigation, including enforcement actions." CFTC Advisory No. 25-36 (Sept. 30, 2025). Kalshi's potential decision not to follow that guidance does not justify an injunction.

Third, Kalshi argues that it would incur "economic and reputational harm" if it refuses to stop violating Utah's gambling laws. Kalshi Mot. 23 (quotation omitted). Once again, these harms are speculative and conditional. They will not materialize unless Kalshi violates Utah law and Utah seeks and obtains relief requiring Kalshi to "[b]lock[] Utah users and unwind[] trades." Kalshi Mot. 24. Even if that were to occur, such relief would not inflict irreparable harm. Kalshi already concedes that it "screen[s]" new customers "against prohibited lists *and geographies*" and that its "surveillance team tracks their trading behavior."[13] And Kalshi has already begun implementing geofencing in States—Michigan, Nevada, and Washington so far—where courts have ordered it to do so. *See* Daniel O'Boyle, *Kalshi Launches First Full Geofence, But It Only Works After Optional App Update*, InGame (Aug. 14, 2026).[14]

Requiring Kalshi to avoid violating the laws of a *fourth* State would not cause irreparable injury. Kalshi's motion should be denied.

---

[13] https://kalshi.com/faq (emphasis added).

[14] https://www.ingame.com/kalshi-geofence-optional-app-update/.

## IV. The public interest and balance of the equities heavily favor the State.

Because Kalshi seeks an injunction against a State government, the final two preliminary injunction factors—the balance of equities and the public interest—"merge" together. *Denver Homeless*, 32 F.4th at 1278. Here, that combined factor heavily favors the State.

The State—and the public—would suffer significant harm from an injunction. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). And the Tenth Circuit has long held that a State "government has a strong interest generally in the enforcement of its criminal laws." *Aid for Women v. Foulston*, 441 F.3d 1101, 1119 (10th Cir. 2006) (collecting cases).

An injunction in this case would be particularly injurious given the harms that Utah's gambling laws are designed to prevent. "[G]ambling is associated with a wide range of financial, cultural and crime-related harms," and it is "recognized by the WHO [(World Health Organization)] as a health-harming activity." Dkt. 71 at 11. "Self-harm and suicide are two of the most severe gambling-related harms." *Id.*

Indeed, those with serious gambling problems are up to fifteen times more likely to die by suicide. And 15% of adults ages 18-34 reported concerning gambling behavior. *Id.* Gambling also affects more than the individual who gambles. "Increased relationship strain, financial debt, … domestic violence," and "adverse effects on work and education" are all recognized harms stemming from gambling. *Id.* In short, both the State and its residents will suffer significant harm from an injunction that prevents Utah from enforcing its duly enacted laws.

In contrast, Kalshi faces no irreparable harm if the status quo remains in place. As explained above, any potential harms to Kalshi are just that—potential, and conditioned upon Kalshi's decision to violate preexisting law that is not preempted. Kalshi only briefly acknowledges Utah's "interest in enforcing its laws," and ignores gambling-related harms altogether. Kalshi Mot. 24. Kalshi's argument that "Defendants have proffered no evidence that Kalshi users in Utah have suffered harm from trading on Kalshi" is similarly misguided. *Id.* at 25. It is Kalshi that has sued, it is Kalshi that seeks injunctive relief, and it is Kalshi that must "proffer[]…evidence" to justify its demand for extraordinary relief.

Kalshi's further insists that "[a]n injunction would preserve the last uncontested status between the parties." Kalshi Br. 24. That too is incorrect. Kalshi has never been immune or exempt from Utah state law—the "status" it now seeks. With the exception of a monthlong stipulated stay of enforcement during the briefing period in district court, Utah has always been free to bring an enforcement action against Kalshi. *Kalshi* is the party seeking to alter that status quo by obtaining an injunction. And after losing on the merits below, Kalshi should not be awarded relief that the district court has already denied.

## Conclusion

The Court should deny Kalshi's Motion.

Respectfully submitted,

Derek Brown
Utah Attorney General

/s/ *Joshua B. Cutler*
Joshua B. Cutler
Utah Assistant Solicitor General
Stanford E. Purser
Utah Solicitor General
Mark C. Gillespie
Utah Assistant Solicitor General

*Counsel for Defendants-Appellees*

## Certificate of Compliance

I certify that:

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Tenth Circuit Rule 32(B), this document contains 5,187 words.

2. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) and Tenth Circuit Rule 32(A) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Joshua B. Cutler*

## Certificate of Service

I hereby certify that the foregoing brief was served on all counsel of record for all parties via the ECF system.

/s/ *Joshua B. Cutler*