**No. 26-4100**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

KALSHIEX LLC,

*Plaintiff–Appellant*,

v.

SPENCER J. COX, in his official capacity as Governor of Utah; DEREK BROWN, in his official capacity as Attorney General of Utah; DANIEL BURTON, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; STEWART YOUNG, in his official capacity as Criminal Deputy Attorney General of Utah; and DOUGLAS CRAPO, in his official capacity as Public Protection Attorney General of Utah,

*Defendants–Appellees*.

---

On Appeal from the United States District Court
for the District of Utah,
Case No. 2:26-cv-151, Hon. Robert J. Shelby

---

# BRIEF OF BETTER MARKETS, INC. AS AMICUS CURIAE SUPPORTING DEFENDANTS-APPELEES AND AFFIRMANCE

---

Dennis M. Kelleher
Dominick V. Freda
Better Markets, Inc.
2000 Pennsylvania Avenue, NW
Suite 408
Washington, DC 20006
(301) 437-4343
dkelleher@bettermarkets.org
dfreda@bettermarkets.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure ("FRAP"), Better Markets, Inc. ("Better Markets") states that it has no parent or affiliate corporation and there is no publicly held corporation or affiliate that owns any stock in Better Markets. Better Markets further states that there is no publicly owned corporation or affiliate that is aligned with Better Markets for which there is insurance, a franchise agreement, or indemnity agreement that would create a substantial financial interest in the outcome of the litigation.

## STATEMENT AS TO AUTHORSHIP AND FUNDING

In accordance with FRAP 29(a)(4)(E), Better Markets states that (i) no counsel for any party authored this brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (iii) no person—other than Better Markets, its members (of which there are none), or its counsel—contributed money that was intended to fund preparing or submitting this brief.

## TABLE OF CONTENTS

**Page(s)**


Table of Authorities .......... iv

I. Kalshi's sports gambling contracts are not subject to the CFTC's exclusive jurisdiction .......... 6

A. Text, structure, and history defeat express preemption. .......... 6

1. Sports-bets are not "swaps." .......... 6

2. The CEA expressly prohibits listing "gaming" contracts on the derivatives markets. .......... 10

3. The CFTC's historical treatment confirms that sports-bets are not swaps that lawfully can be traded on DCMs .......... 13

4. Legislative context and history confirm that sports-bets are prohibited from listing or trading on DCMs. .......... 15

B. Congress sought to enlarge the role of state law in financial regulation, not to preempt gaming regulation. .......... 17

C. Conflict preemption does not apply because the CFTC banned gaming contracts, and because Kalshi's sports gambling platform does not require uniform regulation. .......... 18

II. Preempting state regulation of Kalshi's sports-betting threatens to harm millions of Americans, election integrity, and the derivatives markets themselves. .......... 22

A. Preempting state law would override Utah's decision to protect its residents from the evils of sports-betting. .......... 22

B. The CFTC lacks the authority, expertise, and resources to oversee gambling, and it has a core mission that Americans depend on it to fulfill. .......... 25

Conclusion .......... 28

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004). .......... 6

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995) .......... 7

*KalshiEX LLC v. Cox*, No. 2:26-cv-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026) .......... 2, 18

*KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026) .......... 10

*KalshiEX v. Assad*, — F.4th —, 2026 WL 2543846 (9th Cir. Aug. 28, 2026) .......... 4, 8, 10, 11, 19, 20

*KalshiEX v. Schuler*, — F.4th —, 2026 WL 2884087, at *10 (6th Cir. Sept. 25, 2026) .......... 4, 8, 9, 10, 16, 20

*Murphy v. NCAA*, 584 U.S. 453 (2018) .......... 3

*Skidmore v. Swift*, 323 U.S. 134 (1944) .......... 15

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) .......... 4

### Statutes

7 U.S.C. § 1a(47)(A) .......... 7

7 U.S.C. § 1a(49) .......... 20

7 U.S.C. § 2(e) .......... 10

7 U.S.C. § 5(a) .......... 8, 14

7 U.S.C. § 6(a) .......... 10

7 U.S.C. § 6c(c) .......... 10

7 U.S.C. § 7a-2(c)(5)(C)(i) .......... 4, 11

7 U.S.C. § 7a-2(c)(5)(C)(ii) .......... 11

Dodd-Frank Wall Street Reform and Consumer Protection Act, P.L. 111-203, 124 Stat. 1376 (July 21, 2010) .......... 2, 4

Professional and Amateur Sports Protection Act ("PASPA"), Pub. L. No. 102-559, 106 Stat. 4227 (1992) .......... 3

**Page(s)**

## Other Authorities

156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010) .... 16

Alan White *et al.*, *The Impact of Federal Preemption of State Anti-predatory Lending Laws on the Foreclosure Crisis*, 21 Cornell J. of Pol'y Anal. & Mgmt. 247 (2011) .... 17

Andres Chovil & Benjamin Schiffrin, *Deceptive, Predatory Marketing Practices Show Why States Should Regulate Prediction Markets* 1 (Oct. 21, 2026) .... 23

Andrew Yang, *Sports Betting Hurts American Men. Time To Rethink Its Regulation*, Newsweek (Dec. 3, 2024) .... 22

Arthur E. Wilmarth Jr., *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. CORP. L. 893 (2011) .... 18

Benjamin Schiffrin, Op-Ed, *The U.S. Already Has a Gambling Epidemic—24 Hour Stock Trading Would Only Make It Worse*, Fortune Magazine (Dec. 13, 2024) .... 23

Benjamin Schiffrin, *Sports Betting Scandals Show the Perils of Prediction Markets*, Better Markets (Nov. 20, 2025) .... 19

Br. of 39 States and D.C., *Flaherty v. KalshiEX, LLC*, No. 26-299 (S. Ct. Oct. 2026) .... 27

Br. of Appellee 41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024), Doc. No. 2085055. .... 9

Brad Senkiw, *FanDuel Predicts Goes Live in All 50 U.S. States, Offers Sports in 18* (Jan. 15, 2026) .... 21

BusinessWire, *DraftKings Launches Proprietary Exchange to Bolster Differentiated Predictions* Experience (June 26, 2026) .... 21

*Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the U.S. Senate and U.S. House of Representatives*, CFTC Order, at 15-19 (Sept. 22, 2023) .... 9, 13, 24

*CFTC Reminds Markets to Display Clear Pricing Information* (Aug. 7, 2026) .... 21

CFTC, Contracts and Products .... 12

**Page(s)**

CFTC, President's Budget: FY2026 .......... 26

Chairman Rostin Benham, *Statement Regarding CFTC Order To Prohibit Kalshi Political Control Derivatives Contracts*, CFTC (Sept. 22, 2023). 25

Charles Fain Lehman, *Legalizing Sports Gambling Was a Huge Mistake— The evidence is convincing: The betting industry is ruining lives*, The Atlantic (Sept. 23, 2024) .......... 22

Compl. ¶ 3, *Brown v. Kalshi Inc.*, No. 260908356 (Utah 3d Dist. Ct. Oct. 20, 2026) .......... 20

*Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669 (May 7, 2008) .......... 13, 14

*Conflicts and Affiliations*, 91 Fed. Reg. 50926, 50948 (Aug. 6, 2026) .......... 20

Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* (2017) .......... 6

Daniel Wallach, *CFTC's Failure To Enforce 'Gaming' Contract Ban Could Still Upend Kalshi Sports Betting Lawsuits*, Forbes (May 27, 2025) .......... 12

Dennis M. Kelleher & Stephen Hall, *Report: More than Ever, Americans Must Look to the States for Protection Against Financial Fraud and Abuse*, Better Markets (Sept. 9, 2025) .......... 18

Department of the Treasury, Financial Regulatory Reform, A New Foundation: Rebuilding Financial Supervision and Regulation (2009) .... 6

Di Wu *et al.*, *Spillover Effects of Financial Deregulation: The Unintended Consequences of the OCC Preemption Rule on Mortgage Lending Practices*, 95 Int'l Rev. of Fin. Anal., Part C (Oct. 2024) .......... 17

*Event Contracts,* 89 Fed. Reg. 48968 (June 10, 2024) .......... 4, 15, 24, 25

*Event Contracts; Withdrawal of Proposed Regulatory Action*, 91 Fed. Reg. 5386 (Feb. 6, 2026) .......... 5

Frank D'Souza, et al., *Illuminating the Need for Regulation in Dark Markets: Proposed Regulation of the OTC Derivatives Market,* 12 U. Pa. J. Bus. L. 473 (2010) .......... 7

*Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48208 (Aug. 13, 2012) .......... 14

**Page(s)**

*Further Definition of 'Swap' To Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65969, 65973 (Oct. 19, 2026) .......... 21

https://www.merriam-webster.com/dictionary/irony .......... 21

Hurubie Meko, *A Police Chief Had a $4.5 Million Gambling Problem. No One Knew.*, N.Y. Times (Apr. 14, 2026) .......... 23

Letter from six U.S. Senators to Acting CFTC Chair Caroline Pham (Sept. 30, 2025) .......... 12

Lydia Beyoud, *Staff Cuts and Turmoil Hit the CFTC While the Crypto It Oversees Booms*, Bloomberg (Aug. 21, 2025) .......... 26

Mem. of Law in Support of Plaintiff's Mot. for Summary Judgment at 30, *KalshiEX, LLC v. CFTC*, No. 23-cv-03257 (D.D.C. Jan. 25, 2024), Doc. No. 17-1. .......... 9

Members of Congress Br., *KalshiEX v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025), Doc. No. 66, at 2 n.2 .......... 16

Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011) .......... 12, 13

*Provisions Common to Registered Entities*, 76 Fed. Reg. at 44786 .......... 14

*Regulation Crypto Asset Transactions and Regulation Crypto Asset Markets*, 91 Fed. Reg. 64811 (Oct. 13, 2026) .......... 26

Sharon LaFraniere & David Yaffe-Bellany, *How Prediction Markets and Crypto Firms Steamrolled a Watchdog Agency*, N.Y. Times (May 24, 2026) .......... 23, 26

Simon August, *Traders Bet Big Minutes Before Trump's Iran Post. Then A Top Regulator's Adviser Reportedly Stepped In*, Daily Caller (Oct. 13, 2026) .......... 26

*The Financial Crisis Inquiry Report*, Fin. Crisis Inquiry Comm'n (Off. Gov't Ed., Jan. 2011) .......... 18

WHO, *Gambling* (Dec. 2, 2024) .......... 22

**Regulations**

17 C.F.R. § 33.3(a) .......... 10

**TABLE OF AUTHORITIES—continued**

**Page(s)**

17 C.F.R. § 40.11(a)(1) ..... 11

17 C.F.R. § 40.2 ..... 12

17 C.F.R. § 40.3 ..... 12

## INTERESTS OF THE *AMICUS CURIAE*

**Better Markets files this brief with the parties' consent.** Better Markets is a nonprofit, nonpartisan, and independent organization that promotes the public interest in the financial markets through comment letters on proposed rules, *amicus* briefs, independent research, public advocacy, and congressional testimony. It fights to protect investors and consumers from fraud and abuse, prevent financial crashes, and make the financial system more equitable for all Americans. Better Markets also supports the important role of state regulators as they strive to protect their citizens from harmful financial products and services.

Since Better Markets' founding in 2010, Better Markets' staff has included experts in derivatives, and a large proportion of the organization's advocacy has focused on the Commodity Futures Trading Commission ("CFTC") and its oversight of the derivatives markets. Better Markets' work includes over 130 comment letters filed with the CFTC on a wide range of topics, including the "swap" definition. Better Markets has also devoted a significant body of advocacy to the threats posed by the burgeoning event contracts industry, including numerous comment letters, *amicus* briefs, and other materials. *See generally* www.bettermarkets.org (containing advocacy materials).

Better Markets has a strong interest in this case. The district court correctly recognized Utah's authority to prohibit KalshiEX LLC ("Kalshi") from offering its gambling products in Utah, thus furthering several of Better Markets' public-interest concerns—protecting consumers from sports-bets

masquerading as *bona fide* financial instruments; ensuring that state officials retain their authority to address other threats posed by gambling, including harm to election integrity; and encouraging the CFTC to focus its scarce resources on oversight of the legitimate derivatives markets. Those markets help maintain stable prices for the food, fuel, and durable goods on which all Americans depend. Affirming the district court's decision will help secure those benefits and allow Utah to protect its residents from sports-gambling's many harms. Better Markets thus urges this Court to affirm.

## SUMMARY OF ARGUMENT

By calling their sports-bets "swaps," the esoteric financial derivative at the heart of the 2008 financial crash, Kalshi asks this Court to hold that Congress silently displaced state consumer-protection laws, legalized gambling nationwide, and anointed the CFTC as national gambling regulator over sixteen years ago when it passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank"). As the district court correctly recognized, "[i]t is simply implausible that Congress would silently" do so. *KalshiEX LLC v. Cox*, No. 2:26-cv-151, 2026 WL 2241564, at *10 (D. Utah Aug. 4, 2026).

Much ink has been spilled debating whether, if you squint hard enough, a sports-bet resembles a "swap," or whether sports-bets are associated with the type of economic consequences that historically warranted federal regulation as derivatives. As shown below, the answer to both questions is a resounding no. But the district court's apt observation effectively disposes of this case: it is "simply implausible" to think that Congress "silently"

legalized sports-betting nationwide without anyone realizing it for over a decade. And it is even more implausible to conclude that, in so doing, Congress also silently prohibited all states, including Utah, from outlawing sports-betting within their borders.

"Americans have never been of one mind about gambling[.]" *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Afterall, "[t]he legalization of sports gambling requires an important policy choice[.]" *Id.* For decades, all states, except for Nevada, chose to outlaw sports-betting. Congress largely remained on the sidelines. In 1992, however, Congress came down against sports-betting by prohibiting states (other than Nevada) from authorizing it within their borders. *See* Professional and Amateur Sports Protection Act ("PASPA"), Pub. L. No. 102-559, 106 Stat. 4227 (1992). When New Jersey challenged that prohibition, the Supreme Court struck down PASPA, telling Congress that it couldn't dictate how the states chose to deal with gambling within their borders. *Murphy*, 584 U.S. at 486. "Congress can regulate sports gambling directly," the Court held, "but if it elects not to do so, each State is free to act on its own." *Id.*

That crucial bit of context raises some important questions: If, as Kalshi claims, Congress had already legalized sports-betting nationwide in 2010, why didn't anyone tell the Supreme Court in 2018? Or, why did states respond to that decision by passing laws legalizing or outlawing sports-betting if Congress had already preempted them from making that choice? Afterall, no state was actually "free to act on its own" if they all were preempted.

The answer is simple: because Congress did nothing of the sort.

Congress enacted Dodd-Frank in the wake of the devastating 2008 financial crash precipitated by, among other things, the dismantling of state consumer protections. Congress intended to regulate the financial instruments at the heart of the financial crisis—like "swaps"—not to promote sports-betting or displace state gaming regulation. Dodd-Frank spans 848 pages in the Statutes at Large. The law mentions "gaming" and the Commodity Exchange Act ("CEA") in the same breath only once, as a backstop telling the CFTC to ensure that bad actors do not try to pass-off "gaming" event contracts as "swaps" or other legitimate derivatives. Dodd-Frank § 745(c)(5)(C), 124 Stat. 1737, 7 U.S.C. § 7a-2(c)(5)(C)(i) (authorizing CFTC to ban event contracts that "involve … gaming"). Legalizing sports-betting nationwide by adding an esoteric derivative to the CFTC's regulatory jurisdiction would be the epitome of "'hiding an elephant in a mousehole[.]'" *KalshiEX v. Assad*, — F.4th —, 2026 WL 2543846, at *10 (9th Cir. Aug. 28, 2026) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).[1]

Just two years ago, the CFTC agreed with that view, conceding that it was "not a gaming regulator" and that it possessed neither "the statutory mandate nor specialized experience" to be one. *Event Contracts,* 89 Fed. Reg. 48968, 48982-83 (June 10, 2024), withdrawn by *Event Contracts; Withdrawal of Proposed Regulatory Action*, 91 Fed. Reg. 5386, 5387 (Feb.

[1] *See also KalshiEX v. Schuler*, — F.4th —, 2026 WL 2884087, at *10 (6th Cir. Sept. 25, 2026) ("[I]t is difficult to imagine that Congress intended the CFTC to exclusively regulate whether sports-event contracts could be on [derivatives markets], when those contracts did not even exist at the time.").

6, 2026). Now, the CFTC supports Kalshi's preemption arguments, without squaring that newfound support with its own rules or its admitted lack of capacity to serve as the federal gambling czar, let alone explaining what occurred in the past two years to justify such an about-face.[2] What's worse, by supporting unregulated nationwide gambling on the markets it is entrusted with policing, the CFTC diverts its resources and attention from its core mission—regulating the legitimate derivatives markets for the benefit of the American people, who depend on those markets for stable prices in the essential goods they rely on in everyday life, from gas to groceries.

A decision in favor of Kalshi would not only be erroneous, it would also have dire consequences for consumers and the public interest. It would deprive Utah the opportunity to protect its residents from sports-betting and its well-documented societal ills. It would also threaten other state laws that protect the public, including those that prohibit gambling on elections. And it would effectively endorse the CFTC's decision to ignore its real job policing the legitimate derivatives markets at a time of high inflation to instead serve as the nation's gambling commissioner and election supervisor—roles that, until recently, the agency candidly admitted it lacked the expertise, resources, and mandate to perform.

---

[2] The CFTC recently proposed to formally adopt its newfound pro-sports-betting view. *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35806 (June 12, 2026). For its part, the CFTC at least acknowledges (Br. 24) that the proposal is just that—a proposal. Kalshi is not quite as judicious. See Br. 61-62 (referring to CFTC's existing categorical prohibition of gambling contracts as "soon-to-be-replaced ... by the CFTC's new regulation permitting many sports-event contracts").

## ARGUMENT

### I. Kalshi's sports gambling contracts are not subject to the CFTC's exclusive jurisdiction.

Express preemption cannot be squared with the CEA's text, structure, and history. Field preemption is also inapplicable because the legislative context demonstrates that Congress intended to enlarge the states' role in consumer regulation—including the oversight of event contracts—not preempt it. And since sports-bets have no place trading on the legitimate derivatives markets, state and federal law do not conflict.

#### A. Text, structure, and history defeat express preemption.

Congress granted the CFTC "exclusive jurisdiction" over transactions involving 1) "swaps" that are 2) "traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). Sports-bets satisfy neither of these criteria.

##### 1. Sports-bets are not "swaps."

A "swap" is a form of a hedging agreement whereby two counterparties transfer (or swap) risk from a particular economic activity, like the possibility that a third party defaults on a loan. *See, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 172 (2d Cir. 2004). Congress added "swaps" to the CEA's coverage due to the outsized role that unregulated "credit default swaps" played in the 2008 financial crisis. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* 18-19 (2017).[3] The Act's "swap" definition has six parts,

[3] *See also* Department of the Treasury, Financial Regulatory Reform, A New Foundation: Rebuilding Financial Supervision and Regulation 6-7, 47 (2009) (discussing the "disastrously clear" "downside" to "lax regulatory

consisting of a long list of complex financial instruments, linked to various financial measures and indices like interest rates, currencies, commodities, securities, instruments of indebtedness, and other risk-transferring instruments. 7 U.S.C. § 1a(47)(A).

Kalshi relies on § 1a(47)(A)(ii)'s definition of "swap," which consists of "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(i)-(ii). Kalshi claims that a sports-bet is a swap under this definition because it provides for a payment "dependent" on the "occurrence" of an "event" or "contingency"—the Knicks beating the Jazz, for instance.

That can't be right.

For one thing, Kalshi's interpretation is contrary to the principle that "a word is known by the company it keeps." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). This canon guards against "giving unintended breadth to the Acts of Congress" by "ascribing to one word"—here, occurrence, event, or contingency—"a meaning so broad that it is inconsistent with

---

regime for … credit default swaps" before the financial crisis), https://www.govinfo.gov/content/pkg/GOVPUB-T-PURL-LPS113933/pdf/GOVPUB-T-PURL-LPS113933.pdf; Frank D'Souza, *et al.*, *Illuminating the Need for Regulation in Dark Markets: Proposed Regulation of the OTC Derivatives Market,* 12 U. Pa. J. Bus. L. 473, 475-78 & n.13 (2010) ("By 2005, the notional value of derivatives was $454.4 trillion … more than ten times the global gross domestic product and three times the size of all financial assets combined.").

its accompanying words[.]" *Id.* (cleaned up). The words that "accompany" occurrence, event, or contingency are financial measures or instruments like interest rates, currencies, commodities, and securities. Those are the types of occurrences, events or contingencies that Congress envisioned, and "Kalshi's sports event contracts are unlike these transactions." *Assad*, 2026 WL 2543846, at *10.

The same goes for the definition's only limiting principle—that the occurrence, event, or contingency must be "associated with a potential financial, economic, or commercial consequence." *Schuler*, 2026 WL 2884087, at *10. The CEA's express purpose provides a clue as to which types of "financial, economic, or commercial consequences" an event should be associated with: those "affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). Read holistically then, "the financial, economic, or commercial consequence" is "associated with" an event against which it "would be beneficial for hedging financial risk and deriving pricing information." *Schuler*, 2026 WL 2884087, at *10. The same measures and instruments listed in the definition's neighboring sub-clauses—*i.e.*, the interest rates, currencies, commodities, securities, *etc.*—all comfortably fall within that category; whether the Knicks beat the Jazz or Pat Mahomes passes for 300 yards does not. Indeed, as the Ninth Circuit recognized, "Kalshi's sports event contracts do not help institutions or investors hedge against risk; they *create* risk, largely for ordinary consumers, where none previously existed." *Assad*, 2026 WL 2543846, at *10.

Aside from "bookies" or a sports figure illegally betting on his or her own performance, no one with a straight face would reasonably claim to be utilizing Kalshi's sports-bets to "manage" or "discover" price risks and information. That is why the Sixth Circuit flatly rejected Kalshi's argument focused on sporting events' consequences on third parties like advertisers and sponsors as "too attenuated, indirect, and speculative to satisfy the statutory definition" because they "rely on downstream actions and do not result from the occurrence or nonoccurrence of the sports events themselves." *Schuler*, 2026 WL 2884087, at *15.

Indeed, not long ago, Kalshi agreed that "Congress did not want sports betting to be conducted on derivatives markets." Br. of Appellee 41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024), Doc. No. 2085055. In challenging a CFTC order that prohibited Kalshi from listing election event contracts,[4] Kalshi contrasted elections from sporting events like "horseraces" or "boxing matches," which, it pointed out, "are staged purely for entertainment and to facilitate betting." Mem. of Law in Support of Plaintiff's Mot. for Summary Judgment at 30, *KalshiEX, LLC v. CFTC*, No. 23-cv-03257 (D.D.C. Jan. 25, 2024), Doc. No. 17-1. Kalshi explained that sports-bets "have no independent significance" because "*their outcomes carry no economic risks*." *Id.* (emphasis added).

[4] *Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the U.S. Senate and U.S. House of Representatives*, CFTC Order, at 15-19 (Sept. 22, 2023) ("2023 Kalshi Order"), https://www.cftc.gov/sites/default/files/filings/documents/2023/orgkexkalshiordersig230922.pdf.

Only after it started offering sports-betting did Kalshi change its tune. But the language and intent of the rule prove that Kalshi's original position—that "Congress did not want sports betting … on derivatives markets" because sporting contests are "purely for entertainment," lack "independent significance," and have "outcomes [that] carry no economic risks"—was correct.

Finally, Kalshi's boundless conception of a "swap" leads to absurd results. Under Kalshi's interpretation, all sports-bets would qualify as "swaps." And the CEA *requires* that all consumer swaps must be traded on a DCM or risk criminal prosecution. 7 U.S.C. §§ 2(e), 6(a), 6c(c); 17 C.F.R. § 33.3(a). Thus, according to Kalshi's interpretation, "every person placing a sports bet [on a sportsbook] (or anywhere else for that matter) is violating the CEA." *Assad*, 2026 WL 2543846, at *11. That Kalshi's interpretation would "attach criminal penalties to a breathtaking amount of commonplace gambling activity," *Schuler*, 2026 WL 2884087, at *14 (cleaned up), only underscores its infirmity.[5]

### 2. The CEA expressly prohibits listing "gaming" contracts on the derivatives markets.

Kalshi's interpretation elides that the CFTC's "exclusive jurisdiction" applies only to swaps that are "traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). In Dodd-Frank, Congress adopted the so-called "Special Rule,"

[5] The majority's error in *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026), can largely be attributed to its failure to grapple with this clear implication of Kalshi's "overly broad" interpretation. *See Assad*, 2026 WL 2543846, at *11 (rejecting *Flaherty*); *Schuler*, 2026 WL 2884087, at *15 (same).

a statutory provision that authorizes the CFTC to ban certain contracts that "involve … activity that is unlawful under any … State law," as well as those involving "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). Congress further declared that no such "agreement, contract, or transaction determined by the Commission to be contrary to the public interest … may be listed or made available for clearing or trading on or through" a DCM. 7 U.S.C. § 7a-2(c)(5)(C)(ii). Under this authority, the CFTC adopted a regulation that categorically prohibits DCMs from listing any event contracts that "involve, relate to, or reference" "gaming" or an activity that is "unlawful under … State law." 17 C.F.R. § 40.11(a)(1). Kalshi's contracts fall squarely under this prohibition.

There is no serious dispute that Kalshi's sports-bets "involve" "gaming": "That Kalshi's sports event contracts are, in reality, sports bets is not just an *I* know it when *I* see it issue," but "*everyone*, including Kalshi, knows it when they see it." *Assad*, 2026 WL 2543846, at *10 (cleaned up). Kalshi admitted as much when it contrasted its election contracts from sports-betting (before it started offering sports-betting, that is). *See supra* 9-10.

Astonishingly, the CFTC (Br. 14, 25) now has adopted Kalshi's view, arguing that sports-bets can be traded as "swaps" and subject to exclusive CFTC jurisdiction so long as they are traded on a DCM—whether lawfully or not. But Congress prohibited *all* such contracts from being "listed" or "trad[ed]" on a DCM. 7 U.S.C. § 7a-2(c)(5)(C)(ii). That is why Rule 40.11 is styled as a "prohibition"—"a registered entity shall not list for trading" any of the enumerated contracts. *Id.*

In adopting the rule, the CFTC explained that "its prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44786 (July 27, 2011). Despite its recent position change, the CFTC's website still explains that "Regulation 40.11 prohibits event contracts that reference terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law[.]" CFTC, Contracts and Products[6]; *see also* Letter from six U.S. Senators to Acting CFTC Chair Caroline Pham (Sept. 30, 2025) (questioning why the CFTC is "not enforcing its clear regulatory mandate promulgated under Regulation 40.11")[7]; Daniel Wallach, *CFTC's Failure To Enforce 'Gaming' Contract Ban Could Still Upend Kalshi Sports Betting Lawsuits*, Forbes (May 27, 2025) (quoting former CFTC commissioners Pham and Quintenz regarding Rule 40.11's prohibition on gambling event contracts).[8]

And as the CFTC well knows, while its rules include separate provisions governing self-certification and preapproval of some contracts, those provisions do not negate the Special Rule's prohibition. 17 C.F.R. §§ 40.2, 40.3.

---

[6] https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm (last visited 10/22/26)

[7] https://news.bloomberglaw.com/securities-law/senators-slam-cftc-over-event-contracts-used-for-sports-betting

[8] https://www.forbes.com/sites/danielwallach/2025/05/27/cftcs-failure-to-enforce-gaming-contract-ban-could-still-upend-kalshi-sports-betting-lawsuits/

They address instances where the nature of a contract is in doubt, including contracts that share attributes with prohibited ones. In its adopting release, the CFTC explained that, subject to further rulemaking on gaming contracts, the CFTC will, "[i]n the meantime," prohibit contracts based upon the statutory enumerated activities and "consider individual product submissions on a case-by-case basis under § 40.2 or § 40.3." 76 Fed. Reg. at 44785. The CFTC's failure to enforce its own rules does not negate that prohibition.

### 3. The CFTC's historical treatment confirms that sports-bets are not swaps that lawfully can be traded on DCMs.

The CFTC's newfound view that it has exclusive jurisdiction over sports-bets—whether or not lawfully traded on DCMs—is not only demonstrably wrong, but also contrary to its own historical treatment of event contracts. Until recently, the CFTC viewed all event contracts with a jaundiced eye because they fail the "economic consequences" test—they generally lack the hedging or price discovery attributes of legitimate derivatives. The CFTC severely restricted election gambling contracts in the 1990s, limiting them to the realm of academic research because they lacked "hedging or price-basing utility." *See* 2023 Kalshi Order at 15 & n.33. In 2008, the CFTC sought input on the "appropriate regulatory treatment" of event contracts, including how it should "address the potential gaming aspects of some event contracts" given public interest concerns. *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669 (May 7, 2008) ("*Concept Release*").

Following Dodd-Frank, that answer was clear. The CFTC adopted Rule 40.11 in 2011 to effectuate "Congress's intent to prevent gambling through the futures markets and to protect the public interest from gaming and other events contracts." *Provisions Common to Registered Entities*, 76 Fed. Reg. at 44786 (cleaned up). And in 2012, the CFTC added more inherently financial instruments (like cross-currency swaps, currency options, and foreign exchange rate agreements) to the swap definition—thus further negating any characterization of sports-bets as swaps. 17 C.F.R. § 1.3. Nowhere in the 159-page adopting release does the CFTC indicate that sport-bets are swaps. *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48208 (Aug. 13, 2012).

Rather, the CFTC's discussion confirms that sports-bets lack the swap's essential attributes. Sports-bets are not "risk-shifting arrangements with financial entities." *Id.* at 48248. Rather, sports-bets resemble contracts entered primarily for "personal, family, or household purposes" that are *excluded* from the swap definition. *Id.* at 48246. Like those other excluded contracts, sports-bets do not serve the "two critical functions" underlying the derivatives markets—"hedging and price basing." *Concept Release*, 73 Fed. Reg. at 25672; *see also* 7 U.S.C. § 5(a) (citing management of price risks, price discovery, and price dissemination as CEA's purpose).

In its 2024 rule proposal, the CFTC explained that sports-bets cannot serve these dual purposes because their economic impact is "generally too diffuse and unpredictable to correlate to direct and quantifiable changes in

the price of commodities or other financial assets or instruments, limiting the hedging and price-basing utility of an event contract involving such an occurrence." *Event Contracts*, 89 Fed. Reg. at 48981. Gambling contracts thus cannot reasonably be expected to be "used for hedging and/or price basing on more than an occasional basis." *Id.* at 48982. Additionally, to provide pricing information, gambling contracts rest on unreliable pricing information derived from opaque and unregulated sources. *Id.* This stands in marked contrast to pricing information on which the swaps markets depend, including government research and analysis, market-derived supply and demand data, and other reliable economic markers. *Id.*

The CFTC barely even nods to this history and offers no explanation for its about-face on sports-betting. As such, the CFTC's new position is not entitled to even a modicum of deference. The degree of deference given to an agency's position "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore v. Swift*, 323 U.S. 134, 140 (1944). By ignoring its own treatment of sports-betting event contracts, much less explaining its dramatic departure from that regulatory history, the CFTC has provided no basis to defer to its views.

#### 4. Legislative context and history confirm that sports-bets are prohibited from listing or trading on DCMs.

If Kalshi were correct that Congress intended to legalize sports-betting in Dodd-Frank, one would assume that the Act's legislative history would be

replete with spirited debate over gambling's pros and cons. "Sports gambling," afterall, "has long had strong opposition." *Murphy*, 584 U.S. at 460. But the topic is barely mentioned in legislative history; and that minimal treatment confirms that, to the extent Congress was thinking of sports-betting at all, it certainly was not intending to legalize it.

While debating the "Special Rule," Senators Lincoln and Feinstein engaged in a colloquy emphasizing the CFTC's need for authority to protect the public interest by banning event contracts based, for example, on sporting events. The Senators' exchange demonstrates that such contracts serve "no commercial purpose" and are offered "solely for gambling" rather than "commercial" or "hedging" uses. 156 Cong. Rec. S5906-07, 2010 WL 2788026, at *S5906-07 (daily ed. July 15, 2010). The colloquy confirms that Congress was aware of the risk that bad actors could slap a "swap" label on a sports-bet to sidestep then-existing gambling prohibitions, and included the Special Rule as "a backstop" to guard against that result. *Schuler*, 2026 WL 2884087, at *25.

Former Sen. Lincoln submitted an amicus brief in the New Jersey case claiming that her 2010 floor statement shows that Congress *intended* the CFTC to exercise exclusive jurisdiction over sports-gambling event contracts. As the former senator admitted in her brief, however, she is a paid consultant to Kalshi. Members of Congress Br., *KalshiEX v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025), Doc. No. 66, at 2 n.2.

Regardless, the former senator's current recollection of her 2010 statement doesn't add up. Pointing out that "sports gambling" lacked the

"commercial purpose" to trade as a swap shows that Congress inserted the Special Rule to ensure that sports-event contracts would not be used to evade existing gambling prohibitions—not to empower the CFTC to allow such evasion. Any contrary interpretation is pure sophistry.

### B. Congress sought to enlarge the role of state law in financial regulation, not to preempt gaming regulation.

In addition to suffering from the same lack of textual and structural support, Kalshi's field preemption argument also flies in the face of what Congress was trying to achieve in Dodd-Frank. In Dodd-Frank, Congress intended to address the causes of the 2008 crash—like unregulated swaps. It is implausible in the extreme to think that, in so doing, Congress intended to facilitate nationwide sports-betting platforms insulated from state regulation, a reform that would exacerbate consumer abuse while doing nothing to stabilize the financial system or prevent a future crisis.

Preemption of state anti-predatory lending laws by federal banking regulators contributed significantly to the 2008 financial crisis. That preemption nullified state laws that restricted the aggressive mortgage terms national banks could offer, such as balloon payments, negative amortization schedules, and high fees—and led to much riskier lending. *See* Di Wu *et al.*, *Spillover Effects of Financial Deregulation: The Unintended Consequences of the OCC Preemption Rule on Mortgage Lending Practices*, 95 Int'l Rev. of Fin. Anal., Part C (Oct. 2024). Riskier lending increased defaults, exacerbating the subprime meltdown and foreclosure crisis. *See* Alan White *et al.*, *The Impact of Federal Preemption of State Anti-predatory Lending Laws on the Foreclosure Crisis*, 21 Cornell J. of Pol'y Anal. & Mgmt. 247 (2011); *The*

*Financial Crisis Inquiry Report*, Fin. Crisis Inquiry Comm'n, 112 (Off. Gov't Ed., Jan. 2011).[9]

"To correct the problems created by federal preemption, Dodd-Frank enlarge[d] both the lawmaking and law enforcement authority of the states in the area of consumer financial protection." Arthur E. Wilmarth Jr., *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. Corp. L. 893, 896 (2011); *see also* Dennis M. Kelleher & Stephen Hall, *Report: More than Ever, Americans Must Look to the States for Protection Against Financial Fraud and Abuse* 15-22, Better Markets (Sept. 9, 2025).[10] There is no reason to think that, in so doing, Congress also silently preempted state and tribal gambling laws and regulation—a result dramatically at odds with what Congress had set out to achieve.

### C. Conflict preemption does not apply because the CFTC banned gaming contracts, and because Kalshi's sports gambling platform does not require uniform regulation.

The district court correctly held that Utah's gaming laws do not conflict with the CEA. *Cox*, 2026 WL 2241564, at *12. By categorically prohibiting all gaming event contracts, Rule 40.11 disposes of the conflict preemption claim: there can be no tension between state laws governing those contracts and any provision of the CEA that would regulate their trading *if* they weren't unlawful.

[9] https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf

[10] https://bettermarkets.org/wp-content/uploads/2025/09/BetterMarkets_State_Action_Protection_Report_09-09-2025.pdf

Even putting Rule 40.11 aside, however, the rationale for conflict preemption is absent. Kalshi lacks the derivatives markets' need for uniform regulation because it is not an exchange on which financial instruments are traded so that businesses and industries can manage their price risks or obtain pricing benchmarks—the role that derivatives play. Kalshi points to a CFTC rule (Br. 48) that requires a DCM to provide "impartial" access to its members, but fails to explain how it cannot abide by that rule without violating Utah's gambling ban. *Assad*, 2026 WL 2543846, at *16. Afterall, other sportsbooks utilize "geofencing" to avoid running afoul of local law. *Id.*

That is emblematic of Kalshi's "gambling problem"—it "markets its sports event contracts … as 'legal sports betting,' [y]et it argues that sports bets and sports event contracts are different." *Assad*, 2026 WL 2543846, at *10. Despite Kalshi's insistence to the contrary, its betting platform has no distinctive attributes that would require regulation as anything other than the sportsbook it is. *See* Benjamin Schiffrin, *Sports Betting Scandals Show the Perils of Prediction Markets*, Better Markets (Nov. 20, 2025) (citing New York Times report illustrating that the betting experience on prediction markets is identical to that on the sportsbook FanDuel).[11] By Kalshi's own admission (*supra* 9-10), its contracts can be regulated as sports-bets since they are consumer transactions used for entertainment rather than commercial hedging or price discovery. "[*E*]*veryone*, including Kalshi, knows it when they see it." *Assad*, 2026 WL 2241564, at *10.

---

[11] https://bettermarkets.org/wp-content/uploads/2025/11/Prediction-Markets-Fact-Sheet-11.20.25.pdf

Kalshi's attempts to distinguish its platform from other sportsbooks thus ring hollow. For starters, Kalshi's claim that bettors bet with each other instead of "the house" is, at best, "a tenuous position." *Assad*, 2026 WL 2543846, at *11. In a recent rule proposal, the CFTC acknowledged that "at least six" prediction markets "currently" permit affiliated market makers to engage in proprietary trading—trading from their own accounts with other bettors for profit. *Conflicts and Affiliations*, 91 Fed. Reg. 50926, 50948 (Aug. 6, 2026). Perhaps that is why, in its recent lawsuit against Kalshi, Utah alleges that Kalshi affiliate, Kalshi Trading, and others "act as 'market makers'—institutional bettors that establish the terms of the bets and collect winnings, like a traditional sportsbook, based on the outcome of the bets." Compl. ¶ 3, *Brown v. Kalshi Inc.*, No. 260908356 (Utah 3d Dist. Ct. Oct. 20, 2026). Regardless, the "house" argument is beside the point, as the swap definition does not require a financial intermediary. *See Assad*, 2026 WL 2543846, at *11. Indeed, under the CEA, an intermediary that "regularly" trades swaps "with counterparties … for its own account" is a "swap dealer." 7 U.S.C. § 1a(49).

Equally off-base is Kalshi's attempt (Br. 43-44) to distinguish its "tradable" sports-bets from those placed on other sportsbooks. The Sixth Circuit flatly rejected that argument because "nothing in the statutory definition of a swap draws a distinction based on whether the instrument is tradable." *Schuler*, 2026 WL 2884087, at *15. The CFTC concedes as much, observing that "the CEA's 'swap' definition does not itself contain a

tradability requirement[.]" *Further Definition of 'Swap' To Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65969, 65973 (Oct. 19, 2026).

Indeed, traditional sportsbooks like FanDuel and DraftKings have adopted Kalshi's strategy for evading state gaming laws by creating their own prediction market platforms. *See* Brad Senkiw, *FanDuel Predicts Goes Live in All 50 U.S. States, Offers Sports in 18* (Jan. 15, 2026);[12] Business-Wire, *DraftKings Launches Proprietary Exchange to Bolster Differentiated Predictions* Experience (June 26, 2026).[13] And it's not as though the online sportsbooks act any differently when they engage in this regulatory arbitrage by switching from "traditional" betting platforms to "prediction markets." The CFTC even had to coach prediction markets to stop "displaying pricing information in the 'American' odds format used by casino gambling bookmakers" because, the CFTC told them, providing American odds was "likely to mislead market participants about the nature of the transaction[.]" *CFTC Reminds Markets to Display Clear Pricing Information* (Aug. 7, 2026).[14] *See* https://www.merriam-webster.com/dictionary/irony ("the use of words to express something other than and especially the opposite of the literal meaning").

---

[12] https://www.covers.com/industry/fanduel-predicts-goes-live-in-all-50-states-jan-15-2026.

[13] https://www.business-wire.com/news/home/20260624009284/en/DraftKings-Launches-Proprietary-Exchange-to-Bolster-Differentiated-Predictions-Experience.

[14] https://www.cftc.gov/PressRoom/PressReleases/9278-26?utm_source=govdelivery.

## II. Preempting state regulation of Kalshi's sports-betting threatens to harm millions of Americans, election integrity, and the derivatives markets themselves.

### A. Preempting state law would override Utah's decision to protect its residents from the evils of sports-betting.

Reversing the district court's judgment would prohibit Utah from protecting its residents from gambling and all of its societal ills. And it would increase the likelihood that courts in other states will enjoin enforcement of other state and tribal gaming laws. This matters because Kalshi's sports-bets pose the same threats of financial harm and degraded quality of life as do identical bets offered by other sportsbooks.

That threat is substantial. Sports gambling is financially and emotionally destructive. *See* Charles Fain Lehman, *Legalizing Sports Gambling Was a Huge Mistake—The evidence is convincing: The betting industry is ruining lives*, The Atlantic (Sept. 23, 2024).[15] Sports-betting leads to reduced household savings, increased personal bankruptcies, and spikes in domestic violence. *See* Andrew Yang, *Sports Betting Hurts American Men. Time To Rethink Its Regulation*, Newsweek (Dec. 3, 2024).[16] Problem gamblers are 15 times more likely to die by suicide than the general population. *See* WHO, *Gambling* (Dec. 2, 2024).[17] And problem gambling is increasing nationally. *See* Benjamin Schiffrin, Op-Ed, *The U.S. Already Has a Gambling*

---

[15] https://www.theatlantic.com/ideas/archive/2024/09/legal-sports-gambling-was-mistake/679925/

[16] https://www.newsweek.com/sports-betting-hurts-american-men-time-rethink-its-regulation-opinion-1994180

[17] https://www.who.int/news-room/fact-sheets/detail/gambling

*Epidemic—24 Hour Stock Trading Would Only Make It Worse*, Fortune Magazine (Dec. 13, 2024).[18] Nary a day goes by without another report of someone who allegedly engaged in criminal behavior to support a gambling addiction. *See, e.g.,* Hurubie Meko, *A Police Chief Had a $4.5 Million Gambling Problem. No One Knew.*, N.Y. Times (Apr. 14, 2026).[19]

The need for state-level protections increases by the day. Kalshi and Polymarket, the two largest prediction-market platforms, "took in a total of $50 billion in trades in 2025" and "took in that much in just March and April" this year. Sharon LaFraniere & David Yaffe-Bellany, *How Prediction Markets and Crypto Firms Steamrolled a Watchdog Agency*, N.Y. Times (May 24, 2026).[20] Industry-wide volume has risen to $16.4 billion in the second week of the NFL season, with Kalshi having its first $3 billion day. *See* Andres Chovil & Benjamin Schiffrin, *Deceptive, Predatory Marketing Practices Show Why States Should Regulate Prediction Markets* 1 (Oct. 21, 2026).[21] Prediction markets exploit young Americans' "financial nihilism" through targeted advertising featuring celebrities and internet influencers paid to

---

[18] https://fortune.com/2024/12/13/the-u-s-already-has-a-gambling-epidemic-24-hour-stock-trading-would-only-make-it-worse/.

[19] https://www.nytimes.com/2026/04/14/nyregion/police-chief-sports-gambling-new-haven.html

[20] https://www.nytimes.com/2026/05/24/us/how-prediction-markets-and-crypto-firms-steamrolled-a-watchdog-agency.html?smid=nytcore-ios-share

[21] https://bettermarkets.org/wp-content/uploads/2026/10/Better-Markets-Prediction-Market-Fact-Sheet-.pdf

convince large numbers of Gen Z and Millennial Americans that "trading" on sports is equivalent to traditional investing. *Id.* at 2.

And that's not all. Kalshi and similar firms offer the opportunity to bet on a vast array of events, including elections. These bets undermine the integrity of our elections and the public's faith in the electoral process. That is why states overwhelmingly condemn election gambling. *See* 2023 Kalshi Order at 11-12 nn.26 & 27 (collecting dozens of state prohibitions on election betting). The CFTC's 2023 Order cited vast opposition to Kalshi's election-betting contracts from commenters as well as members of Congress, who warned that "[e]stablishing a large-scale, for-profit political event betting market in the United States … would profoundly undermine the sanctity and democratic value of elections." *Id.* at 19-20. The CFTC's (now rescinded) Gaming Proposal also addressed these concerns. It cited multiple ways in which betting on elections can inflict harm, including manipulation of elections to profit on bets, or the use of bets to influence elections—with all of it increasingly tied to the deployment of AI. *Event Contracts*, 89 Fed. Reg. at 48983.

Kalshi insists states are preempted from prohibiting election-betting contracts. But, like sports-bets, election-bets fall outside the "exclusive jurisdiction" provision in Section 2—they fail the economic consequences test, do not serve as reliable risk-hedging or price-discovery mechanisms, and are not based on reliable data. 2023 Kalshi Order, at 15-21. And they are likewise banned under 17 C.F.R. § 40.11 as gaming and activity that violates state law. Just as the Congress that passed Dodd-Frank did not intend to sweep aside

state laws prohibiting sports-betting, it did not intend to displace nearly 200 years of state laws and court decisions condemning election-gambling.

### B. The CFTC lacks the authority, expertise, and resources to oversee gambling, and it has a core mission that Americans depend on it to fulfill.

Affirmance here would place the CFTC in the untenable position of attempting to police the gaming industry and thousands of elections. The CFTC cannot possibly provide protections that are comparable to those that the dozens of state gaming laws and commissioners provide to their citizens. And allowing for trading of "political event contracts … would require the CFTC to exercise its oversight and enforcement authorities in the manner of an election cop" overseeing the countless elections that take place throughout the country to ensure that gambling does not corrupt election outcomes. Chairman Rostin Benham, *Statement Regarding CFTC Order To Prohibit Kalshi Political Control Derivatives Contracts*, CFTC (Sept. 22, 2023).[22]

Just two years ago, the CFTC admitted that it lacks the necessary tools to regulate either variety of gambling. *Event Contracts*, 89 Fed. Reg at 48982-83 (CFTC lacks statutory mandate and specialized experience to oversee sports-gambling); *id.* at 48983 (CFTC lacks the specialized experience appropriate for investigating election outcomes). The current CFTC has not acknowledged these statements, let alone justified its about-face.

Even if it had a statutory mandate and the requisite expertise, the CFTC lacks the resources to fill those roles. The CFTC ranks among the smallest

[22] https://www.cftc.gov/PressRoom/SpeechesTestimony/behnamstatement092223

regulatory agencies, with a budget of only $365 million, CFTC, President's Budget: FY2026, at 4,[23] and a staff that has been reduced from 760 in 2015 to approximately 550 this year. LaFraniere & Yaffe-Bellany, *supra*. Regardless, the agency already oversees a futures and swaps market with a notional value of nearly $400 trillion dollars. The CFTC also assumes responsibility for parts of the crypto market. *See Regulation Crypto Asset Transactions and Regulation Crypto Asset Markets*, 91 Fed. Reg. 64811 (Oct. 13, 2026).

Assuming those roles will only weaken the CFTC's ability to discharge its core mission: to maintain the integrity and efficiency of the derivatives markets to enable commercial enterprises to safely and reliably hedge price risk in the raw materials they use and the products they sell—a job the current CFTC seems barely interested in doing to begin with. According to recent reports, the agency attempted to bury an investigation into highly suspicious trading patterns in oil futures that took place around presidential announcements of ceasefires with Iran. Simon August, *Traders Bet Big Minutes Before Trump's Iran Post. Then A Top Regulator's Adviser Reportedly Stepped In*, Daily Caller (Oct. 13, 2026).[24] The CFTC should return to its core mission to help ensure that Americans can access stable prices for the countless products they need in their daily lives, rather than expending

---

[23] https://www.cftc.gov/sites/default/files/CFTC_FY2026_Presidents_Budget.pdf.

[24] https://dailycaller.com/2026/10/13/cftc-oil-trades-insider-trading-referral-mel-gunewardena-michael-selig-iran-bloomberg/.

its limited resources championing nationwide sports-betting that benefits only unregulated sportsbooks.

These issues are urgent, with prediction markets rapidly expanding. Traditional sportsbooks have adopted Kalshi's regulatory-arbitrage strategy for evading state gaming laws by creating their own prediction market platforms. *See supra* 21. As the industry expands, cases involving preemption continue to multiply with attorneys general from both sides of the political aisle trying to keep unregulated gambling from infecting their states. Br. of 39 States and D.C., *Flaherty v. KalshiEX, LLC*, No. 26-299 (S. Ct. Oct. 2026).[25] Affirming here will thus not only preserve Utahns' choice to outlaw gambling; it would help those states that choose to allow gambling to ensure that sportsbooks adhere to proper regulations designed to minimize gambling's many documented harms.

[25] https://www.supremecourt.gov/DocketPDF/26/26-299/428759/20261007134816267_Kalshi%20Cert%20Amicus.pdf.

## CONCLUSION

The district court's order should be affirmed.

October 28, 2026

Respectfully submitted,

/s/ *Dominick V. Freda*
Dennis M. Kelleher
Dominick V. Freda
BETTER MARKETS, INC.
2000 Pennsylvania Avenue, NW
Suite 408
Washington, DC 20006
(301) 437-4343
dkelleher@bettermarkets.org
dfreda@bettermarkets.org

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of FRAP 29(a)(5) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 6,463 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14-point Georgia Pro font.

/s/ *Dominick V. Freda*
Dominick V. Freda

## CERTIFICATE OF SERVICE

On October 28, 2026, I filed an electronic copy of this brief with the Clerk of the Tenth Circuit using the CM/ECF system. That system serves all registered attorneys in this case through a Notice of Docket Activity.

/s/ *Dominick V. Freda*
Dominick V. Freda