**No. 26-4100**

# In the United States Court of Appeals for the Tenth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant*,

*v.*

SPENCER J. COX, ET AL.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, NO. 2:26-CV-151 (SHELBY, J.)

**BRIEF OF AMICUS CURIAE ASSOCIATION OF GAMING EQUIPMENT MANUFACTURERS IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**


Kevin F. King
*Counsel of Record*
Scott J. Garfing
Hassan Ahmad
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae Association of Gaming Equipment Manufacturers*


October 28, 2026

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1(a) and Tenth Circuit Rule 26.1, undersigned counsel certifies that the Association of Gaming Equipment Manufacturers does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ... iii

GLOSSARY ... viii

INTEREST OF AMICUS CURIAE ... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ... 3

ARGUMENT ... 7

I. Federal and State Gaming Laws Establish an Integrated, Carefully Structured Regulatory Framework that Respects State Policy Choices. ... 7

II. AGEM's Members Partner with Regulators to Implement the Governing Framework. ... 11

III. Kalshi's Arguments Would Authorize Unlicensed Gambling Nationwide. ... 15

 A. Kalshi's "Sports-Event Contracts" Are Sports Bets. ... 15

 B. Kalshi's Boundless Interpretation Would Facilitate Nationwide Online Casino Gaming. ... 17

IV. Kalshi's "Swap" and Preemption Arguments Fail ... 23

 A. Kalshi's "Swap" Definition Is Untethered to the CEA. ... 23

 B. The CEA Does Not Preempt State Gaming Laws. ... 26

CONCLUSION ... 31

CERTIFICATE OF COMPLIANCE ... 32

CERTIFICATE OF SERVICE ... 33

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) ........ 3

*Blue Lake Rancheria v. Kalshi, Inc.*,
__ F.4th __, 2026 WL 2728466 (9th Cir. Sept. 16, 2026) ........ 4, 15

*Boynton v. Ellis*,
57 F.2d 665 (10th Cir. 1932) ........ 7, 27

*Coinbase Fin. Mkts., Inc. v. Raoul*,
2026 WL 2969682 (N.D. Ill. Oct. 2, 2026) ........ 26

*Emerson v. Kansas City S. Ry. Co.*,
503 F.3d 1126 (10th Cir. 2007) ........ 27

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017) ........ 28

*KalshiEX, LLC v. Assad*,
__ F.4th __, 2026 WL 2543846 (9th Cir. Aug. 28, 2026) ........ 4, 6, 10,
........ 14, 16, 17, 23, 25-27, 30

*KalshiEX, LLC v. Bird*,
2026 WL 2691009 (S.D. Iowa Sept. 8, 2026) ........ 9, 24

*KalshiEX LLC v. Cafferelli*,
__ F. Supp. 3d __, 2026 WL 2294589
(D. Conn. Aug. 10, 2026) ........ 9, 23

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ........ 28

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) ........ 9, 17

*KalshiEX LLC v. Schuler*,
__ F.4th __, 2026 WL 2884087 (6th Cir.Sept. 25, 2026) ........ 6, 14-17,
........ 23, 25-30

*Murphy v. NCAA*,
584 U.S. 453 (2018) .................................................. 3, 6, 7, 27

*N. Beach Amusement Co. v. United States*,
240 F.2d 729 (4th Cir. 1957) .................................................. 11

*QCX LLC v. Nessel*,
2026 WL 1895958 (W.D. Mich. June 17, 2026) .................. 17, 24

*Quarles v. United States*,
587 U.S. 645 (2019) .................................................. 25

*Tarrant Reg'l Water Dist. v. Herrmann*,
569 U.S. 614 (2013) .................................................. 27

*Tarrant Reg'l Water Dist. v. Herrmann*,
656 F.3d 1222 (10th Cir. 2011) .................................................. 27

*In re Three Pa. Skill Amusement Devices*,
2026 WL 1741474 (Pa. June 15, 2026) .................................................. 21

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .................................................. 26

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .................................................. 6

**Statutes**

7 U.S.C. § 1a .................................................. 17, 23, 25

7 U.S.C. § 2 .................................................. 25, 26

7 U.S.C. § 13 .................................................. 25

7 U.S.C. § 13a-1 .................................................. 25

15 U.S.C. § 1172 .................................................. 8, 11

15 U.S.C. § 1173 .................................................. 8, 12

15 U.S.C. § 1174 .................................................. 8, 12

15 U.S.C. § 3001 .......... 7

18 U.S.C. § 1084 .......... 7

18 U.S.C. § 1955 .......... 8

25 U.S.C. § 2710 .......... 8

31 U.S.C. § 5362 .......... 8

31 U.S.C. § 5363 .......... 8

Dodd-Frank Wall Street Reform and Consumer Protection
Act of 2010, Pub. L. No. 111-203 .......... 4

Ky. Rev. Stat. § 528.010 .......... 21

N.M. Stat. § 60-2E-1 .......... 12

Okla. Stat. tit. 3A, § 262.1 .......... 10

Okla. Stat. tit. 3A, § 281 .......... 10

Utah Code § 76-9-1401 .......... 12

Wyo. Stat. § 9-24 .......... 10

**Regulatory Materials**

17 C.F.R. § 38.151 .......... 30

038-5 Wyo. Code R. § 5-1 .......... 10

038-5 Wyo. Code R. § 5-2 .......... 10

038-7 Wyo. Code R. § 7-1 .......... 10

038-8 Wyo. Code R. § 8-1 .......... 10

Colo. Code Regs. § 207 .......... 10, 29

*Event Contracts*, 89 Fed. Reg. 48,968 (June 10, 2024) .......... 11

Kan. Admin. Regs. § 112-101-10 .......... 10

N.M. Admin. Code § 15.1 .......... 10, 29

Nev. Gaming Control Bd. Reg. 5.012 (Feb. 2025) .......... 4

Nev. Gaming Control Bd. Reg. 5.170 (Feb. 2025) .......... 13

Nev. Gaming Control Bd. Reg. 5.011 (Feb. 2025) .......... 13

Okla. Admin. Code § 325 .......... 10

*Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806 (June 12, 2026) .......... 18, 20, 21

**Other Authorities**

Am. Gaming Ass'n, *Skilled at Deception: How Unregulated Gaming Machines Endanger Consumers and Dilute Investments in Local Economies* (Apr. 19, 2021) .......... 21

Aristocrat Techs., Inc., *Aristocrat's Game-Changing Fast Cash Wide Area Progressive Slot Product Now Racing Across the United States* (Feb. 28, 2017) .......... 29

Compact Between the State of New Mexico and the Pueblo of Isleta, App'x to 2015 Compact Amendments § III(A) (2015) .......... 29

Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, The Event Horizon (Apr. 1, 2026) .......... 16

Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, The Event Horizon (Aug. 27, 2025) .......... 16

Eric Ramsey & Dustin Gouker, *Parlays Propel Kalshi to Back-to-Back Volume Records to Open Football Season*, The Event Horizon (Sept. 15, 2026) .......... 16

Eric Ramsey, *Prediction Markets Pitch Hedging As Traders Pile Into Longshot Sports Combos*, The Event Horizon (Oct. 22, 2026) .......... 16

Int'l Game Tech., *Wheel of Fortune - $5.00 in Interstate WAP Slots Jackpot*, https://perma.cc/FP66-KBZC ........ 28

Jeff Edelstein, *It Seems the COO of Betr Just Built a Slot Machine on Kalshi*, In Game (June 17, 2026) ........ 18

Joint Status Report, *Blue Lake Rancheria v. Kalshi, Inc.*, No. 3:25-cv-06162 (N.D. Cal. Oct. 14, 2026), Dkt. 101 ........ 30

Kalshi, *Bill Belichick and Jordon Hudson: Married Before 2027?* ........ 24

Kalshi, *Will the 11th Circuit Rule Non-Intervened False Claims Act* Qui Tam *Suits Unconstitutional?* ........ 24

Kalshi, *Will Any Supreme Court Justice Be Charged with a Federal Crime?* ........ 24

Nat'l Indian Gaming Comm'n, Bulletin 2009-3 (Mar. 9, 2009) ........ 28

Nev. Gaming Control Bd., *Gaming Device Submission Instructions* (Feb. 27, 2026) ........ 12

Nev. Gaming Control Bd. Technical Standards 1.400 & 1.800 (2026) ........ 4

Tom Schad, *Why Prediction Markets Might Be Skipping the Kentucky Derby*, ESPN (Apr. 30, 2026) ........ 22

## GLOSSARY

| | |
|---|---|
| CEA | Commodity Exchange Act |
| CFTC or Commission | Commodity Futures Trading Commission |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| June Proposed Rule | Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,826 (June 12, 2026) |
| WAP | Wide-Area Progressive |

## INTEREST OF AMICUS CURIAE[1]

The Association of Gaming Equipment Manufacturers (AGEM) is a nonprofit international trade association representing manufacturers and suppliers of electronic gaming devices, lottery and sports betting systems, and table games. AGEM's members also develop software, manufacture hardware, deliver components, maintain systems, and offer products and services surrounding gaming equipment and devices of all kinds, including poker chips, bill validators, touchscreen monitors, and slot-machine seating (among countless others). AGEM works to advance the interests of gaming-equipment suppliers throughout the world. Its members include companies that design, manufacture, supply, and service the products and systems used in all regulated gaming markets across the United States.

For decades, AGEM and its members have partnered with federal, state, and tribal regulators to build a gaming framework that is safe, transparent, and accountable. That framework recognizes that gaming

[1] Counsel for amicus certify that no party's counsel authored this brief in whole or in part and that no person other than amicus, its members, or its counsel funded the preparation or submission of this brief. All parties have consented to the filing of this brief.

is principally regulated through state and tribal licensing, oversight, technical standards, testing, auditing, and consumer-protection requirements, supplemented by targeted federal statutes. This system allows states and tribes to make different policy choices that best suit their own needs, and also provides a level competitive playing field for licensed operators and suppliers.

AGEM's members have substantial reliance interests in this longstanding framework. For instance, in 2023 alone, gaming-equipment manufacturers with operations within the United States collectively generated $10.6 billion in direct economic output from commercial sales and operational activities, $3.0 billion in wages and salaries, and more than 24,000 jobs. These manufacturers also spend tens of millions of dollars annually to obtain and maintain licenses and to secure new approvals in hundreds of state and tribal jurisdictions in the United States. AGEM submits this brief to explain why Kalshi's effort to characterize sports wagers as federally regulated derivatives threatens the regulatory framework in which gaming-equipment manufacturers and suppliers have made those investments.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For more than a century, courts have held that gaming regulation lies "within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). Some states, like Utah and Hawaii, have exercised that authority by prohibiting casino gaming altogether. Others permit gaming and have enacted licensing standards, tax laws, and consumer-protection requirements designed to ensure that it serves the public interest. Congress has consistently "respect[ed] the policy choices of the people of each State on the controversial issue of gambling" by designing federal statutes to incorporate and accommodate state gaming laws. *Murphy v. NCAA*, 584 U.S. 453, 484 (2018).

AGEM's members have built their businesses around this regulatory framework. They design, test, license, and service the devices and systems used in lawful gaming markets, and they invest heavily to satisfy the jurisdiction-specific requirements that make those markets safe, transparent, and accountable. Those rules are conditions of market access: AGEM's members cannot offer a gaming product unless the relevant operators, suppliers, and products satisfy the governing jurisdiction's licensing, testing, and consumer-protection requirements.

For example, electronic slot machines manufactured by AGEM's members cannot be operated in Las Vegas casinos unless the machines "conspicuous[ly]" display the payouts for winning wagers, incorporate detailed auditing systems, and use a validated random number generator for each virtual spin of the reels.[2]

Enter Kalshi, which contends that the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, authorized prediction markets to offer "sports-event contracts" nationwide, and designated the Commodity Futures Trading Commission (CFTC) as the sole regulator of those contracts under the Commodity Exchange Act (CEA). But Kalshi's so-called "sports event contracts" "are, in reality," run-of-the-mill "sports bets." *KalshiEX, LLC v. Assad*, __ F.4th __, 2026 WL 2543846, at *10 (9th Cir. Aug. 28, 2026); *see also Blue Lake Rancheria v. Kalshi, Inc.*, __ F.4th __, 2026 WL 2728466, at *8 (9th Cir. Sept. 16, 2026) ("The similarities between a sports event contract, which even Kalshi calls 'sports betting,' and a traditional sports wager are overwhelming."). Kalshi offers point

---

[2] *See, e.g.*, Nev. Gaming Control Bd. Reg. 5.012 (Feb. 2025), https://perma.cc/FXJ5-6TLR; Nev. Gaming Control Bd. Technical Standards 1.400 & 1.800 (2026), https://perma.cc/V953-3ZPZ.

spreads, over/unders, proposition bets, and multi-leg parlays. It markets these wagers as "legal sports betting" and thus engages in precisely the conduct Utah law prohibits: unlicensed gambling. Nothing suggests that Congress designed Dodd-Frank to override longstanding state laws on that issue.

Kalshi's novel interpretation of the CEA has no limiting principle and would dismantle the structured markets in which AGEM's members participate. According to Kalshi, a wager transacted on a prediction market qualifies as a federally regulated "swap" whenever its outcome may have some downstream economic consequence. But that rule cannot distinguish a point-spread wager or a 30-leg parlay from a roulette spin, a slot-machine pull, or a blackjack hand. Accepting Kalshi's position would thus authorize unlicensed, nationwide digital analogues of the state-regulated products that AGEM's members manufacture, but without the licensing, testing, taxation, and consumer-protection obligations that apply under well-established state and tribal gaming laws.

Beyond the lack of a limiting principle, Kalshi's arguments fail for two additional reasons. *First*, the wagers offered by Kalshi are not

"swaps" because the outcomes of the underlying sporting events are not "associated with" the type of potential financial, economic, or commercial consequences the CEA requires. *Second*, even if some event contracts qualified as swaps, nothing in the CEA clearly preempts the states' traditional authority to regulate (or, as in Utah, prohibit) casino gaming. As the Sixth and Ninth Circuits recently recognized, Congress did not enact Dodd-Frank as a nationwide gambling code, nor did it transfer authority over gambling from states and tribes to the CFTC. *See KalshiEX LLC v. Schuler*, __ F.4th __, 2026 WL 2884087, at *2, *8, *18 (6th Cir. Sept. 25, 2026); *Assad*, 2026 WL 2543846, at *8–17.

Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and a federal override of the "policy choices of the people of each State on the controversial issue of gambling," *Murphy*, 584 U.S. at 484, would demand a particularly clear statement of congressional intent. The obscure derivatives provisions cited by Kalshi do not come close to clearing that high bar.

The District Court's judgment should be affirmed.

## ARGUMENT

### I. Federal and State Gaming Laws Establish an Integrated, Carefully Structured Regulatory Framework that Respects State Policy Choices.

This Court has long recognized that gaming regulation "fall[s] within the police power of a state." *Boynton v. Ellis*, 57 F.2d 665, 666 (10th Cir. 1932). Whether a state prohibits gaming entirely (as Utah does) or authorizes it subject to licensing, taxation, technical oversight, and consumer-protection requirements (as dozens of others do), federal law "respect[s]" each state's policy choice. *Murphy*, 584 U.S. at 484.

Congress has expressly endorsed states' authority over gaming, declaring that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1) (Interstate Horseracing Act). And Congress has further reinforced state gaming laws by incorporating, rather than displacing, state laws when it has enacted federal gaming legislation. For instance, the Wire Act prohibits interstate transmissions regarding "bets or wagers on a sporting event or contest," but exempts transmissions "from a State … where betting on that sporting event or contest is legal into a State … in which such betting is legal." 18 U.S.C. § 1084(b). The Illegal Gambling Business Act defines an "illegal

gambling business" by reference to violation of the law of the State or political subdivision where the business is conducted. *Id.* § 1955(b)(1). And the Unlawful Internet Gambling Enforcement Act similarly defines "unlawful Internet gambling" as online transmission of a "bet or wager" that "is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. §§ 5362(10)(A), 5363.

The Johnson Act, with which AGEM's members comply, follows the same pattern. It imposes federal registration, identification, and labeling requirements on manufacturers and distributors of gambling devices (such as slot machines), while also preserving state authority to determine where those devices may lawfully be transported and used. *See* 15 U.S.C. §§ 1172–1174. Similarly, the Indian Gaming Regulatory Act establishes a federal structure for tribal gaming that depends on tribal ordinances, tribal-state compacts, and state participation in the terms under which gaming may occur. *See* 25 U.S.C. § 2710(d)(1), (6).

Together, these statutes reflect the settled approach *Murphy* identified: federal law supplements state and tribal gaming regulations

while preserving each sovereign's authority to determine whether and under what circumstances gaming may occur within its borders.

Kalshi's reading of Dodd-Frank cannot be squared with that landscape. On Kalshi's view, a statute that was "aimed … at systemic risks in the financial sector that undermined U.S. financial stability," *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1028–29 (D. Nev. 2025), also authorized sports betting and other wagers nationwide—including in states like Utah that categorically prohibit gambling. Congress did not effect that fundamental change through a definition of "swap" that does not mention sports betting, casino gaming, or state gambling laws. As courts have recognized, "[g]ambling was not a focal point for Congress when it amended the Commodity Exchange Act through the Dodd-Frank Act," and expanding the scope of authorized sports wagering "had nothing to do with" Dodd-Frank's objectives, especially since "sports gambling was illegal in all but four states" when Dodd-Frank was enacted. *KalshiEX, LLC v. Bird*, 2026 WL 2691009, at *8 (S.D. Iowa Sept. 8, 2026); *see also KalshiEX LLC v. Cafferelli*, __ F. Supp. 3d __, 2026 WL 2294589, at *13 (D. Conn. Aug. 10, 2026).

States and tribes have crafted comprehensive schemes to regulate gaming in jurisdictions where it is authorized. Gaming regulators review and approve licenses for operators and suppliers; prescribe technical standards; require independent testing; audit games and systems; oversee advertising and responsible-gaming programs; and impose reporting and tax obligations.[3] These layers of regulation promote the integrity of each wager, protect consumers, and create stable conditions for investment by manufacturers, commercial gaming operators, and tribes.

This allocation of responsibility to states and tribes makes sense, as Congress has long relied on these regulators and their specialized expertise in gaming oversight. *See, e.g.*, *Assad*, 2026 WL 2543846, at *15 ("Nevada has … a comprehensive regulatory regime, over a variety of gaming methods, that is recognized as the gold standard in gaming regulation." (cleaned up)). The CFTC, by contrast, has acknowledged that it is "not a gaming regulator" and lacks the mandate and experience

[3] *See, e.g.*, Colo. Code Regs. §§ 207-2-7–9; Kan. Admin. Regs. § 112-101-10; N.M. Admin. Code §§ 15.1.7.8–9, 15.1.8.9, 15.1.9.8; Okla. Stat. tit. 3A, §§ 262.1, 281; Okla. Admin. Code §§ 325:85-11-1, 325:85-11-5, 325:85-11-8.1, 325:80-5-5; Wyo. Stat. §§ 9-24-102, 9-24-103; 038-5 Wyo. Code R. §§ 5-1, 5-2; 038-7 Wyo. Code R. §§ 7-1–2; 038-8 Wyo. Code R. § 8-1.

to oversee casino gaming. *Event Contracts*, 89 Fed. Reg. 48,968, 48,982–83 (June 10, 2024). Kalshi's reading of the CEA would transfer authority from the institutions Congress has long entrusted with gaming regulation to an agency that has expressly disclaimed that role.

## II. AGEM's Members Partner with Regulators to Implement the Governing Framework.

The current gaming landscape depends on manufacturers and suppliers to develop and support gaming products, such as slot machines and electronic table games. AGEM's members build the devices, systems, software, and support services that licensed operators use every day, and they must satisfy myriad federal, state, and tribal requirements to bring those products to market. That compliance effort is jurisdiction-specific and central to the integrity of the games offered to the public.

Federal law illustrates the point. The Johnson Act prohibits knowingly transporting a gambling device in interstate commerce unless the destination state permits the device or has "enacted a law providing for the exemption of such state" from the federal prohibition. 15 U.S.C. § 1172(a); *see also N. Beach Amusement Co. v. United States*, 240 F.2d 729, 732 (4th Cir. 1957). It separately requires manufacturers and distributors of gaming devices to register with the Department of Justice

and comply with identification and labeling requirements. 15 U.S.C. §§ 1173–1174. The resulting regulatory framework depends on the laws of each jurisdiction. Utah, for example, prohibits gambling and restricts the possession of gaming devices, *see* Utah Code § 76-9-1401 *et seq.*, while states like New Mexico permit gaming under state laws and regulations, *see, e.g.*, N.M. Stat. § 60-2E-1 *et seq.* AGEM's members must satisfy not only federal requirements, but also the rules of every jurisdiction in which a product is manufactured, shipped, installed, or offered for play.

Those compliance measures require substantial, continuing investment. AGEM's members incur, on average, tens of millions of dollars annually in licensing and compliance costs. They maintain licenses across hundreds of jurisdictions, submit products for testing and certification, and employ trained compliance personnel. Approval of a new gaming product alone often requires extensive review of a game's software, hardware, mathematics, accounting functions, and security controls. *See, e.g.*, Nev. Gaming Control Bd., *Gaming Device Submission Instructions* 1–11 (Feb. 27, 2026), https://perma.cc/J6A9-DJPP (providing that new "[g]aming devices must be reviewed and approved by the Board … prior to installation and use at any [casino]"). AGEM's members make

these investments in reliance on the settled understanding that gaming products may be offered only after the operator, supplier, and product meet the requirements of the relevant jurisdiction—and that all gaming products are equally subject to those requirements.

State and tribal regulation also produces important public benefits. Regulatory review ensures that games operate as represented, that systems accurately record wagers and payouts, and that products meet integrity standards. *See, e.g.*, Nev. Gaming Control Bd. Regs. 5.011–5.012, 5.112(4)–(5) (Feb. 2025) (requiring continuous supervision of slot machines, "conspicuous" placement of payout schedules, and retention of records). Testing, licensing, and suitability review reduce the risk of malfunction, manipulation, or fraud. And the state-oversight framework advances responsible-gaming measures, such as age verification, geolocation, and problem-gambling prevention. *See, e.g.*, Nev. Gaming Control Bd. Reg. 5.170 (Feb. 2025). These protections are the product of the longstanding cooperative relationship among regulators, operators, and suppliers.

Kalshi's approach would bypass that framework entirely. Under its interpretation of Dodd-Frank and the CEA, products that "are virtually

indistinguishable from" traditional gambling, *Schuler*, 2026 WL 2884087, at *22, could be offered without satisfying *any* of the licensing, testing, taxation, or responsible-gaming requirements that govern regulated markets.[4] Kalshi's regime would thus create a profound regulatory asymmetry: state- and tribal-regulated operators must comply with jurisdiction-specific requirements before offering gaming products, while prediction markets could offer the same products nationwide free of those obligations. The result would be to undermine settled reliance interests, distort competition, and strip away the consumer protections that are conditions of market access under state and tribal laws. As the Ninth Circuit recently observed, "Congress did not take a wrecking ball to all sports gambling regulations built up over decades by federal, state, and tribal governments when it amended the CEA to add the definition of swap …." *Assad*, 2026 WL 2543846, at *15.

---

[4] It bears emphasizing that unlike Kalshi, which generally self-certifies new products without prior CFTC approval, AGEM's members must obtain advance regulatory approval for *each product* in *each jurisdiction* where it will be offered. *See supra* note 3. That product-by-product, jurisdiction-by-jurisdiction review assures the public that games have been scrutinized for compliance before reaching consumers.

## III. Kalshi's Arguments Would Authorize Unlicensed Gambling Nationwide.

Kalshi's arguments seek to obscure a simple truth: it operates a sportsbook. Kalshi asks this Court for an injunction that would let prediction markets offer their wagers everywhere, including in states like Utah that prohibit gambling. A decision in Kalshi's favor would not only authorize nationwide sports betting, but would also pave the way for prediction markets to offer traditional gaming options—such as slots, roulette, and blackjack—across the Nation under the auspices of the CFTC's jurisdiction.

### A. Kalshi's "Sports-Event Contracts" Are Sports Bets.

As court after court has recognized, the "sports-event contracts" offered by Kalshi "materially resembl[e]" traditional sports bets. *Blue Lake*, 2026 WL 2728466, at *9. When a user places a sports bet with Kalshi, "[t]he only thing that changes is Kalshi's vocabulary." *Id.* (cleaned up); *accord Schuler*, 2026 WL 2884087, at *22. Kalshi offers the same point-spread, over/under, proposition, and parlay bets as state-regulated sportsbooks, and it "describes and markets its sports event

contracts … as 'legal sports betting.'"[5] *Assad*, 2026 WL 2543846, at *10. In 2025, sports betting accounted for "[o]ver 90% of Kalshi's trades" and "95% of its revenue." *Id.* at *4.

Parlays—which combine several different wagers and pay off only if *all* listed outcomes occur, with the payout "depend[ing] on the performance of [multiple] sports team[s] or" "player[s]," *id.* at *10—illustrate the point. Kalshi promotes parlays composed of dozens of different outcomes across multiple games,[6] and it "offers billions of dollars' worth" of such parlays per month, *Schuler*, 2026 WL 2884087, at *15, accounting for approximately two-thirds of its volume.[7] "Centipede" parlays—those with eleven or more legs—made up nearly half (47%) of Kalshi's parlay volume during the first weekend of the 2026 NFL season.[8]

---

[5] *See also* Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, The Event Horizon (Aug. 27, 2025), https://perma.cc/QEH6-YA3L.

[6] Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, The Event Horizon (Apr. 1, 2026), https://perma.cc/V34F-4WAU.

[7] Eric Ramsey, *Prediction Markets Pitch Hedging As Traders Pile Into Longshot Sports Combos*, The Event Horizon (Oct. 22, 2026), https://perma.cc/M7G4-EWQK; Eric Ramsey & Dustin Gouker, *Parlays Propel Kalshi to Back-to-Back Volume Records to Open Football Season*, The Event Horizon (Sept. 15, 2026), https://perma.cc/33QT-7GMV.

[8] Ramsey & Gouker, *supra* note 7.

None of these wagers has any economic significance apart from the bet itself.

### B. Kalshi's Boundless Interpretation Would Facilitate Nationwide Online Casino Gaming.

Kalshi contends that its sports bets are "swaps" under 7 U.S.C. § 1a(47)(A)(ii) and that the CEA preempts state gaming laws with respect to transactions on its federally registered "designated contract market." As many courts have held, and as discussed further below, that is incorrect as a matter of law. *See infra* Part IV.B; *see also, e.g.*, *Schuler*, 2026 WL 2884087, at *10–18; *Assad*, 2026 WL 2543846, at *9–12; *QCX LLC v. Nessel*, 2026 WL 1895958, at *2–9 (W.D. Mich. June 17, 2026); *Hendrick*, 817 F. Supp. 3d at 1026–34. But if Kalshi's position prevailed, there would be no stopping point. Critically for AGEM's members, the same theory that purportedly authorizes prediction markets to offer sports wagers would also permit prediction markets to offer digital versions of traditional casino games, "skill games," and historical horseracing games.[9]

[9] For further discussion of "skill" and "historical horseracing" games, *see infra* pp. 20–22.

Nor is there any principled distinction between Kalshi's sports bets and games like roulette and slots. Indeed, the CFTC has proposed a rule contemplating that games of pure chance, like roulette, could be "swaps" subject to the CFTC's exclusive jurisdiction. *See Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806, 35,826 (June 12, 2026) ("June Proposed Rule"). And there are indications that prediction-market platforms could be used for roulette- and slot-machine-style gaming under that permissive interpretation. For example, in June 2026, the Chief Operating Officer of an online gaming company published a demonstration of a "Slot" machine built "on top of [Kalshi's]" markets.[10] This game was designed to allow users to "spin" three reels on a virtual slot machine, with the items on the reels consisting of randomly selected sports bets that are bought, held for five seconds, and then sold, with the

[10] Jeff Edelstein, *It Seems the COO of Betr Just Built a Slot Machine on Kalshi*, In Game (June 17, 2026), https://perma.cc/6QBH-AECL. The video linked in this article (depicted in the screenshot) shows how the prediction-market-based slot machine operated and is available at https://x.com/alexursa/status/2067281165518618693/video/1 [https://perma.cc/6B67-L4DD].

payout being the sum of the wins and losses of each contract, as shown in the screenshot below (and the video identified in the footnote):[11]




[11] AGEM's counsel took a screenshot of this post on October 14, 2026.

Prediction-market platforms could thus function as mirror images of the gaming devices AGEM's members manufacture and service, but without the accountability of state and tribal oversight.

The same logic extends to blackjack and poker. The June Proposed Rule states that "swaps" on games that "depend on a high degree of luck, like poker," may nevertheless be permissible where outcomes are "significantly affected by the participants' skill." 91 Fed. Reg. at 35,835. Under that logic, prediction markets could offer wagers on whether a blackjack hand will "bust" by going over 21 or whether Ace-King will be the best poker hand, and then claim that those wagers are "swaps" subject to the CFTC's exclusive jurisdiction.[12]

Kalshi's theory could also be used to justify digital "skill games"—*i.e.*, unlicensed devices that "mimic the slot machines found in regulated

---

[12] Although the June Proposed Rule states that the CFTC "would be *more likely* to find that the event contracts involving … the spin of a roulette wheel" and other "contracts that settle based on purely random events" are "contrary to the public interest," 91 Fed. Reg. at 35,830 (emphasis added), the June Proposed Rule notably presumes that such contracts are swaps and would not categorically prohibit them.

gaming properties" while purporting to depend on player "skill,"[13]—notwithstanding state efforts to restrict such devices. *See, e.g.*, Ky. Rev. Stat. § 528.010(7)(a).2 (defining "gambling device" to include games "also partially or predominantly based on skill"); *In re Three Pa. Skill Amusement Devices*, 2026 WL 1741474 (Pa. June 15, 2026) (holding that "skill game" machines are illegal slot machines). Indeed, a footnote buried in the CFTC's June Proposed Rule proclaims that "many games … mix skill and chance, and are therefore not 'purely random,'" 91 Fed. Reg. at 35,830 n.232, thus carving such games out of the Rule's noncommittal observation that "games whose outcome depends on random chance—*e.g.*, pure luck—are *likely to be* contrary to the public interest," *id.* at 35,835 (emphasis added).

Additionally, Kalshi's arguments would provide a regulatory foothold for prediction-market platforms to offer "historical horseracing" products. State-regulated historical-horseracing machines "allow bettors to wager on anonymized and archived horseraces" in what some commentators have described as an experience similar "to playing a slot

[13] Am. Gaming Ass'n, *Skilled at Deception: How Unregulated Gaming Machines Endanger Consumers and Dilute Investments in Local Economies* 8 (Apr. 19, 2021), https://perma.cc/3AWK-KWXU.

machine."[14] Like Kalshi's parlays, these wagers are a form of entertainment that has no economic consequence apart from the bet itself. But under Kalshi's theory, prediction markets could offer them nationwide—even in states like Utah that prohibit gambling—free of the compliance costs and taxes borne by AGEM's state-regulated members.

The consequences are difficult to overstate. If Kalshi can offer sports bets and parlays as "swaps," it can also offer roulette spins, slot pulls, blackjack hands, and historical horseraces—all at a competitive advantage over licensed operators by virtue of its asserted immunity from state law. The result would be thinly regulated digital analogues of the products AGEM's members produce. There is no credible evidence that Congress authorized that disruptive scheme when it enacted Dodd-Frank's financial-oversight reforms.

Because the relief Kalshi seeks would threaten regulated markets in which U.S. gaming manufacturers generate $10.6 billion in direct economic output from commercial sales and operations and pay $3.0 billion in wages and salaries, AGEM respectfully asks that, if the Court

---

[14] Tom Schad, *Why Prediction Markets Might Be Skipping the Kentucky Derby*, ESPN (Apr. 30, 2026), https://perma.cc/SA45-4HNK.

addresses Kalshi's arguments regarding the non-merits injunction factors, *see* Opening Br. at 62, the Court also weigh competitive harms to AGEM's members in assessing the balance of equities and the public interest.

## IV. Kalshi's "Swap" and Preemption Arguments Fail.

Kalshi's legal arguments also fail for two independent reasons, both grounded in settled law. *First*, Kalshi's sports bets are not "swaps," and Kalshi's contrary reading lacks any limiting principle. *Second*, Kalshi cannot overcome the presumption against preemption, and its appeal to regulatory "uniformity" ignores the multi-jurisdictional gaming products AGEM's members have long supplied.

### A. Kalshi's "Swap" Definition Is Untethered to the CEA.

Kalshi insists that its offerings are "swaps," not bets. But a transaction qualifies as a "swap" only if it is based on an "event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). "[A]ssociated with" requires a connection between the underlying event and the relevant consequence; the wager itself cannot manufacture it. *See Assad*, 2026 WL 2543846, at *8–13; *Schuler*, 2026 WL 2884087, at *8; *Cafferelli*, 2026 WL 2294589, at *7–10. The statute's context—a definition otherwise

populated by interest-rate, currency, and commodity instruments—and Dodd-Frank's history as a response to the financial crisis confirm that reading. *See Bird*, 2026 WL 2691009, at *8–10; *QCX*, 2026 WL 1895958, at *3–4, *7.

Kalshi's contrary construction has no limiting principle. It treats an event as "associated with" an economic consequence whenever a downstream financial effect might hypothetically exist. Every coin flip and player statistic would qualify as long as someone chose to wager on it. Kalshi's own "culture" wagers illustrate the point: Kalshi offers bets on Bill Belichick's hypothetical nuptials[15]; whether a sitting Supreme Court Justice will be charged with a federal crime[16]; and decisions of federal courts at all levels, including the Courts of Appeals.[17] In other words, under Kalshi's own interpretation, anything and everything can be a "swap," including online casino gaming. *See supra* Part III.B.

---

[15] *See* Kalshi, *Bill Belichick and Jordon Hudson: Married Before 2027?*, https://perma.cc/9PW9-Y7BH.

[16] *See* Kalshi, *Will Any Supreme Court Justice Be Charged with a Federal Crime?*, https://perma.cc/63XT-XPCU.

[17] *See, e.g.*, Kalshi, *Will the 11th Circuit Rule Non-Intervened False Claims Act* Qui Tam *Suits Unconstitutional?*, https://perma.cc/W6KC-745E.

Courts "should not lightly conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 587 U.S. 645, 654 (2019); *see Assad*, 2026 WL 2543846, at *12 (Kalshi's reading of the CEA would "render the definition of swap so broad as to be meaningless").

Kalshi's reading "would also attach criminal penalties to a breathtaking amount of commonplace gambling activity." *Schuler*, 2026 WL 2884087, at *14 (cleaned up). The CEA generally requires that swap transactions be executed on CFTC-registered exchanges, *see* 7 U.S.C. § 2(e),[18] and imposes stiff civil and criminal penalties for failing to comply with that rule, *see* 7 U.S.C. §§ 13(a)(5), 13a-1(a), (d)(1). Thus, if sports wagers (and other types of casino bets) qualify as "swaps," as Kalshi contends, the CEA would make a broad range of ordinary wagers unlawful—including parimutuel horse-racing wagers, "bets on 'bingo games,'" *Assad*, 2026 WL 2543846, at *11, and "every sports wager placed … between two friends at a bar," *Schuler*, 2026 WL 2884087, at *14

[18] The CEA exempts transactions by "eligible contract participant[s]" from this general rule. 7 U.S.C. § 2(e). That exemption covers only a narrow range of transactions—and does not reach wagers placed by consumers—because the CEA defines "eligible contract participant[s]" as "financial institution[s]," "insurance compan[ies]," and similar sophisticated entities and high-net-worth individuals. *Id.* § 1a(18).

(citations omitted). Courts have wisely rejected that boundless reading. *See, e.g.*, *id.* at *10–14; *Assad*, 2026 WL 2543846, at *8–12.[19]

Nor can the CEA bear the weight of Kalshi's interpretation. Kalshi (and the CFTC) now seek to recast the CEA, which was enacted in 1936, as a source of federal authority over the multibillion-dollar sports-betting industry. That claimed authority is precisely the kind of "unheralded power" that warrants skepticism under the major-questions doctrine. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see Assad*, 2026 WL 2543846, at *14–15.

**B. The CEA Does Not Preempt State Gaming Laws.**

Even if some of Kalshi's wagers were "swaps," nothing in the CEA would prevent Utah from regulating them. The District Court thus

[19] One district court recently held that a subset of sports-event contracts, regarding "who will win or lose a title game," likely qualify as swaps. *Coinbase Fin. Mkts., Inc. v. Raoul*, 2026 WL 2969682, at *5–8 (N.D. Ill. Oct. 2, 2026). But *Raoul* did not address the full range of Kalshi's sports wagers, including multi-leg parlays that make up the vast majority of Kalshi's volume. Nor did *Raoul* confront the weight of authority (including the decisions of the Sixth and Ninth Circuits) regarding the "swap" definition. Moreover, the *Raoul* court overlooked several key arguments, including that, on its reading, many traditional types of wagering, such as parimutuel wagers on horse racing, would violate federal law because the CEA requires swaps to be listed on CFTC-registered markets. *Schuler*, 2026 WL 2884087, at *8 (discussing 7 U.S.C. § 2(e)); *see supra* p. 25.

correctly held that Kalshi failed to show that Utah's gaming laws are preempted. 2-Appx-506; *see Schuler*, 2026 WL 2884087, at *17–18.

Because gaming regulation lies within the states' historic police powers, the Court must "start[] with the assumption that" state authority is "not to be superseded … unless that is the clear and manifest purpose of Congress." *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007). This Court has been "especially reluctant to find preemption in matters of longstanding state regulation," *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1242 (10th Cir. 2011), *aff'd*, 569 U.S. 614 (2013), and it has recognized "the police power of a state" to regulate gambling (and "gambling devices") for nearly its entire existence, *Boynton*, 57 F.2d at 666; *see also Murphy*, 584 U.S. at 484. As the Sixth Circuit observed in rejecting Kalshi's express-, field-, and conflict-preemption theories, "[t]here is a long history of states regulating intrastate gambling, and a history of federal gambling regulations tying federal illegality to state law." *Schuler*, 2026 WL 2884087, at *19; *see also id.* at *17–27; *Assad*, 2026 WL 2543846, at *13–17 (rejecting field and conflict preemption).

Kalshi attempts to salvage its conflict-preemption arguments by invoking a generalized desire for regulatory "uniformity." A divided Third Circuit panel reasoned that the CEA aims to "do away with [a] patchwork of state regulations." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 229–30 (3d Cir. 2026). But an abstract interest in uniform derivatives regulation cannot support an objective of nationwide gambling, and "no statute yet known pursues its stated purpose at all costs." *Schuler*, 2026 WL 2884087, at *27 (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)).

AGEM's members are living proof that Kalshi's uniformity argument draws an irrelevant line between prediction-market wagering and traditional casino gaming. For decades, AGEM's members have manufactured and serviced slot machines and other gaming devices that offer linked, multi-jurisdictional jackpots.[20] Wide-area progressive and

[20] *See, e.g.*, Int'l Game Tech., *Wheel of Fortune - $5.00 in Interstate WAP Slots Jackpot*, https://perma.cc/FP66-KBZC (interstate jackpot linked across multiple casinos and jurisdictions); Nat'l Indian Gaming Comm'n, Bulletin 2009-3, at 1–2 (Mar. 9, 2009), https://perma.cc/KCK6-M5AE (addressing "multi-site bingo games and … wide-area progressive (WAP) systems" in which "participating machines in multiple locations are networked together," with "a fraction of each wager … allocated to [a shared] progressive jackpot").

multi-jurisdictional systems for slot machines, for example, connect slot machines in disparate physical locations—often across state lines—to develop a communal jackpot that grows more quickly than if the devices operated independently of one another.[21] AGEM's members, the billions of dollars in sales they generate and wages and salaries they pay, as well as the thousands of jobs they sustain, prove that multi-jurisdictional gaming can be carried out successfully in a manner that complies with varying state and tribal laws. No doubt, complying with diverse gaming regimes can be challenging and expensive. But "expensive does not mean impossible." *Schuler*, 2026 WL 2884087, at *26 (cleaned up).

Nor is compliance with Utah law a significant obstacle to the CEA's purposes and objectives. Kalshi can employ geofencing systems that wall off Utah, a step state-licensed online sportsbooks routinely take, *see Schuler*, 2026 WL 2884087, at *26 (noting that "[o]ther companies have

---

[21] *See, e.g.*, Aristocrat Techs., Inc., *Aristocrat's Game-Changing Fast Cash Wide Area Progressive Slot Product Now Racing Across the United States* (Feb. 28, 2017), https://perma.cc/8TA8-4AFS. Operating these multi-jurisdictional systems demands compliance with a complex web of state and tribal laws. *See, e.g.*, Colo. Code Regs. § 207-1-12; N.M. Admin. Code § 15.1.24.7; Compact Between the State of New Mexico and the Pueblo of Isleta, App'x to 2015 Compact Amendments § III(A) (2015), *available at* https://perma.cc/AJ2Y-X39E.

also complied with … state sports-gaming laws by using geofencing"), and that Kalshi itself has taken in several jurisdictions, *see, e.g.*, Joint Status Report at 5, *Blue Lake Rancheria v. Kalshi, Inc.*, No. 3:25-cv-06162 (N.D. Cal. Oct. 14, 2026), Dkt. 101 ("Kalshi has taken reasonable measures … to geofence Plaintiffs' tribal lands."). Alternatively, Kalshi could refrain from offering sports bets altogether—as Kalshi itself and *every other* prediction market platform did before January 2025. *Assad* rejected Kalshi's contrary argument as a "false, all-or-nothing proposition." 2026 WL 2543846, at *16. And the impartial-access principle, 17 C.F.R. § 38.151(b), does not require Kalshi to offer every product in every state. *See Schuler*, 2026 WL 2884087, at *26; *Assad*, 2026 WL 2543846, at *14.

* * *

Kalshi asks this Court to infer a nationwide gambling code from provisions designed to rein in wayward derivatives markets. That is precisely the kind of transformative change that requires unmistakable statutory authorization. Congress has legislated on gambling repeatedly and deliberately, and has consistently designed federal statutes in a way that respects federalism and the states' and tribes' regulatory expertise. It did not hide a transfer of authority over a multibillion-dollar state-

regulated industry in the word “swap” or in a jurisdictional provision allocating responsibilities between federal agencies. The District Court correctly rejected that inference.

## CONCLUSION

The District Court’s judgment should be affirmed.

Respectfully submitted,

*/s/ Kevin F. King*
Kevin F. King
*Counsel of Record*
Scott J. Garfing
Hassan Ahmad
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae Association of Gaming Equipment Manufacturers*

October 28, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,779 words, including the words in the image reproduced on page 19. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Kevin F. King*
Kevin F. King

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2026, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Kevin F. King*
Kevin F. King