No. 26-4100

IN THE

# United States Court of Appeals for the Tenth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

SPENCER J. COX, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Utah, No. 2:26-cv-151 (Hon. Robert J. Shelby)

## REPLY BRIEF FOR KALSHIEX LLC


GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant KalshiEX LLC*


November 12, 2026

## TABLE OF CONTENTS


Page

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. THE CEA'S GRANT OF "EXCLUSIVE JURISDICTION" PREEMPTS STATE LAW .......... 3

A. The CEA Expressly Preempts The Application of State Gambling Laws To Swaps Traded On DCMs .......... 3

B. The CEA Also Impliedly Preempts Utah's Efforts To Regulate Swaps Traded On DCMs .......... 17

II. KALSHI'S CONTRACTS ARE SWAPS SUBJECT TO THE CFTC'S EXCLUSIVE JURISDICTION .......... 21

III. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI .......... 30

CONCLUSION .......... 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ................................................ 16, 18, 19, 29

*Arizona v. United States*,
567 U.S. 387 (2012) ..........................................................................19

*Batterton v. Francis*,
432 U.S. 416 (1977) ...................................................................... 22, 23

*Blue Lake Rancheria v. Kalshi Inc.*,
191 F.4th 1071 (9th Cir. 2026) ........................................................ 12, 13

*BNSF Ry. Co. v. Hiett*,
22 F.4th 1190 (10th Cir. 2022) ............................................................. 5

*Burrage v. United States*,
571 U.S. 204 (2014) ........................................................................... 24

*Coinbase Fin. Mkts., Inc. v. Raoul*,
No. 1:25-cv-15406, 2026 WL 2969682
(N.D. Ill. Oct. 2, 2026) ............................................................. 23, 24, 25

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*,
520 U.S. 806 (1997) ...........................................................................16

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) ........................................................................... 29

*Fischer v. United States*,
603 U.S. 480 (2024) ........................................................................... 28

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) .............................................................................18

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016) ..................................................................... 17, 18

**TABLE OF AUTHORITIES—Continued**

Page(s)


*Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*,
123 F.3d 1098 (8th Cir. 1997) .......... 12

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .......... 18, 19

*Hunter v. FERC*,
711 F.3d 155 (D.C. Cir. 2013) .......... 4

*Int'l Trading, Ltd. v. Bell*,
566 S.W.2d 420 (Ark. 1977) .......... 7

*KalshiEX LLC v. Assad*,
190 F.4th 1098 (9th Cir. 2026) .......... 5, 6, 12

*KalshiEX LLC v. CFTC*,
No. 23-3257, 2024 WL 4164694
(D.D.C. Sep. 12, 2024) .......... 9

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 18

*KalshiEX LLC v. Schuler*,
192 F.4th 664 (6th Cir. 2026) .......... 24

*Kisor v. Wilkie*,
588 U.S. 558 (2019) .......... 20

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .......... 3, 6, 7, 10, 11

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 11, 12

## TABLE OF AUTHORITIES—Continued

Page(s)

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 30

*Napier v. Atl. Coast Line R. Co.*,
272 U.S. 605 (1926) .......... 18

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 30

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) .......... 14, 15

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) .......... 6, 7

*Rice v. Bd. of Trade of Chi.*,
331 U.S. 247 (1947) .......... 4, 5

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 3, 4

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .......... 22

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980) .......... 6

*United States v. New York*,
708 F.2d 92 (2d Cir. 1983) .......... 30

*Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*,
22 F.4th 892 (10th Cir. 2022) .......... 30

*Walker v. BOKF, Nat'l Ass'n*,
30 F.4th 994 (10th Cir. 2022) .......... 20

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 15

Page(s)

*Westar Energy, Inc. v. Lake*,
552 F.3d 1215 (10th Cir. 2009) .......... 30

**STATUTES:**

7 U.S.C. §§

1a(47)(A)(ii) .......... 23

1a(47)(A)(iv) .......... 22, 23

2(a)(1)(A) .......... 1, 3, 4, 6, 7, 11, 15, 27

2(e) .......... 27

2(h) .......... 27

5 .......... 8, 9

5(a) .......... 28

5(b) .......... 9

7(d)(3) .......... 28

7(d)(9) .......... 27

7a-2(c)(1) .......... 14

7a-2(c)(5)(B) .......... 1, 14

7a-2(c)(5)(C) .......... 1

7a-2(c)(5)(C)(i) .......... 9, 14, 17

7a-2(c)(5)(C)(ii) .......... 28

8(b) .......... 21, 30

## TABLE OF AUTHORITIES—Continued

Page(s)


12a(2) ....................10

12a(9) ....................20

13a ....................21, 30

13a-2(1) ....................10

13a-2(7) ....................11

16(a) ....................10

16(e)(2) ....................7, 8

16(h)(2) ....................7, 8

15 U.S.C. §§

8302(d)(1) ....................21, 22

8321(a)(2) ....................22

8321(b) ....................22, 24

49 U.S.C. § 10501(b) ....................5

1973 Ill. Laws 3276 ....................29

**RULES & REGULATIONS:**

17 C.F.R. §§

38.251(a) ....................28

40.2(c) ....................14

40.2(d) ....................14

40.11 ....................14

## TABLE OF AUTHORITIES—Continued

Page(s)

DCM Impartial Access Requirements,
91 Fed. Reg. 72,407 (Nov. 10, 2026) .......................................................19

Further Definition of "Swap,"
77 Fed. Reg. 48,208 (Aug. 13, 2012) ................................................. 26, 27

Further Definition of "Swap" to Exclude Casino-Style Gambling Products,
91 Fed. Reg. 65,969 (Oct. 19, 2026) .................................................. 26, 27

Further Definition of "Swap"—Inclusions,
91 Fed. Reg. 66,022 (Oct. 19, 2026)...........................................21, 22, 23

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (June 12, 2026)................................................... 14, 15

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30464 (1974) ......................................................................... 4, 5

124 Cong. Rec. S16527 (daily ed. Sep. 28, 1978)..................................... 10, 11

H.R. Rep. No. 93-975 (1974) ........................................................................... 29

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) ............................................... 4, 5

H.R. Rep. No. 106-711, pt. 2 (2000).............................................................. 8

*Hearings Before the H. Comm. on Agric.*, 93d Cong. (1974)...................... 29

**OTHER AUTHORITIES:**

Al Tylis et al., *The Financing Gap in Sports: Unlocking a $2.5 Trillion Opportunity*, Apollo (Dec. 2025), https://perma.cc/483U-HSQW .......................................................................................... 25

Page(s)

Christopher J. Kirkpatrick, *Order Directing Kalshi to Continue Exercising DCM Functions*, CFTC (Aug. 11, 2026), https://perma.cc/C6NW-4KFM ........ 20

Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents*, CFTC (July 14, 2026), https://perma.cc/GV5X-M9PQ ........ 20

Kalshi, Comment Letter on Conflicts and Affiliations (Oct. 5, 2026), https://perma.cc/Z5Z7-H8LV ........ 27, 28

Robert N. Sidman, *Order Instituting Proceedings and Staying the Listing of the Contract Under Commission Regulation 40.2(c)*, CFTC (Oct. 21, 2026), https://perma.cc/K4GD-9YGJ ........ 15

*Staff Advisory on Individual Mention, Attendance and Interaction Event Contracts*, CFTCLTR No. 26-27, 2026 WL 2972520 (Sep. 22, 2026) ........ 14, 15

## INTRODUCTION

Utah concedes that, by granting the CFTC "exclusive jurisdiction" over "swaps … traded … on" DCMs, 7 U.S.C. § 2(a)(1)(A), Congress "preempt[ed] State law" that "would usurp the CFTC's regulatory functions," Utah Br. 29. That concession is fatal to Utah's defense because its enforcement actions against Kalshi do exactly that. The CEA tasks the CFTC with "approv[ing]" event contracts if they comply with federal law and determining whether to prohibit certain contracts, including those involving "gaming," as "contrary to the public interest." 7 U.S.C. §§ 7a-2(c)(5)(B), (C). Yet Utah asserts the authority to bar *all* gaming-related event contracts based on its own public-interest determination, even those the CFTC has approved. Indeed, Utah is seeking to *criminally prosecute* Kalshi and its executives for listing contracts the CFTC has permitted. And under Utah's reading of the CEA, the state could ban all derivatives trading tomorrow by declaring (as states did a century ago) that it is "gambling." That is clearly wrong.

Utah's position cannot be squared with the CEA's text or history. Utah misreads Section 2(a)'s grant of "exclusive jurisdiction," selectively quotes a misleading fragment of its savings clause, and interprets Section 16's express-preemption clauses backwards. The state disregards all statutory history confirming that Congress amended the CEA in 1974 to preempt state

regulation of derivatives after decades of experimentation with concurrent federal-state jurisdiction. And Utah interprets the CEA's "Special Rule"—which grants only the *CFTC* discretionary authority to ban event contracts involving gaming—as supporting *Utah*'s efforts to ban the very same contracts the CFTC has chosen to permit.

Utah falls back on a straw man: that under Kalshi's view, Congress transferred all regulatory authority over traditional gambling to the federal government in the Dodd-Frank Act of 2010. Kalshi has never made that argument; the CFTC's exclusive jurisdiction dates to 1974 and extends *only* to trading on federal exchanges. States have long derided such trading as "gambling," the very reason that Congress preempted the application of state law to derivatives markets fifty years ago. But states, including Utah, may continue to regulate conduct occurring outside those federal enclaves. Such separate state-federal spheres abound: State police may give speeding tickets all along Utah's highways, but *only* the National Park Service can issue citations to hikers in Zion. Utah's scare tactics accordingly supply no reason to affirm the district court's ahistorical and atextual decision. This Court should reverse.

## ARGUMENT

### I. THE CEA'S GRANT OF "EXCLUSIVE JURISDICTION" PREEMPTS STATE LAW.

Even setting aside Utah's dispositive concession, its preemption arguments fail many times over. Utah claims the authority to prohibit all contracts contingent on future events as gambling without offering any limiting principle, meaning that states could ban all derivatives trading under the guise of gambling laws. That aggrandizement of power would turn the clock back fifty years, overriding Congress's incontrovertible decision to preempt state regulation of nationwide markets in 1974.

#### A. The CEA Expressly Preempts The Application of State Gambling Laws To Swaps Traded On DCMs.

1. Section 2(a)(1)(A)'s plain text expressly "preempts the application of state law" to trading on DCMs. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.). By granting the CFTC "exclusive jurisdiction" over "transactions involving swaps … traded or executed on" DCMs, Congress prevented states from (if nothing else) prohibiting trading of those instruments in those venues. 7 U.S.C. § 2(a)(1)(A).

"[E]xclusive jurisdiction" is language Congress often uses to preempt state law, as courts have long recognized. The Supreme Court held in *Rice v. Santa Fe Elevator Corp.* that a statutory grant of "exclusive" "jurisdiction" to a federal agency preempts state laws. 331 U.S. 218, 234-236 (1947)

(citation modified). Utah dismisses *Santa Fe* (at 20) as relevant only to implied preemption, but it is in fact an express-preemption case; the Court held that Congress's use of "the mandatory" and "special wording" "exclusive" "jurisdiction" made "unequivocally" clear that "it intends no regulation except its own." *Id.* Congress's choice of the same words in Section 2(a)(1)(A) likewise compels the conclusion that regulated parties "need serve but one master, and that one the federal agency." *Id.* at 234.

Indeed, a companion case decided on the same day as *Santa Fe* confirms that Congress's manifest objective in the CEA was to "preempt the field" of futures trading. H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.). In *Rice v. Board of Trade of Chicago*, the Supreme Court held that the pre-1974 CEA did not preempt state law because it included a savings provision clarifying that certain CEA sections should not be "construed to impair any [applicable] State law" and did not contain "a declaration by Congress" that federal regulation "of trading on contract markets is *exclusive* of state regulation." 331 U.S. 247, 253-255 (1947) (emphasis added). Thirty years later, Congress decided to preempt state law to address the "hodgepodge regulatory system" that sprung up in the absence of uniform federal regulation. *Hunter v. FERC*, 711 F.3d 155, 157 (D.C. Cir. 2013). To "assure that Federal preemption is complete," Congress added precisely the

exclusive-jurisdiction language that the Supreme Court had found preemptive in *Santa Fe* but missing from the CEA; it also deleted the savings provision the Court had interpreted to preserve state law. 120 Cong. Rec. 30464 (1974); *see Bd. of Trade*, 331 U.S. at 255; Conf. Rep. at 35. Congress's intent can get no clearer than that.

This Court's decision in *BNSF Railway Co. v. Hiett* confirms that grants of "exclusive jurisdiction" to federal agencies preempt state law. 22 F.4th 1190, 1194 (10th Cir. 2022); *contra* Utah Br. 20. *BNSF* reasoned that the ICCTA's grant of "exclusive" "jurisdiction" to the Surface Transportation Board over rail transportation, 49 U.S.C. § 10501(b), preempted Oklahoma's rail-operation statute by its "plain" and "unambiguous" language, 22 F.4th at 1194. Utah's only response (at 20) cites an irrelevant portion of the decision declining to apply a separate federal statute. That in no way undercuts this Court's holding that a grant of exclusive jurisdiction is preemptive.

Utah insists (at 18-19) that Section 2(a) lacks preemptive force because it does not use the terms "preempt" and "state law." But "there are no magic words that a statute must employ to preempt state law." *KalshiEX LLC v. Assad*, 190 F.4th 1098, 1110 (9th Cir. 2026). "Congress need only express

through the plain text that a statute preempts state law," and it did so here. *Id.*

The rest of Utah's textual arguments fare no better. It reads Section 2(a)'s savings clause (at 21) to indicate that all state laws "survived the CEA's enactment," but the clause preserves state regulatory authority "[e]xcept as hereinabove provided" in the exclusive-jurisdiction provision—a clause Utah tellingly omits (at 6). 7 U.S.C. § 2(a)(1)(A). Far from undermining preemption, the savings clause does the opposite: "If the exclusive jurisdiction provision was not intended to have preemptive effect, the '[e]xcept as hereinabove provided' clause would be superfluous." *Assad*, 190 F.4th at 1110. Utah's assertion (at 18) that Section 2(a) does not mention "'laws' of other sovereigns" is even more baffling; the provision literally references the "laws of … any State," 7 U.S.C. § 2(a)(1)(A).

2. Unsurprisingly, then, courts have long recognized that the CEA as amended in 1974 preempts state efforts to regulate DCM trading. *Leist*, 638 F.2d at 322; *see United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980);[1]

[1] Utah notes (at 29) that *Brien* concluded that the CEA does not preempt the federal mail and wire fraud statutes. But that conclusion followed from the CEA's text, which "preempts state regulation of commodities futures" but "does not preempt" "federal general antifraud statutes." 617 F.2d at 310.

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam).[2]

Utah asserts (at 19-20) that these post-1974 cases found only "limited preemption" where States attempted to "directly regulate subjects" assigned to the CFTC. But Utah *does* seek to directly regulate subjects assigned to the CFTC—by attempting to ban CFTC-approved event contracts. And Utah's efforts to narrow these decisions are belied by their broad language. The Second Circuit's conclusion that "the CEA preempts the application of state law" was not cabined to the specific potato futures before the court. *Leist*, 638 F.2d at 322. And authority on which the Second Circuit relied to establish that preemptive force speaks equally broadly, interpreting Section 2(a)(1)(A) "to supersede the jurisdiction of all state and federal agencies" and indicate "that Congress intended no regulation in this field except under" the CEA. *Int'l Trading, Ltd. v. Bell*, 566 S.W.2d 420, 423-424 (Ark. 1977).

3. Contrary to Utah's argument (at 22-26), all relevant statutory context supports Kalshi's plain-text reading of Section 2(a).

Utah contends (at 23) that Section 16(e)(2)'s and Section 16(h)(2)'s express-preemption clauses "would be superfluous" if the exclusive-

---

[2] Utah wrongly states (at 29) that only the district court applied CEA preemption to bar the state's commercial-gambling claim, but the Fifth Circuit "affirm[ed]" that holding. *Rasmussen*, 608 F.2d at 178.

jurisdiction provision preempted state regulation of DCM-traded contracts. But Utah does not appear to appreciate that both clauses apply to *off-DCM* transactions. *See* 7 U.S.C. §§ 16(e)(2) (preempting the application of state gaming law to certain transactions "excluded" and "exempted" from the on-exchange requirement), 16(h)(2) (preventing states from regulating swaps, including over-the-counter swaps, as insurance). Utah thus draws exactly the wrong lesson from Section 16; it confirms that Congress understood Section 2(a) to preempt state regulation of on-DCM transactions but later enacted additional provisions to preempt some off-DCM transactions, too. *See* H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (noting that the then-"current" CEA already "supersede[d] and preempt[ed]" state laws as to "transactions conducted on a registered entity," and that the new provision extended preemption to off-DCM transactions). Indeed, the statute would make no sense if Section 2(a) were read as Utah suggests. The CEA would then preempt state regulation of certain transactions occurring *outside* federally regulated DCMs, while leaving states free to override federal regulation of *on-DCM* transactions.

Similarly, the statutory purposes Utah cites (at 24) do not undercut preemption; they explain *why* Congress granted the CFTC exclusive jurisdiction over its nationwide marketplaces. The CEA serves the "*national*

public interest" by creating a trading system "under the *oversight of the Commission*." 7 U.S.C. § 5 (emphasis added). The system aims to prevent "systemic risk"; that calls for a nationwide regulator with a bird's-eye view of the system, not fifty regulators overseeing only their own slice of a splintered exchange and allowing aggregate risk to pool in the shadows. *Id.* § 5(b). And only nationwide participation can ensure sufficient liquidity to deter "manipulation" and promote "fair competition." *Id.*

Utah next argues (at 24) that the Special Rule, which grants the CFTC discretion to prohibit event contracts involving "activity that is unlawful" under federal or state law, 7 U.S.C. § 7a-2(c)(5)(C)(i), assumes that some on-exchange activity can be unlawful under state law. No. Utah is conflating "the act of trading the contract" with its "underlying event." *KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *11-12 (D.D.C. Sep. 12, 2024). The Rule contemplates that a contract's *underlying event* may be unlawful under state law, in which case the CFTC may prohibit trading on it (*e.g.*, a contract on whether a famous piece of art will be stolen from a museum). The Rule does not contemplate that *trading a contract* might violate state law. Otherwise the clause would make no sense, as a contract whose trading is itself "unlawful under any Federal ... law" is obviously already banned. In all events, even if Utah's reading made sense, the Rule permits *the CFTC*, not

the states, to decide whether to restrict DCMs from listing contracts involving state-prohibited conduct.

Utah's reliance (at 23) on Section 12a is equally off-base. That provision lists gambling as one of many past crimes that may justify exclusion from DCM trading, which hardly suggests that trading on DCMs *is itself* gambling or that Congress intended for state gambling laws to govern on-exchange transactions. 7 U.S.C. § 12a(2).

As for Section 16(a)'s authorization of federal-state cooperation, Kalshi has never denied that states continue to play *some* role under the CEA, but that role is carefully circumscribed and does not allow states to override the CFTC's decisions permitting contracts to be traded. Section 16(a)'s authorization of collaboration and information-sharing between the CFTC and state authorities, for instance, is a far cry from subjecting DCMs to regulation by 50 states in addition to the CFTC.

Section 13a-2, titled "Jurisdiction of States," proves the point by authorizing states to bring actions for CEA violations against many defendants "*other than*" designated "contract market[s]." 7 U.S.C. § 13a-2(1) (emphasis added). Explaining that exclusion, Senator Leahy cited "the deterrent effect on contract markets" already "caused by Commission regulation" and "Commission enforcement proceedings." *Leist*, 638 F.2d at

320 (quoting 124 Cong. Rec. S16527 (daily ed. Sep. 28, 1978)). Congress thus judged the CFTC and its regulatory toolkit sufficiently robust to obviate any need for dual state enforcement. Section 13a-2 further reinforces the CEA's preemptive effect by expressly preserving states' ability to apply only their "antifraud" laws, 7 U.S.C. § 13a-2(7), making clear that gambling laws remain squarely preempted.

4. Utah's contrary precedent is unavailing. Utah first relies (at 22, 28) on *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, but that case did not address whether the CEA preempts state law and certainly did not rewrite Section 2(a)'s plain text. In holding that the CEA implies a private right of action, the Supreme Court observed that in 1974, "the Commission was given exclusive jurisdiction over commodity futures trading." 456 U.S. 353, 386 (1982). The Court also referenced legislative history indicating that the exclusive-jurisdiction provision's purpose "was to separate the functions of the Commission from those of the Securities and Exchange Commission *and other regulatory agencies*." *Id.* (emphasis added). Section 2(a)(1)(A)'s text makes clear those "other regulatory agencies" include those of the "State[s]." And while the Court held that the 1974 amendments did not disturb the CEA's preexisting implied private remedy because none of Congress's changes suggested a desire to eliminate it, *id.* at 384-388,

Congress by contrast decisively amended the CEA's preemption provisions, *supra* at 4-5. Utah thus badly errs by relying on pre-1974 precedent (at 6, 28, 38) without acknowledging those textual changes.

Utah's citation (at 20-21) to an Eighth Circuit decision applying *Rice* is of even less help; Utah's efforts to regulate DCMs "usurp" the CFTC's regulatory function, *infra* at 14-15, and the court in any event interpreted the United States Warehouse Act's exclusive-jurisdiction provision to sweep more broadly still, preempting "*any* [state] *regulation* of grain certification." *Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*, 123 F.3d 1098, 1104-05 (8th Cir. 1997) (emphasis added).

Utah also exaggerates the support for its position in recent cases considering sports-event contracts. For instance, the Ninth Circuit recognized that Section 2(a) "preempts state regulation of swaps that are 'traded or executed' " on a DCM. *Assad*, 190 F.4th at 1110. And contrary to Utah's assertion (at 26-27), another panel's subsequent decision in *Blue Lake Rancheria v. Kalshi Inc.* did not disturb that holding; the quotation Utah artfully modifies (at 26) states in full that Section 2(a)(1)(A) does not exclude the application of "all other *federal* laws," 191 F.4th 1071, 1089 (9th Cir. 2026) (emphasis added). The manner in which *federal* statutes interact says nothing about whether *states* can usurp the CFTC's exclusive jurisdiction—

they cannot. A paragraph later, the Ninth Circuit reiterated *Assad*'s holding that "Congress spoke clearly to supersede and preempt 'state regulation of swaps that are "traded or executed" on a DCM.'" *Id.* (citation omitted).

In the end, Utah cannot point to a single case outside the event-contract context suggesting that states may apply their gambling regulations to DCMs. None exists, because if that were permissible, states could ban all derivatives as gambling if they chose. Indeed, Utah's position (at 8-9) that any contract where payment depends on a contingency qualifies as unlawful gambling would cover every single derivative—whether on the price of corn, the possibility of an interest-rate hike, or whether the Utes will defeat Arizona. Utah's reading would thus allow it to proscribe all derivatives trading statewide. Even Utah seems to understand that cannot be right: Though the state touts its total and longstanding ban on gambling, it has never sought to restrict the Chicago Mercantile Exchange or any other nationwide derivatives market from operating in the state, and even now does not seek to shut down Kalshi markets on financial events, stock prices, or economic indices. *See* Compl. ¶¶197, 202, *Brown v. Kalshi Inc.*, No. 260908356 (Utah 3d Dist. Ct. Oct. 20, 2026).

5. Even under Utah's proposed rule, reversal is required. Utah repeatedly concedes (*e.g.*, 20, 22, 29) that Section 2(a) preempts state laws

that "usurp the regulatory functions conferred on" the CFTC. That concession disposes of this case because Utah has "usurp[ed]" those regulatory functions several times over.

*First* (and most obviously), by seeking to prohibit DCMs from offering event contracts—and *criminally prosecuting* them for doing so—Utah has usurped the CFTC's express authority to decide what instruments may be traded there. Section 7a-2 provides that, before a DCM "list[s] for trading … any new contract," it must seek formal pre-approval or certify that the contract "complies with" the CEA and its regulations. 7 U.S.C. § 7a-2(c)(1); *see* 17 C.F.R. §§ 40.2(c)-(d). Either way, the CFTC "shall approve" that "new contract … unless the Commission finds that" it would violate the statute or regulations. 7 U.S.C. § 7a-2(c)(5)(B). Utah inevitably intrudes on this regulatory function by purporting to bar Kalshi from listing CFTC-approved contracts.

*Second*, the Special Rule charges the CFTC with determining whether to prohibit "[e]vent contracts" that "involve … gaming" as "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i); *see* 17 C.F.R. § 40.11. The CFTC recently exercised that function by proposing a detailed framework for determining when sports-event contracts are (and are not) contrary to the public interest, Prediction Markets; Public Interest Determinations, 91 Fed.

Reg. 35,806 (June 12, 2026), issuing guidance restricting "mention markets," Duncan Hennes, *Staff Advisory on Individual Mention, Attendance and Interaction Event Contracts*, CFTCLTR No. 26-27, 2026 WL 2972520 (Sep. 22, 2026), and ordering prediction markets to stay their listings of other sports-related contracts.[3] Utah usurps those functions by applying state laws to bar event contracts because, in *Utah*'s view, they contravene the public interest.

6. Finally, Utah unsuccessfully tries (at 30-35) to escape the CEA's plain meaning by relying on the major questions doctrine. That effort fails out of the gate because the major questions doctrine applies only to "ambiguous statutory text." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted). Here, the text speaks clearly.[4] Section 2(a)(1)(A) gives the CFTC "exclusive jurisdiction" over swaps traded on DCMs, leaving no room for state regulation.

Utah's argument is also based on a straw man. Utah suggests that, if it cannot apply its gambling laws to bar event contracts from DCMs, then it

---

[3] Robert N. Sidman, *Order Instituting Proceedings and Staying the Listing of the Contract Under Commission Regulation 40.2(c)*, CFTC (Oct. 21, 2026), https://perma.cc/K4GD-9YGJ.

[4] That clarity in the statutory text also explains why, contrary to Utah's view (at 45-46), the presumption against preemption does not apply. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016).

cannot apply any state laws that affect DCMs in any respect. That is mistaken. The CFTC's exclusive jurisdiction preempts state laws that "directly affect trading on or the operation of a futures market." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,* 977 F.2d 1147, 1156 (7th Cir. 1992). Contrary to Utah's view (at 37-38), laws of general applicability can have that forbidden impact as applied to transactions on DCMs; the common-law claims in *American Agriculture* are a quintessential example. But that does not mean the CEA preempts all state laws with some indirect impact on federal derivatives trading. Kalshi does not dispute, for instance, that many neutral state tax and contracting laws may continue to apply to it, just as they do under other express preemption schemes. *See De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 816 (1997) (generally applicable tax law not preempted by ERISA); *contra* Utah Br. 31-32. What the state *cannot* do is flatly criminalize trading on federal DCMs.

As a result, though Utah may not apply its gambling laws to ban DCMs from offering contracts the CFTC has permitted, the state may obviously continue to apply its laws to their underlying events, including the criminal laws listed (at 30-31). Nor has Kalshi ever suggested that using a DCM somehow "insulate[s]" traders from liability for state crimes. *Contra* Utah Br. 30. The relevant question is instead whether Utah may subject DCMs to

criminal penalties merely for offering certain contracts. It may not—the Special Rule reserves that power to federal regulators alone. 7 U.S.C. § 7a-2(c)(5)(C)(i).

In the end, Utah admits (at 34-35) that it does not violate the major questions doctrine or any other canon to recognize that, under Section 2(a), a state may not interfere with the CFTC's "regulatory functions" with respect to derivatives trading. Because that is precisely what Utah seeks to do, the major questions doctrine has no role to play.

### B. The CEA Also Impliedly Preempts Utah's Efforts To Regulate Swaps Traded On DCMs.

1. Utah's attempt to bar certain contracts from DCMs is also field-preempted. The CEA comprehensively regulates trading on DCMs, and Utah does not argue otherwise. Instead, it claims (at 36-37) to be exercising authority not over "direct derivatives regulation," but only gambling. That is wordplay. For over a century, states have argued that derivatives are a form of gambling. The point of the CEA's exclusive-jurisdiction provision was to foreclose those objections.

In all events, if banning contracts from federally designated markets is not direct derivatives regulation, nothing is. And the state's supposed intent is irrelevant because "[p]re-emption claims turn on *Congress's* intent." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 324 (2016) (emphasis added)

(citation omitted). By establishing a detailed federal scheme for determining when contracts may be traded on DCMs, Congress demonstrated its intent to supersede state laws that would restrict which contracts can be traded. So, "the scope of field preemption" is "the regulation of trading on a DCM" rather than "gambling" writ large. *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 229 (3d Cir. 2026).

Utah also argues (at 37-39) that laws explicitly targeting derivatives trading are preempted, while laws "aimed at [the] distinct and different evils" of gambling are not. *Napier v. Atl. Coast Line R. Co.*, 272 U.S. 605, 612 (1926). The Supreme Court has rejected similar reasoning. "Whatever the purpose" of a state law, preemption analysis turns on "the effect of the challenged state action on the pre-empted field," and here, Utah's staggering assertion of authority to ban certain instruments subject to exclusive CFTC authority overtakes the field completely. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992). By seeking to ban derivatives whose trading the CFTC permits, Utah is "regulating the same subject matter" as the agency: DCM-traded swaps. *Id.* at 105.

2. Utah's efforts are also conflict-preempted because they conflict with the "complete scheme of regulation" Congress established in the CEA. *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). Permitting states to "regulate the

futures markets themselves," *Am. Agric.*, 977 F.2d at 1156, in direct contravention of Congress's opposite goal in the 1974 amendments, would frustrate Congress's "purposes and objectives," *Hines*, 312 U.S. at 67. State-by-state regulation would "fragment a national pool of liquidity" and increase manipulation opportunities, splinter and render ineffectual regulatory oversight, and permit a single outlier state to shut down event-contract markets across the country. DCM Impartial Access Requirements, 91 Fed. Reg. 72,407, 72,409 (Nov. 10, 2026). And applying criminal penalties where federal law contemplates only civil penalties raises a recognized conflict. *Arizona v. United States*, 567 U.S. 387, 403 (2012); *contra* Utah Br. 44 (objecting that the Special Rule does not empower the CFTC "to criminalize conduct or enforce criminal gambling laws").

Utah primarily responds by contending that the CFTC's impartial-access rule permits geographic restrictions on DCMs. Though Utah relies (at 41) on outdated CFTC commentary, the agency recently issued guidance confirming that the "CEA and Commission Regulations generally do not permit a DCM to limit access based on the location of an otherwise eligible market participant within the United States," because "[l]imiting access by geographic location raises significant concerns for both financial integrity and risk management within derivatives markets." 91 Fed. Reg. at 72,409.

This Court should afford serious weight to the CFTC's considered interpretation of its impartial-access rule. *See Walker v. BOKF, Nat'l Ass'n*, 30 F.4th 994, 1013 (10th Cir. 2022) (deferring to agency's interpretation of its own regulations in analogous interpretive guidance under *Kisor v. Wilkie*, 588 U.S. 558 (2019)).

Further demonstrating its insistence on nationwide marketplaces, the CFTC also issued two orders, under its independent statutory power to prevent market emergencies, 7 U.S.C. § 12a(9), barring Kalshi from cancelling contracts in response to state court orders in Michigan and New York.[5] Kalshi cannot comply with Utah's prohibitions on event contracts without violating these mandates. Utah's recent criminal indictment of Kalshi, *State v. KalshiEX LLC*, No. 261912852 (Utah 3d Dist. Ct. filed Oct. 28, 2026), and the CFTC's immediate TRO motion to block Utah's efforts, Pls.' Mot. for TRO & Prelim. Inj., *United States v. Utah*, No. 2:26-cv-1055-RJS (D. Utah Oct. 29, 2026), Dkt. No. 7, even more dramatically illustrate the conflict.

---

[5] Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents*, CFTC (July 14, 2026), https://perma.cc/GV5X-M9PQ; Christopher J. Kirkpatrick, *Order Directing Kalshi to Continue Exercising DCM Functions*, CFTC (Aug. 11, 2026), https://perma.cc/C6NW-4KFM.

Utah responds (at 42) that the CFTC cannot issue orders that conflict with directives of federal or state courts. But Kalshi cannot disobey the mandates of its federal regulator merely because *Utah* believes that the CFTC had no authority to issue those orders in the first place. Doing so would risk serious consequences, including fines to the tune of $500,000 a day, imprisonment, and revocation of its DCM designation. 7 U.S.C. §§ 8(b), 13a.

When federal law tells a party to do X, and state law commands not-X, the Supremacy Clause resolves that dilemma. The Court should reverse the decision below and liberate Kalshi from this impossible position.

## II. KALSHI'S CONTRACTS ARE SWAPS SUBJECT TO THE CFTC'S EXCLUSIVE JURISDICTION.

The district court did not decide whether Kalshi's contracts are swaps within the scope of the CFTC's exclusive jurisdiction, because it held that the CEA does not preempt any state gaming laws regulating any derivatives. Add-12. Although Utah invites this Court to affirm on an alternative ground (at 46-53), the district court can best address the question on remand, especially given that recent and impending CFTC regulatory actions are materially changing the governing legal rules. As particularly relevant, a recently issued Notice of Proposed Rulemaking confirming the CFTC's longstanding view that sports-event contracts are "swaps" will render Utah's textual arguments irrelevant, given the agency's expressly delegated power

to "further define" the term. *See* Further Definition of "Swap"—Inclusions, 91 Fed. Reg. 66,022 (Oct. 19, 2026); 15 U.S.C. § 8302(d)(1). Moreover, Utah concedes (at 47) that *some* of Kalshi's contracts qualify as swaps, so reversal is required regardless of how this Court resolves the swap question.

In any event, Kalshi's contracts are swaps.

1. As an initial matter, the CFTC's recent NPRM defining "swaps" to include "event contracts" involving "sports" will dispose of Utah's arguments once finalized. Utah does not address this NPRM, presumably because it lacks a response. Congress expressly delegated to the CFTC and the SEC the authority to "further define" "swap." 15 U.S.C. § 8302(d)(1); *see id.* §§ 8321(a)(2), (b). Congress therefore granted the agencies "primary responsibility" for defining that term, *Batterton v. Francis*, 432 U.S. 416, 425 (1977), and with good reason: Expert regulators are best-positioned to assess which instruments qualify as derivatives, *see Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 182-183 (2025).

The CFTC and SEC have now exercised their expressly delegated authority to conclude that event contracts, including sports-event contracts, constitute swaps. First, based on the behavior of institutional traders, hedgers, exchanges, market makers, and more, the agencies determined that "[m]arket participants have" "overwhelmingly recognized that event

contracts are swaps," so they fall under Section 1a(47)(A)(iv) as instruments "commonly known to the trade as a swap." 91 Fed. Reg. at 66,025-26. Second, the agencies confirmed that sports-event contracts also qualify as contracts because they are "associated with potential economic consequences" including "additional ticketing revenue," "sports team[s'] valuation[s]," "bonuses," and "[b]usiness promotions." *Id.* at 66,029.

Once finalized, the proposed rule will provide an independent basis to conclude that Kalshi's event contracts are swaps and will render Utah's textual arguments irrelevant. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-395 & n.5 (2024) (preserving explicit delegations of statutory authority); *Batterton*, 432 U.S. at 425-426 (where Congress "expressly delegated" definitional authority, an agency's construction "can be set aside only" as exceeding its statutory authority or arbitrary and capricious).

2. In any event, Kalshi's contracts qualify as swaps under the current regime. The swap definition "reads about as broadly as it could," *Coinbase Fin. Mkts., Inc. v. Raoul*, No. 1:25-cv-15406, 2026 WL 2969682, at *7 (N.D. Ill. Oct. 2, 2026), including not just any contract where payment depends on the occurrence of an "event" associated with "potential" financial consequences, but also any instrument that is or becomes known to the trade as a swap, 7 U.S.C. §§ 1a(47)(A)(ii), (iv). This breadth was intentional.

Congress added "swaps" to Section 2(a)'s exclusive jurisdiction provision in 2010 in response to the Great Recession, which it attributed in large part to unregulated trading in "credit default swaps," among other "risky bets." *Raoul*, 2026 WL 2969682, at *4. Because the crisis arose from "unforeseen risks," Congress defined swaps to include "risky financial instruments [that] might arise unexpectedly in the future, too." *Id.* at *9; *see* 15 U.S.C. § 8321(b) (directing the CFTC to further define the term "swap" to capture entities "structured to evade" the CEA). Congress therefore chose a statutory definition broad enough to defy creative efforts to escape regulation.

Utah responds (at 47-48) that Kalshi's contracts involve "outcomes" rather than "occurrences" or "events," but those terms mean the same thing, as Utah's selected definitions confirm. *See Burrage v. United States*, 571 U.S. 204, 212 (2014) (observing that "it is natural to say that one event is the outcome ... of another"). The term "occurrences" thus clarifies that "the provision's reach depends on whether an event happens in full, in part, or not at all"; it does not impose some additional requirement. *KalshiEX LLC v. Schuler*, 192 F.4th 664, 685 (6th Cir. 2026). And Utah's proposed distinction falters when applied to other derivatives as much as to sports-event contracts because any event can be described as the outcome of

another; a credit-default swap depends on the *event* of default, which is also the *outcome* of a company failing to make timely payments on its debt.

Utah's assertion that sports events are not "associated with" "potential" financial consequences is equally untenable. Sports is a $2.5-trillion-plus[6] industry. Utah's attempt to dismiss (at 50) the vast economic consequences of sports as "downstream" fails because *all* consequences are downstream—that is what makes them consequences. A weather event's economic impact, for example, turns on its downstream consequences for an agricultural harvest, property values, tourism, or insurance rates.

3. Utah insists that Kalshi's and the CFTC's interpretation renders the swap definition limitless. But Utah simply ignores the concrete limits that Kalshi has described (at Opening Br. 42-46): Swaps must be tradable and carry a "concrete and articulable" association with financial consequences of "some significance and materiality." *Raoul*, 2026 WL 2969682, at *8. To be sure, whether an event is associated with potential economic consequences is not a bright line. But the CEA assigns the line-drawing exercise to the CFTC, not the states. If states believe the CFTC has wrongly approved a contract, they may sue the agency under the APA. But they cannot arrogate

[6] Al Tylis et al., *The Financing Gap in Sports: Unlocking a $2.5 Trillion Opportunity* 3, Apollo (Dec. 2025), https://perma.cc/483U-HSQW.

to themselves the power to define a swap by making their own judgments, instrument-by-instrument and case-by-case, about which economic consequences are sufficiently concrete and direct to qualify.

While Utah cherry-picks (at 51) certain contracts that it does not believe qualify as swaps, it has sought to categorically bar *all* Kalshi's contracts involving sports, politics, culture, and more. The district court did not consider any particular contracts and instead held that Utah could ban *all* sports-event contracts. Because Utah is plainly incorrect that sports events categorically lack economic consequences, reversal is required.

Utah contends (at 33) that if sports-event contracts are swaps, every sports bet must be traded on an exchange. The CFTC's recently issued regulation refutes that reasoning. Employing the agency's express power to "further define" the term swap, the CFTC reaffirmed its "longstanding position that casino-style gambling products" are not swaps because they "do not bear the structural characteristics of a CEA-regulated derivative" and are not "inherently tradable." Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969, 65,971-73 (Oct. 19, 2026). The rule rejects the "erroneous premise" proposed by states "that if event contracts are swaps, then casino-style gambling products must also be swaps." *Id.* at 65,971; *see also* Further Definition of "Swap," 77 Fed. Reg.

48,208, 48,214 (Aug. 13, 2012) (adopting similar exclusion from the "swap" definition for state-regulated insurance products). Accordingly, there is no risk that treating event contracts as swaps would sweep off-exchange gambling activity onto DCMs.

The rule's distinction between tradable and non-tradable instruments is firmly rooted in the statutory text and purpose. Multiple CEA provisions "presuppose that derivatives are tradable instruments." 91 Fed. Reg. at 65,973. Section 2(e) makes it unlawful for retail participants to enter a swap unless executed on, or subject to the rules of, a DCM. Section 2(a)(1)(A) confers exclusive jurisdiction over transactions involving swaps *traded* on DCMs. Section 2(h) requires swaps to be cleared, rendering them tradable. And Core Principle 9 requires exchanges to "protect[ ] the price discovery process of trading in the centralized market." 7 U.S.C. § 7(d)(9). Because swaps are traded between market participants, rather than entered into bilaterally with a house or sportsbook, the market sets their prices and they can be used for hedging and price discovery. Indeed, contrary to Utah's view (at 50), the ever-growing record of hedging on Kalshi, Opening Br. 41-42,

underscores that "layperson[s]" associate sports events with financial consequences.[7]

Further, Utah mistakenly assumes that the swap definition is the *only* limit on what can be traded on a DCM. The CEA is not a lone swap definition existing in isolation; it is a constellation of provisions that operate in harmony. Congress chose broad language in some provisions and limited its scope in others. *See Fischer v. United States*, 603 U.S. 480, 490 (2024) ("limiting the broad language in light of narrower terms" found elsewhere in the statute). Besides the tradability requirement, the CEA includes other limits; DCMs cannot list contracts susceptible to manipulation, 7 U.S.C. § 7(d)(3); 17 C.F.R. § 38.251(a), or those incapable of trading in interstate commerce, *see* 7 U.S.C. § 5(a). And the CFTC may prohibit all gaming-related contracts that it determines are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(ii).

As a last gasp, Utah asserts (at 25-26, 30-32) that Kalshi's contracts should be barred because they resemble traditional gambling. But as just

[7] Utah's argument (at 10) that Kalshi's contracts function as bets against the house also fails. Kalshi Trading—a separate market-making entity that does not share information with KalshiEX, the DCM—has accounted for less than 2% of trading on Kalshi this year, and its participation does not change the structure through which traders exchange with each other via the bid-and-ask process. Kalshi, Comment Letter on Conflicts and Affiliations (Oct. 5, 2026), https://perma.cc/Z5Z7-H8LV.

explained, any resemblance between derivatives and run-of-the-mill gambling is surface-level. The reality is that states have long sought to regulate derivatives as "gambling in grain," *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933), and through the early 1970s, many continued to treat futures trading as gambling, *e.g.*, 1973 Ill. Laws 3276. Congress decisively ended those efforts in 1974 to promote uniform interstate derivatives markets. *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1974); H.R. Rep. No. 93-975, at 54 (1974).[8] And in 2010, Congress placed all swaps within that framework. All along the way, Congress has been aware that states may describe derivatives as "gambling" to regulate them and yet has consistently rebuffed that gambit.

It is Utah's view, not Kalshi's, that would upend the financial regulatory system. The federal government actively brings civil and criminal enforcement actions for insider trading and other manipulative activity associated with event contracts, including overseas. CFTC Br. 7-8, Dkt. No. 34. But if event contracts fall outside the CEA's coverage, those prosecutions will cease, leaving a "massive regulatory vacuum." *Id.* at 26.

---

[8] That legislative history contradicts Utah's view (at 15) that uniformity is not a CEA goal. *See Am. Agric.*, 977 F.2d at 1156.

## III. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI.

This Court's "usual practice is to remand for the district court to reweigh all four elements anew" if it reverses on the likelihood-of-success prong. *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 908 (10th Cir. 2022). Kalshi has no objection to that approach here. But if this Court reaches the remaining factors, they also favor an injunction.

Utah cannot dispute that absent preliminary relief, Kalshi faces a "Hobson's choice" between exposure to "huge liability" and "suffer[ing] the injury of obeying the [state] law" during this appeal. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Utah doubts (at 15) the CFTC's ability to punish Kalshi for noncompliance with its orders, but the agency unquestionably may impose severe penalties on DCMs. 7 U.S.C. §§ 8(b), 13a. Utah also argues (at 55) that Kalshi's impending economic harms will not destroy its business, but that is not the test; because sovereign immunity prevents Kalshi from recovering financial losses from Utah, those harms are irreparable. *United States v. New York*, 708 F.2d 92, 93-94 (2d Cir. 1983) (per curiam); *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (per curiam). Utah's recent criminal indictment severely exacerbates these harms. *See Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1225 (10th Cir. 2009) (possibility of criminal conviction demonstrates irreparable injury).

Utah, by contrast, is not irreparably harmed. It can continue to prohibit conventional gambling, as it always has. But since 1974, it has been barred from prohibiting trading on DCMs, even when it thinks that trading is gambling. The equities favor maintaining that status quo.

## CONCLUSION

This Court should reverse the district court's grant of summary judgment to Defendants and denial of preliminary relief to Kalshi.

November 12, 2026

Respectfully submitted,

<u>*/s/ Neal Kumar Katyal*</u>

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff-Appellant*
*KalshiEX LLC*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,493 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(B).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and Circuit Rule 32(A) because this brief has been prepared in 14-point Georgia font using Microsoft Office Word for Office 365.

November 12, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on November 12, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by CM/ECF.

November 12, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Plaintiff-Appellant*
*KalshiEX LLC*